UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MALCOLM H. WIENER, <br><br>    Plaintiff, <br><br> v. <br><br> AXA EQUITABLE LIFE INSURANCE COMPANY, DAVID HUNGERFORD, AXA ADVISORS, LLC, and AXA NETWORK, LLC, <br><br>    Defendants. | Civil Action No.: 1:16-cv-04019-ER <br><br><br><br><br><br><br><br> August 12, 2016 |

## **THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

The Plaintiff, MALCOLM H. WIENER ("Plaintiff") by and through his attorneys, Saxe Doernberger & Vita, P.C., as and for its Complaint, alleges upon information and belief as follows:

## **THE PARTIES**

1.      Plaintiff is a citizen of the State of Connecticut, who presently resides at 66 Vista Drive, Greenwich Connecticut 06830.

2.      Upon information and belief, AXA Equitable Life Insurance Company ("AXA Equitable") is an insurance company duly organized and existing under the laws of the State of New York with its principal place of business located at 1290 Avenue of the Americas, 13th Floor, New York, New York 10104.

3.      Upon information and belief, David Hungerford ("Hungerford") is a citizen of the State of New York, who presently resides at 241 Eaton Lane, West Islip, New York 11795.

4.      Upon information and belief, AXA Advisors, LLC ("AXA Advisors") is a financial services company duly organized and existing under the laws of the State of Delaware with its principal place of business located at 1290 Avenue of the Americas, New York, New York 10104.

5.      Upon information and belief, AXA Network, LLC ("AXA Network") is a financial services company duly organized and existing under the laws of the State of Delaware with its principal place of business located at 1290 Avenue of the Americas, New York, New York 10104.

## JURISDICTION AND VENUE

6.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that the Plaintiff and Defendants are citizens of different states, the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and the matter presents a case of actual controversy between the parties.

7.      Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391 since a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

8.      Defendants transact business in this State and are subject to the jurisdiction of this Court.

## FACTUAL ALLEGATIONS

### The Policies

9.     Plaintiff acquired a series of flexible premium life insurance policies from AXA Equitable (collectively, the "Policies") as follows:

   a.     On or about October 14, 1986, policy number 36 224 259 (attached hereto as "Exhibit A") in the amount of Nine Million Dollars ($9,000,000.00), which on or about November 30, 1987 was reduced to Seven Million Two Hundred Thousand Dollars ($7,200,000.00);

   b.     On or about May 14, 1987, policy number 37 205 147 (attached hereto as "Exhibit B") in the amount of Nine Million Dollars ($9,000,000.00), which on or about November 30, 1987 was reduced to Seven Million Two Hundred Thousand Dollars ($7,200,000.00); and

   c.     On or about May 14, 1987, policy number 37 205 155 (attached hereto as "Exhibit C") in the amount of Two Million Dollars ($2,000,000.00), which on or about November 30, 1987 was reduced to One Million Six Hundred Thousand Dollars ($1,600,000.00).

10.     The Policies are universal life insurance plans that stay in effect throughout Plaintiff's life provided that the conditions of the Policies are met.

11.     Plaintiff was born on July 3, 1935 and purchased the policies at Fifty-One (51) years of age.

12.     Plaintiff resided in Greenwich, Connecticut at the time the Policies were issued.

13.     AXA Advisors and AXA Network are affiliated companies of AXA Equitable.

14.   AXA Advisors and AXA Network are financial services and consulting companies.

15.   Upon information and belief, AXA Equitable assigns professionals from AXA Advisors and/or AXA Network to serve as agents of record on life insurance policies.

16.   Hungerford is an agent and/or representative of AXA Equitable.

17.   Hungerford is an agent and/or representative of AXA Advisors and AXA Network.

18.   Hungerford is a retirement planning specialist and financial advisor assigned to the Policies by AXA Equitable to serve as the agent of record on the Policies.

19.   Hungerford held himself out as Plaintiff's agent and/or representative on the Policies.

20.   Upon information and belief AXA Advisors, AXA Network and/or Hungerford sold Plaintiff the Policies.

21.   Hungerford was responsible for servicing and maintenance of the Policies on behalf of the Plaintiff.

22.   Hungerford acted as Plaintiff's advocate whenever any action needed to be taken with respect to the Policies, including but not limited to handling reinstatement requests.

23.   Hungerford was responsible for advising Plaintiff with respect to the financial management of the Policies.

24.   Plaintiff's former company, Millburn Corporation ("Millburn"), a New York company, was responsible for maintaining the Policies on Plaintiff's behalf, including paying any and all premiums.

25.     Plaintiff, through Millburn, relied on Hungerford's advice in maintaining the Policies.

26.     Millburn's business address was designated as the mailing address for the Policies.

27.     Upon information and belief, on or about March 4, 2009, AXA Equitable instituted a change of address for the Policies, wherein the mailing address was changed from Millburn's address to Plaintiff's personal residence.

28.     Beginning on or about March 4, 2009, Plaintiff proceeded to forward any and all mail relating to the Policies received at his personal residence directly to Millburn.

29.     The Policies provide for semi-annual premium payments due on the first day of May and the first day of November of each year.

30.     Pursuant to the express terms of the Policies, AXA Equitable is required to send a premium reminder notice to Plaintiff's last known address prior to each premium due date.

31.     The Policies require that Plaintiff maintain the cash value of the Policies at a level sufficient to cover the cost of monthly deductions.

32.     Pursuant to the express terms of the Policies, if upon any monthly anniversary the cash value of the Policies is insufficient to cover the cost of monthly deductions, AXA Equitable is required to send a policy lapse notice to Plaintiff's last known address informing Plaintiff of the calculated shortfall and resultant premium payment needed to prevent the Policies from lapsing.  The only way Plaintiff or Millburn would know whether there was a premium shortfall and in what amount is by receipt of

the policy lapse notice from AXA Equitable. The Policies further provided Plaintiff a Sixty One (61)-day grace period in which to make such payment.

33. AXA Equitable copied Hungerford on all correspondence with Plaintiff, including all premium reminder notices and policy lapse notices.

34. Despite being copied on all policy lapse notices, Hungerford never advised Plaintiff as to how to properly maintain the Policies nor took any steps to ensure Plaintiff knew about the lapse notices, nor took any steps to prompt Plaintiff to make the required payment(s) to AXA Equitable.

35. From the time the Policies were issued to the present date, Plaintiff has paid in excess of Three Million Dollars ($3,000,000.00) in premiums.

36. Plaintiff's intention was, and remains, to continue to pay premium as required by the terms of the Policies.

**AXA Equitable's Conduct in Terminating the Policies**

37. On or about December 2, 2013, when Plaintiff was Seventy Eight (78) years old, Plaintiff received by way of regular mail a notice of policy termination from AXA Equitable for each of the Policies (attached hereto as Exhibit D) along with an application for reinstatement.

38. The purpose of the application for reinstatement as stated on the application form is to "[p]rovide a preliminary indication of [Plaintiff's] insurability[.]"

39. The Policy states that AXA Equitable has the discretion to approve a reinstatement application if the "evidence of insurability" provided by Plaintiff is "satisfactory" to AXA Equitable.

40.     Prior to December 2, 2013, Plaintiff had not received any notice that either the cash value of the Policies was insufficient to cover the cost of monthly deductions or that premium was past due, nor was Plaintiff advised of the amount due and owing at that time.

41.     Immediately upon receipt of the policy termination notices, Plaintiff contacted Hungerford and expressed the intention to immediately tender the missing payments to AXA Equitable.

42.     Hungerford advised Plaintiff against sending the payment, and instead advised Plaintiff complete the application for reinstatement and submit the requested medical evidence of insurability.

43.     In reliance upon Hungerford's advice and guidance, Plaintiff set about to complete the application for reinstatement and submitted the same to AXA Equitable along with the requested medical evidence of insurability.

44.     On or about December 23, 2013, Plaintiff submitted the reinstatement application complete with the required medical evidence of insurability.

45.     Hungerford took steps, as Plaintiff's agent and/or representative, to pursue reinstatement of the Policies.

46.     AXA Advisors took steps, as Plaintiff's agent and/or representative, to pursue reinstatement of the Policies.

47.     On or about February 21, 2014, Millburn, on behalf of Plaintiff, sent a letter to AXA Equitable informing AXA Equitable that a premium reminder notice was never received by Plaintiff or Millburn and enclosed a premium payment in the form of a single check in the amount of Ninety Six Thousand Ninety Three Dollars ($96,093.00) (attached

hereto as Exhibit E). That figure was based on the last premium payment notice in Plaintiff's and Millburn's possession, which was dated July 1, 2013.

48. On or about February 21, 2014, AXA Equitable accepted and cashed Plaintiff's check.

49. On or about February 27, 2014, Hungerford sent an email to Millburn stating that he was pursuing reinstatement of the Policies (attached hereto as Exhibit F).

50. On or about March 3, 2014, Millburn, on behalf of Plaintiff, contacted AXA Equitable to advise that Plaintiff had not received a premium payment notice since July 1, 2013, to contest the termination of the Policies by AXA Equitable on December 2, 2013, and to request that the Policies be reinstated.

51. On or about March 5, 2014, AXA Equitable sent Plaintiff three separate AXA Equitable checks, purporting to refund Plaintiff's February 21, 2014 payment, which they had previously accepted and deposited, along with a notice stating that Plaintiff's reinstatement application was still under the consideration of AXA Equitable's underwriting department.

52. On or about March 5, 2014, in response to Millburn's March 3, 2014 inquiry, AXA Equitable sent a letter to Plaintiff (attached hereto as Exhibit G), enclosing policy lapse notices allegedly generated and sent to Plaintiff on October 1, 2013, stating that the termination of the Policies was valid, that a premium reminder notice was not sent out because it is AXA Equitable's policy to not send out premium reminder notices during policy provided grace periods, that reinstatement of the Policies would not be considered absent evidence of medical insurability, and that AXA Equitable would continue monitoring the status of Plaintiff's December 23, 2013 reinstatement application.

53.     The copies of the October 1, 2013 policy lapse notices attached to AXA Equitable's March 5, 2014 letter constitute the first time Plaintiff ever received notice that the Policies' cash value was insufficient on October 1, 2013 or of the amount of premium payment required to keep the Policies in force.

54.     On or about March 24, 2014, AXA Equitable sent a notice to Plaintiff formally declining Plaintiff's reinstatement application, stating only that "[t]he decision results from our evaluation of specific items of information obtained from you in your application, or supplements to the application statements: specifically information received from Dr. Barry Boyd" (attached hereto as Exhibit H).

55.     On behalf of Plaintiff, Hungerford requested that AXA Equitable produce copies of the medical records provided by Dr. Barry Boyd, which AXA Equitable supposedly relied upon in denying Plaintiff's reinstatement application.

56.     AXA Equitable refused to provide copies of the medical records provided by Dr. Barry Boyd as Hungerford requested on Plaintiff's behalf.

**AXA Equitable's Inconsistent Conduct in Evaluating
Plaintiff's Reinstatement Application**

57.     On or about June 2, 2008, Policy number 37 205 155 terminated in the same manner that the Policies terminated on or about December 2, 2013.

58.     On or about June 2, 2008, AXA Equitable sent Plaintiff a termination notice with an identical application for reinstatement.

59.     On or about June 24, 2008, Plaintiff filled out the application for reinstatement and submitted it to AXA Equitable.

60.     On or about August 13, 2008 AXA Equitable approved Plaintiff's June 24, 2008 reinstatement application.

61.     AXA Equitable's approval of Plaintiff's June 24, 2008 reinstatement indicates that AXA Equitable determined Plaintiff was insurable at that time.

62.     AXA Equitable did not request any medical records in order to process the June 24, 2008 reinstatement application.

63.     Plaintiff's health did not differ in any material manner between June 2008 and December 2013.

64.     Plaintiff is and has been ready, willing and able to pay any and all outstanding premium amounts owed on the Policies.

65.     AXA Equitable has refused any and all of Plaintiff's attempts to make payment and reinstate the Policies.

66.     Despite significant efforts, Plaintiff has been unable to secure replacement life insurance coverage.

### COUNT I – DECLARATORY AND INJUNCTIVE RELIEF AGAINST AXA EQUITABLE

67.     The allegations of paragraphs 1 through 66 are hereby repeated and re-alleged as if fully set forth herein.

68.     AXA Equitable failed to send a policy lapse notice to Plaintiff on or before October 1, 2013, which is a condition precedent to declaring the Policies terminated for nonpayment of premium.

69.     AXA Equitable failed to send a premium reminder notice for the November 1, 2013 premium due date, as is required by the express terms of the Policies.

70.     AXA Equitable wrongfully terminated the Policies on December 2, 2013.

71.     An actual case and justiciable controversy exists between Plaintiff and AXA Equitable regarding whether AXA Equitable is obligated to reinstate the Policies, and a

declaratory judgment pursuant to Conn. Gen. Stat. §52-29, is necessary and appropriate to determine the rights and duties of Plaintiff and AXA Equitable concerning the Policies.

72.     Plaintiff seeks a declaration that the Policies remain in force pursuant to Conn. Gen. Stat. §52-29.

## COUNT II – EQUITABLE REINSTATEMENT AGAINST AXA EQUITABLE

73.     The allegations of paragraphs 1 through 66 are hereby repeated and re-alleged as if fully set forth herein.

74.     Enforcing the termination of the Policies will result in Plaintiff suffering a disproportionate forfeiture, given the over Three Million Dollars ($3,000,000.00) paid into the Policies over twenty-six years, Plaintiff's prompt tender of the missing policy payments after receiving notice that payment had not been made, and Plaintiff's inability to secure replacement life insurance coverage.

75.     AXA Equitable's conduct in withholding the October 1, 2013 policy lapse notice and the premium reminder notice for the November 1, 2013 premium due date prevented Plaintiff from curing the lapse of the Policies prior to the December 1, 2013 grace period expiration date, thereby bringing about the termination of the Policies.

76.     AXA Equitable's conduct in withholding the October 1, 2013 policy lapse notice and the premium reminder notice for the November 1, 2013 premium due date was intended to mislead Plaintiff as to the status of the Policies.

77.     AXA Equitable's conduct in withholding the October 1, 2013 policy lapse notice and the premium reminder notice for the November 1, 2013 premium due date indicates AXA Equitable's intent to leverage the lapsed status of the Policies in order to bring about the termination of the Policies and thereby evade responsibility for payment

of the Policies' significant death benefits while simultaneously retaining the benefit of decades of premiums.

78.     Plaintiff relied on the receipt of policy lapse notices and premium reminder notices to ascertain the status of the Policies, to determine if any premiums were owed, and, if so, to learn the proper amount to pay AXA Equitable.  Without said notice, Plaintiff would not know if any payment was due nor the amount of such required payment.

79.     AXA Equitable knew or should have known that Plaintiff relied upon AXA Equitable to provide the aforementioned policy lapse notices and premium reminder notices.

80.     AXA Equitable's conduct in assigning Hungerford as the financial advisor on the Policies, and Hungerford's conduct in failing to advise Plaintiff on the proper financial management of the Policies to avoid their lapse, after having led Plaintiff and Millburn to rely on the receipt of such advice, ensured that Plaintiff would be in the position where a single missed policy lapse notice would bring about the termination of the Policies, and thereby allow AXA Equitable to evade responsibility for payment of the Policies' significant death benefits while simultaneously retaining the benefit of decades of premiums.

81.     AXA Equitable knew or should have known that Plaintiff would rely on Hungerford to provide advice with respect to how to financially manage the Policies to keep them from lapsing.

82.     Plaintiff's failure to remit payment of the outstanding premiums prior to December 2, 2013 was unintentional, as Plaintiff was not aware that any premiums were outstanding.

83.     Plaintiff's failure to remit payment of the outstanding premiums prior to December 2, 2013 was a direct result of AXA Equitable's failure to issue the October 1, 2013 policy lapse notice and the premium reminder notice for the November 1, 2013 premium due date, and Hungerford's conduct in failing to advise Plaintiff with respect to how to financially manage the Policies to keep them from lapsing.

84.     Plaintiff had no other reasonable means of determining the status of the Policies, and the amount of payments due to AXA Equitable, other than relying on the receipt of notices from AXA Equitable, and/or the receipt of advice from Hungerford.

85.     Plaintiff's failure to remit payment of the outstanding premiums prior to December 2, 2013 did not prejudice AXA Equitable as Plaintiff was ready, willing and able to remit full payment for any outstanding premiums upon notice that the Policies' cash value was insufficient, and in fact did tender such a payment to AXA Equitable upon receiving notice of same.

86.     Plaintiff's payment would have been tendered more promptly had Hungerford not advised Plaintiff against sending said payment.

87.     AXA Equitable accepted Plaintiff's premium payment on or about February 21, 2014.

88.     AXA Equitable will not suffer any substantial or undue prejudice from reinstatement of the Policies since (1) Plaintiff is ready, willing, and able to pay all outstanding premiums with interest; and (2) AXA Equitable has indicated its willingness to reinstate the Policies if Plaintiff provided "evidence of medical insurability."

89.     AXA Equitable's willingness to reinstate the Policies upon receipt of "evidence of medical insurability" shows that AXA Equitable claimed and suffered absolutely no financial prejudice as a result of the minor delay in receipt of the payment.

90.     Plaintiff is ready, willing and able to pay any and all outstanding premiums, with interest, needed to reinstate the Policies, and AXA Equitable will therefore suffer no prejudice whatsoever from the delay in receiving payment.

91.     Just as AXA Equitable inadvertently accepted Plaintiff's payment on February 21, 2014 and attempted to refund said payment at a later date, Plaintiff should be afforded the same leniency in inadvertently failing to tender payment by December 2, 2013, considering Plaintiff's lack of knowledge that said payment was due and the conduct of the Defendants mentioned herein.

92.     Plaintiff has provided the required evidence of medical insurability.

93.     AXA Equitable determined Plaintiff was insurable in June 2008, and Plaintiff's health at the time of his reinstatement application in December 2013 had not changed in any material way since that time.

94.     In light of the aforementioned circumstances surrounding Plaintiff's failure to pay the outstanding premiums prior to December 2, 2013, Plaintiff seeks equitable reinstatement of the Policies.

### COUNT III – BREACH OF CONTRACT AGAINST AXA EQUITABLE
### (Failure to Send October 1, 2013 Policy Lapse Notice)

95.     The allegations of paragraphs 1 through 66 are hereby repeated and re-alleged as if fully set forth herein.

96.     AXA Equitable failed to send a policy lapse notice to Plaintiff's last known address when, on October 1, 2013, the value of the Policies was insufficient to cover the monthly deductions.

97.     AXA Equitable's conduct in withholding the October 1, 2013 policy lapse notice is a breach of the express terms of the Policies.

98.     AXA Equitable's breach prevented Plaintiff from remitting timely payment for the premium owed as of October 1, 2013, as a result of which Plaintiff has suffered damages in the form of the terminated Policies.

99.     Plaintiff seeks to be put back in the position it was in prior to AXA Equitable's breach by having the Policies reinstated.

### COUNT IV – BREACH OF CONTRACT AGAINST AXA EQUITABLE
### (Failure to Send November 1, 2013 Premium Reminder Notice)

100.     The allegations of paragraphs 1 through 66 are hereby repeated and re-alleged as if fully set forth herein.

101.     AXA Equitable failed to send out a premium reminder notice for the November 1, 2013 premium due date.

102.     AXA Equitable's conduct in withholding the premium reminder notice is a breach of the express terms of the Policies.

103.     Plaintiff has suffered damages as a result of AXA Equitable's breach in the form of the terminated Policies.

104.     Plaintiff seeks to be put back in the position it was in prior to AXA Equitable's breach by having the Policies reinstated.

## COUNT V – WAIVER AGAINST AXA EQUITABLE

105.   The allegations of paragraphs 1 through 66 are hereby repeated and re-alleged as if fully set forth herein.

106.   AXA Equitable accepted Plaintiff's premium payment on February 21, 2014 during its evaluation of Plaintiff's reinstatement application.

107.   Plaintiff reasonably relied on the cashing of the premium payment check as an indication that AXA Equitable approved reinstatement of the Policies and/or was not going to insist on the termination of the Policies.

108.   AXA Equitable's conduct in accepting the premium payment with knowledge that Plaintiff's reinstatement was under review constitutes a waiver of its right to assert the terms and conditions of the Policies to reject Plaintiff's reinstatement application.

109.   AXA Equitable's conduct in accepting the premium payment with knowledge that the Policies had terminated for nonpayment of premium constitutes a waiver of its right to assert the terms and conditions of the Policies to insist on the Policies' terminations.

110.   AXA Equitable's conduct in accepting the premium payment with knowledge that the Policies had terminated for nonpayment of premium constitutes a waiver of Plaintiff's inadvertent failure to pay premium for the Policies by December 2, 2013.

## COUNT VI – VIOLATION OF CUTPA AGAINST AXA EQUITABLE

111.   The allegations of paragraphs 1 through 66 are hereby repeated and re-alleged as if fully set forth herein.

112.   At all relevant times hereto, AXA Equitable was engaged in the conduct of trade or commerce as defined by the Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. § 42-110a(4) and the Connecticut Unfair Insurance Practices Act (CUIPA), Conn. Gen. Stat. § 38a-815.

113.   At all relevant times hereto, AXA Equitable was an insurer as defined by the Connecticut Unfair Insurance Practices Act (CUIPA), Conn. Gen. Stat. § 38a-815.

114.   At all relevant times hereto, AXA Equitable was prohibited by CUTPA § 42-110b from engaging in unfair or deceptive acts or practices in the conduct of trade or commerce.

115.   AXA Equitable has engaged in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of CUIPA § 38a-816(1), CUTPA § 42-110b, and the public policy of the State of Connecticut by engaging in conduct including, but not limited to, the following:

a. Misrepresenting the benefits, advantages, terms or conditions of the Policies and/or making a misrepresentation for the purpose of inducing or tending to induce a forfeiture or lapse of the Policies by failing to send out the policy lapse notice and/or the premium reminder notice in order to procure the lapse and forfeiture of the Policies and avoid paying out the significant death benefits under the Policies, in violation of CUIPA § 38a-816(1)(a) and(f);

b. Misrepresenting the benefits, advantages, terms or conditions of the Policies and/or making a misrepresentation for the purpose of inducing or tending to induce a forfeiture of the Policies by offering,

and through Hungerford, encouraging Plaintiff to apply for reinstatement of the Policies and representing that the Policies will be reinstated upon "evidence of medical insurability" while not rendering such decisions upon medical considerations, but rather upon AXA Equitable's financial self-interest and/or unfair age discrimination, in violation of CUIPA § 38a-816(1)(a) and (f)

c. Failing to send out the policy lapse notice and/or premium reminder notice in order to procure the lapse and forfeiture of the Policies and avoid paying out the significant death benefits under the Policies, in violation of CUTPA § 42-110b; and/or

d. Employing the practice of not sending out premium reminder notices during policy-provided grace periods, which has the resulting and/or intended effect of procuring the lapse and forfeiture of variable premium life insurance policies, thereby allowing AXA Equitable to avoid paying out death benefits, in violation of CUTPA § 42-110b; and/or

e. Employing the practice of offering, and through its affiliate companies, encouraging its insureds to apply for reinstatement of variable premium life insurance policies, and representing that said policies will be reinstated upon "evidence of medical insurability" while not rendering such decisions upon medical considerations, but rather upon AXA Equitable's financial self-interest and/or unfair age discrimination, in violation of CUTPA § 42-110b.

116.   Such immoral, unethical, oppressive and/or unscrupulous conduct offends public policy as established by Connecticut statutes, common law and otherwise, including but not limited to Conn. Gen. Stat. § 38a-816.

117.   AXA Equitable's promise to send out premium reminder notices, as expressed in the Policies, constitutes a misrepresentation as to the terms and conditions of the Policies as AXA Equitable never intended on sending premium reminder notices during policy-provided grace periods, which AXA Equitable knew or reasonably should have known would mislead the Plaintiff and thereby result in the termination of the Policies.

118.   AXA Equitable's conduct in withholding the October 1, 2013 policy lapse notice and/or the November 1, 2013 premium reminder notice is an omission constituting a misrepresentation of fact as to the status of the Policies, which AXA Equitable knew or reasonably should have known would mislead the Plaintiff and thereby result in the termination of the Policies.

119.   AXA Equitable's immoral, unethical, oppressive and/or unscrupulous conduct as aforesaid is the proximate cause of the termination of the Policies, and has thereby caused significant injury to Plaintiff, which the Plaintiff could not reasonably have avoided.

120.   AXA Equitable's immoral, unethical, oppressive and/or unscrupulous conduct has no countervailing benefits to consumers or competition.

121.   AXA Equitable's immoral, unethical, oppressive and/or unscrupulous conduct was intended to rob Plaintiff of his rights and benefits under the Policies, namely

the pay out of death benefits to his beneficiaries, for which benefits Plaintiff has paid in excess of Three Million Dollars ($3,000,000.00) to date.

122.    AXA Equitable's immoral, unethical, oppressive and/or unscrupulous conduct reveals a reckless indifference to the rights of the Plaintiff and/or an intentional and wanton violation of those rights.

## COUNT VII – FRAUDULENT MISREPRESENTATION AGAINST AXA EQUITABLE

123.    The allegations of paragraphs 1 through 66 are hereby repeated and re-alleged as if fully set forth herein.

124.    AXA Equitable's statement in the Policies that it would provide premium reminder notices in advance of the semi-annual premium due date was a false representation of fact made to the Plaintiff in light of AXA Equitable's policy of not sending out premium reminder notices during policy provided grace periods.

125.    AXA Equitable knew that it would not provide a premium reminder notice during a policy provided grace period at the time it made the statement and did not inform the Plaintiff as such.

126.    AXA Equitable's promise to provide premium reminder notices was intended to induce Plaintiff to rely on the receipt of said notices during policy-provided grace periods in order to increase the likelihood that Plaintiff would fail to make payment within the grace period and thereby bring about the termination of the Policies so that AXA Equitable could avoid payment of the significant death benefits under the Policies while simultaneously retaining the benefit of the premiums paid thereunder.

127.    Plaintiff relied on the receipt of premium reminder notices to ascertain the status of the Policies, to determine if any premiums were owed, and, if so, to learn the

proper amount to pay to AXA Equitable. Without said notice, Plaintiff would not know if any payment was due nor the amount of such required payment.

128. Plaintiff's reliance on AXA Equitable's promise to send out a premium reminder notice brought about Plaintiff's failure to remit payment of the outstanding premiums prior to December 2, 2013, to Plaintiff's detriment.

### COUNT VIII – BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING (BAD FAITH) AGAINST AXA EQUITABLE

129. The allegations of paragraphs 1 through 66 are hereby repeated and re-alleged as if fully set forth herein.

130. The Policies are contractual agreements which contain an implied covenant of good faith and fair dealing, requiring AXA Equitable to deal honestly and in good faith with Plaintiff.

131. AXA Equitable's conduct in withholding the October 1, 2013 policy lapse notice and/or the premium reminder notice for the November 1, 2013 premium due date was purposeful and was intended to procure the termination of the Policies so that AXA Equitable could avoid payment of the significant death benefits owed under the Policies.

132. AXA Equitable's conduct in assigning Hungerford as the financial advisor on the Policies, and Hungerford's conduct in failing to advise Plaintiff with respect to how to financially manage the Policies to keep them from lapsing, after having led Plaintiff and Millburn to rely on the receipt of such advice, was purposeful and intended to ensure that Plaintiff would be in the position where a single missed policy lapse notice would bring about the termination of the Policies, and thereby allow AXA Equitable to evade responsibility for payment of the Policies' significant death benefits while simultaneously retaining the benefit of decades of premiums.

133.   AXA Equitable's aforesaid conduct reveals a design to mislead or deceive Plaintiff into failing to timely pay the premium amounts owed within the Policies' grace period and thereby procure the Policies' terminations.

134.   AXA Equitable's denial of Plaintiff's reinstatement application on the basis of supposedly unsatisfactory "evidence of medical insurability," knowing that the Policies were wrongfully terminated, is deceptive and wrongful.

135.   AXA Equitable's denial of Plaintiff's reinstatement application on the basis of unsatisfactory "evidence of medical insurability," when in June 2008 AXA Equitable determined Plaintiff was insurable, and there being no material changes in Plaintiff's health from June 2008 to December 2013, demonstrates that AXA Equitable's denial was not based on Plaintiff's insurability, as required by the terms of the Policies, but rather was motivated by ulterior factors, including AXA Equitable's desire to avoid the significant death benefits owed under the Policies while simultaneously retaining the benefit of decades of premiums.

136.   AXA Equitable's conduct in procuring the termination of life insurance policies, and thereby the forfeiture of death benefits for Plaintiff's beneficiaries, is dishonest, egregious, morally reprehensible, and constitutes bad faith.

137.   AXA Equitable's conduct constitutes a breach of the implied covenant of good faith and fair dealing.

## COUNT IX – NEGLIGENCE
## AGAINST AXA ADVISORS AND AXA NETWORK

138.   The allegations of paragraphs 1 through 66 are hereby repeated and re-alleged as if fully set forth herein.

139.    At all times mentioned, Hungerford was an agent and/or representative of AXA Advisors and AXA Network when performing his duties as agent of record for the Policies.

140.    At all times mentioned, Hungerford was an agent and/or representative of AXA Advisors and AXA Network when holding himself out as Plaintiff's agent with respect to the Policies.

141.    As agent of record on the Policies, Hungerford owed Plaintiff a duty of care in the servicing and maintenance of the Policies.

142.    As Plaintiff's agent, Hungerford owed Plaintiff a duty of care with respect to advising Plaintiff on the financial management of the Policies.

143.    Hungerford failed to exercise reasonable care and skill in the performance of his duties in the servicing and maintenance of the Policies by failing to ensure that the Policies were paid in a manner that would prevent their termination.

144.    Hungerford was copied on all policy lapse and policy termination notices AXA Equitable sent to Plaintiff but failed to ever advise Plaintiff or Millburn as to the significance of these notices and/or the proper method for ensuring sufficient premium was being paid into the Policies.

145.    Had Hungerford exercised proper care and skill in performing the servicing and maintenance of the Policies, the Policies would not have terminated.

146.    As a proximate cause of Hungerford's negligence as agent and/or representative of AXA Advisors and AXA Network, Plaintiff has suffered damages in the form of the terminated Policies.

## COUNT X – NEGLIGENCE AGAINST HUNGERFORD

147.  The allegations of paragraphs 1 through 66 are hereby repeated and re-alleged as if fully set forth herein.

148.  At all times mentioned, Hungerford was an agent and/or representative of AXA Advisors and AXA Network when performing his duties as agent of record for the Policies.

149.  At all times mentioned, Hungerford was an agent and/or representative of AXA Advisors and AXA Network when holding himself out as Plaintiff's agent with respect to the Policies.

150.  As agent of record on the Policies, Hungerford owed Plaintiff a duty of care in the servicing and maintenance of the Policies.

151.  As Plaintiff's agent, Hungerford owed Plaintiff a duty of care with respect to advising Plaintiff on the financial management of the Policies.

152.  Hungerford failed to exercise reasonable care and skill in the performance of his duties in the servicing and maintenance of the Policies by failing to ensure that the Policies were paid in a manner that would prevent their termination.

153.  Hungerford was copied on all policy lapse and policy termination notices AXA Equitable sent to Plaintiff but failed to ever advise Plaintiff or Millburn as to the significance of these notices and/or the proper method for ensuring sufficient premium was being paid into the Policies.

154.  Had Hungerford exercised proper care and skill in performing the servicing and maintenance of the Policies, the Policies would not have terminated.

155.   As a proximate cause of Hungerford's negligence, Plaintiff has suffered damages in the form of the terminated Policies.

## COUNT XI – BREACH OF FIDUCIARY DUTY
## AGAINST AXA ADVISORS AND AXA NETWORK

156.   The allegations of paragraphs 1 through 66 are hereby repeated and re-alleged as if fully set forth herein.

157.   At all times mentioned, Hungerford was an agent and/or representative of AXA Advisors and AXA Network.

158.   At all times herein, an agent-client relationship existed between Hungerford and Plaintiff.

159.   By virtue of the agent-client relationship that existed between Hungerford and Plaintiff, Hungerford owed a fiduciary duty to Plaintiff to act with the utmost care, loyalty and fidelity in servicing and maintaining the Policies, including but not limited to advising Plaintiff as to the financial management of the Policies and representing Plaintiff's interests when dealing with AXA Equitable.

160.   Hungerford breached his fiduciary duty of care by the acts of misfeasance and malfeasance described herein, including but not limited to failing to advise Plaintiff as to the proper manner to pay premiums for the Policies to ensure they would not terminate.

161.   Hungerford breached his fiduciary duty of loyalty and good faith by holding himself out as Plaintiff's agent for the Policies while at the same time failing to disclose and/or simultaneously maintaining a relationship with AXA Equitable that influenced Hungerford's provision of services to the Plaintiff.

162.    As a proximate cause of Hungerford's breach of his fiduciary duties to Plaintiff, for which AXA Advisors and/or AXA Network are responsible as principal, Plaintiff has suffered damages in the form of the terminated Policies.

## COUNT XII – BREACH OF FIDUCIARY DUTY AGAINST HUNGERFORD

163.    The allegations of paragraphs 1 through 66 are hereby repeated and re-alleged as if fully set forth herein.

164.    At all times mentioned, Hungerford was an agent and/or representative of AXA Advisors and AXA Network.

165.    At all times herein, an agent-client relationship existed between Hungerford and Plaintiff.

166.    By virtue of the agent-client relationship that existed between Hungerford and Plaintiff, Hungerford owed a fiduciary duty to Plaintiff to act with the utmost care, loyalty and fidelity in servicing and maintaining the Policies, including but not limited to advising Plaintiff as to the financial management of the Policies and representing Plaintiff's interests when dealing with AXA Equitable.

167.    Hungerford breached his fiduciary duty of care by the acts of misfeasance and malfeasance described herein, including but not limited to failing to advise Plaintiff as to the proper manner to pay premiums for the Policies to ensure they would not terminate.

168.    Hungerford breached his fiduciary duty of loyalty and good faith by holding himself out as Plaintiff's agent for the Policies while at the same time failing to disclose and/or simultaneously maintaining a relationship with AXA Equitable that influenced Hungerford's provision of services to the Plaintiff.

169.    As a proximate cause of Hungerford's breach of his fiduciary duties to Plaintiff, Plaintiff has suffered damages in the form of the terminated Policies.

### COUNT XIII – VIOLATION OF CUTPA
### AGAINST AXA ADVISORS AND AXA NETWORK

170.    The allegations of paragraphs 1 through 66 are hereby repeated and re-alleged as if fully set forth herein.

171.    At all relevant times hereto, Hungerford, AXA Advisors and AXA Network were engaged in the conduct of trade or commerce as defined by the Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. § 42-110a(4).

172.    At all relevant times hereto, Hungerford, AXA Advisors and AXA Network were prohibited by CUTPA § 42-110b from engaging in unfair or deceptive acts or practices in the conduct of trade or commerce.

173.    At all times mentioned, Hungerford was an agent and/or representative of AXA Advisors and AXA Network.

174.    Hungerford, AXA Advisors and AXA Network have engaged in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of CUTPA § 42-110b, and the public policy of the State of Connecticut by engaging in conduct including, but not limited to the following:

> a.  Hungerford held himself out as Plaintiff's agent for the Policies while failing to disclose and/or simultaneously maintaining a relationship with AXA Equitable that influenced Hungerford's provision of services to the Plaintiff; and/or
>
> b.  Hungerford refrained from taking any action in response to policy lapse notices sent by AXA Equitable for the Policies in order to

ensure that Plaintiff would be in the position where a single missed policy lapse notice would bring about the termination of the Policies, and thereby allow AXA Equitable to evade responsibility for payment of the Policies' significant death benefits.

175.   Such immoral, unethical, oppressive and/or unscrupulous conduct offends public policy as established by Connecticut statutes, common law and otherwise.

176.   Hungerford, AXA Advisors and AXA Network's immoral, unethical, oppressive and/or unscrupulous conduct as aforesaid is the proximate cause of the termination of the Policies, and has thereby caused significant injury to Plaintiff, which the Plaintiff could not reasonably have avoided.

177.   Hungerford, AXA Advisors and AXA Network's immoral, unethical, oppressive and/or unscrupulous conduct has no countervailing benefits to consumers or competition.

178.   Hungerford, AXA Advisors and AXA Network's immoral, unethical, oppressive and/or unscrupulous conduct was intended to rob Plaintiff of his rights and benefits under the Policies, namely the pay out of death benefits to his beneficiaries, for which benefits Plaintiff has paid in excess of Three Million Dollars ($3,000,000.00) to date.

179.   Hungerford, AXA Advisors and AXA Network's immoral, unethical, oppressive and/or unscrupulous conduct reveals a reckless indifference to the rights of the Plaintiff and/or an intentional and wanton violation of those rights.

## **JURY DEMAND**

The Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays for judgment as follows:

a)      A declaration that AXA Equitable must reinstate the Policies;

b)      Attorney's fees;

c)      Costs;

d)      Punitive damages;

e)      Post judgment interest;

f)      Any other relief which the Court may find to be just and equitable.

DATED:      Trumbull, Connecticut
            August 11, 2016

/s/Nicole C. Bikakis
Tracy Alan Saxe, Esq. (ct27281)
tas@sdvlaw.com
Nicole C. Bikakis, Esq. (ct29848)
ncb@sdvlaw.com
SAXE DOERNBERGER & VITA, P.C.
35 Nutmeg Drive
Trumbull, Connecticut 06611
Telephone:   203.287.2100
Fax:          203.287.8847


/s/Lawrence F. Reilly
Lawrence F. Reilly, Esq. (ct05061)
Larry@lreillylaw.com
The Reilly Law Firm, LLC
90 Grove Street, Suite 206
Ridgefield, Connecticut 06877
Telephone:   (203) 438-3651
Fax:          (203) 403-1658

*Attorneys for Plaintiff, Malcolm H. Wiener*

## **CERTIFICATION**

Pursuant to Conn. Gen. Stat. 110g(c), this is to certify that a copy of the

foregoing was sent via regular mail, on this 12th of August, 2016, to the following:

Office of the Attorney General       Commissioner of Consumer Protection
55 Elm Street                       165 Capitol Avenue
Hartford, CT 06106            Hartford, CT 06106



/s/Nicole C. Bikakis
Nicole C. Bikakis, Esq.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 12th day of August, 2016, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System

/s/Nicole C. Bikakis
Nicole C. Bikakis, Esq. (ct29848)
ncb@sdvlaw.com
SAXE DOERNBERGER & VITA, P.C.
1952 Whitney Avenue
Hamden, Connecticut 06517
Telephone:  203.287.2100
Fax:          203.287.8847