UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MALCOLM H. WIENER,

                          Plaintiff,

            -against-

AXA EQUITABLE LIFE INS. CO., DAVID
HUNGERFORD, AXA ADVISORS, L.L.C., and
AXA NETWORK, L.L.C.,
                          Defendants.

**OPINION AND ORDER**

16 Civ. 04019 (ER)

Ramos, D.J.:

 Malcolm Wiener brings this suit against his former life insurance company, AXA

Equitable Life Insurance Co. ("AXA"), two related companies that serviced his policies, AXA

Advisors L.L.C. and AXA Network L.L.C., and his life insurance agent, David Hungerford, for

allowing his life insurance policies to lapse and for failing to reinstate his policies.  Defendants

have moved to preclude three of Wiener's experts and two of their reports.  For the reasons

provided below, these motions are GRANTED in part and DENIED in part.

**I.     Background**

 In the late 1980s, Wiener, born in 1935, ran an investment company, Millburn Corp., and

purchased three flexible premium life insurance policies from AXA.   Doc. 79, 3.

 On October 14, 1986, he applied for the first policy.  Doc. 140-3, 82–84.  In this

application, he sought $9,000,000 in life insurance, named the Trust for Malcom H. Wiener (the

"Trust") as the owner and used Milburn Corp.'s mailing address as the Trust's mailing address.

On November 9, 1993, Wiener changed the policy's owner from the Trust to himself.  *Id.* at 78.

He listed his street address in New York, New York.  *Id.*

On May 14, 1987, Wiener applied for two additional policies, one for $9,000,000 and the other for $2,000,000. *Id.* at 26–28, 53–55. In each application, he named the Trust as the owner and used Milburn Corp.'s mailing address as the Trust's mailing address. On November 9, 1993, he changed the beneficiary for one policy and listed his street address in New York, New York. *Id.* at 51. On November 9, 1993, he changed the beneficiary for the other policy and used his street address in New York, New York. *Id.* at 22.[1]

Each of the three policies required semi-annual premium payments on May 1 and November 1 of each year and that it maintain a cash value sufficient to cover the costs of monthly deductions. Doc. 79, 5. Wiener alleges that, prior to each premium due date, Defendants were required to send premium reminder notices to the policy owner's last known address and that, whenever the cash value of the policies was insufficient to cover the costs of monthly deductions, Defendants were required to send a policy lapse notice, also to the policy owner's last known address. *Id.* The policies provided a sixty-one-day grace period for late payments. *Id.* at 6.

All three policies also provided for the following reinstatement process:

> If this policy has ended without value, you may reinstate it while the insured person is alive if you: [1] Ask for reinstatement within 3 years after the end of the grace period; and [2] Provide evidence of insurability satisfactory to us; and [3] Make a premium payment sufficient to keep the policy in force for at least 3 months after the date of reinstatement.

---

[1] On July 23, 1986, he made himself the owner and his estate the beneficiary of all three policies. Doc. 140-3, 23. He lists his address as Ridgefield, Connecticut. *Id.* The complaint does not reference this request. The Court regards the date as an error because Wiener did not even purchase the second and third policies until almost a year after this date.

Doc. 79-1, 12 (36-224-259); Doc. 79-2, 12 (37-205-147); Doc. 79-3, 12 (37-205-155).  Millburn Corp., Wiener's company, was responsible for maintaining the policies, including paying all premiums.   Doc. 79, 4.

Since their purchase, Millburn has paid the policies' cash value based on the lapse notices.  Doc. 127-4, 9.  According to Wiener, Millburn was paying pursuant to lapse notices because they had decided to pay only the minimum payment amount to keep the policies in force and that was the only document that would give them the minimum payment amount.  Doc. 127-5, 8.

AXA assigned professionals from AXA Advisors and AXA Network, companies affiliated with AXA, to service the life insurance policies.  Doc. 79, 3–4.  In 1990, it assigned David Hungerford to service Wiener's three policies.  Doc. 127-8, 15.  Allegedly, Hungerford held himself out as Wiener's agent on these policies and was responsible for maintaining the policies on Wiener's behalf.  Doc. 79, 4.  AXA copied Hungerford on all correspondence with Wiener, *id*. at 6, and paid him a percentage of the premiums paid, Doc. 127-8, 7.  However, Hungerford never read the correspondence and never had any conversation with Wiener himself.  Rather, he communicated with Wiener's representatives, Harvey Beker and Gregg Buckbinder, and only provided them with information when they requested it.  Doc. 127-8, 8, 18, 19.

Wiener had had to apply for reinstatement on one previous occasion.  On June 2, 2008, AXA sent him a termination notice for one policy because he had failed to maintain the policy's cash value.  Doc. 79, 9.  The notice included an application for reinstatement.  *Id*.  On June 24, 2008, Wiener completed and submitted the reinstatement application.  *Id*.  On August 13, 2008, AXA approved Wiener's June 24, 2008 reinstatement application.  *Id.*

On March 4, 2009, at Wiener's request, AXA changed the mailing address from Millburn's address to Wiener's personal address.  *Id.* at 5.

On October 1, 2013, more than four years after the change of address, AXA claims that it sent Wiener a Notice of Policy Lapse for each policy.   Doc. 79-6, 6, 7, 8.  Wiener alleges that he did not receive these notices.  Doc. 79, 7.

On December 2, 2013, AXA sent Wiener, seventy-eight years old at the time, a Notice of Policy Termination for each policy.  Doc. 79-4, 2, 3, 4.  Upon receiving these termination notices, Wiener[2] contacted Hungerford and expressed his intent to tender the missing payments. Doc. 79, 7.  Hungerford advised Wiener against making the payment, and instead, told him to complete the application for reinstatement.  *Id.*  Wiener followed Hungerford's advice and, on December 23, 2013, submitted the application for reinstatement, including the requested medical evidence of insurability.  *Id.*

On February 21, 2014, Millburn, on Wiener's behalf, sent AXA a premium payment of $96,093.  *Id.*  That same day, AXA accepted and cashed the check.  *Id.* at 8.  However, on March 5, 2014, AXA sent Wiener three separate checks, purporting to refund Wiener's February 21, 2014 premium payments.  *Id.*

On March 24, 2014, AXA sent Wiener a letter signed by its medical director, Richard Jaegar, informing him that it had declined to reinstate the policies.  Doc. 79-8, 2.  Specifically, it provided, "The decision results from our evaluation of specific items of information obtained from you in your application, or supplements to the application statements: - specifically information received from Dr. Barry Boyd."  *Id*. (emphasis omitted).  The letter also informed

---

[2] The Complaint states that "Plaintiff" contacted Hungerford but it is unclear if Wiener or one of his representatives communicated with Hungerford.

Wiener that he had the right "to know the specific items of information we have that supports the reasons for our decision," "to see and obtain copies of such items of information," and, "[i]f the information is incorrect, . . . to have it corrected, amended or deleted." *Id.* at 3.  Hungerford, on behalf of Wiener, requested AXA to produce copies of the medical records that supported its denial but allegedly AXA refused.  Doc. 79, 9.  Wiener alleges that his health did not materially differ between June 2008, when AXA last previously granted his reinstatement, and December 2013, when Wiener applied for reinstatement.  *Id.* at 14.

On May 13, 2015, Wiener sued AXA in Connecticut State Court for declaratory and injunctive relief, equitable reinstatement, breach of contract, violation of Connecticut Unfair Trade Practices Act ("CUTPA"), violation of Connecticut Unfair Insurance Practices Act, fraudulent misrepresentation, and breach of covenant of good faith and fair dealing.  Doc. 1, 8–25.  On June 10, 2015, AXA removed the case to the United States District Court for the District of Connecticut.  *Id.* at 1–4.  On February 19, 2016, Wiener filed an amended complaint.  Doc. 34.  In the amended complaint, Wiener added David Hungerford, AXA Advisors LLC, and AXA Network, LLC, as Defendants.  *Id.*  Against these newly added Defendants, Wiener brought claims for negligence and breach of fiduciary duty.  *Id.* at 22–24.  Against AXA Advisors and AXA Network, Wiener also brought a CUTPA claim.  *Id.* at 25–26.  On April 13, 2016, Wiener filed another amended complaint.  Doc. 51.  In this amended complaint, Wiener brought the same claims but further specified the particular claims he was alleging against each individual Defendant.  *Id.*

On May 10, 2016, the parties filed a joint motion to transfer the case from the United States District Court for the District of Connecticut to this Court because they agreed that this Court "is a more convenient forum for the Parties and their witnesses, and is the location of a

5

majority of relevant documents and other sources of proof."  Doc. 58-1.  On May 31, 2016, the

case was transferred.  Doc. 61.  On August 12, 2016, Wiener filed a Third Amended complaint.

Doc. 79.  The parties have since engaged in extensive discovery.  Docs. 80, 82.

      During discovery, Wiener obtained additional information about AXA's decision to deny

his reinstatement application.  Specifically, Wiener learned that it was Hallie Hawkins, the chief

underwriter, and not Richard Jaeger, AXA's medical director, that made the determination to

deny Wiener's application for reinstatement.  Doc. 134-8, 8; Doc. 135-6, 16, 195.  In making this

decision, Hawkins relied on the Senior Applicant Medical Checklist, which is used for all life

insurance applicants over the age of seventy, and the Gen Re Source Life Underwriting Manual.

Doc. 135-6, 72, 98.  As relevant to this motion, under the Senior Applicant Medical Checklist,

the underwriter should "usually decline" the policy, if the applicant has difficulty performing

activities of daily living, an albumin level of 3.8 or less, or mild or worse dementia.  Doc. 140-7,

3.[3]

      On August 24, 2017, the first day of her deposition, Hawkins testified that the deciding

factors in denying Wiener's application were cerebrovascular accident ("CVA"), monoclonal

gammopathy of uncertain significance ("MGUS"), mild cognitive impairment, paroxysmal atrial

fibrillation ("PAF"), stroke, gait instability, and anemia.  Doc. 135-6, 212.[4]  On September 19,

2017, during his deposition, Wiener testified that he had never suffered a stroke.  Doc. 135-2, 9.

During the second day of her deposition, on October 25, 2017, after Wiener's testimony,

Hawkins testified, "The reason we declined Mr. Wiener's request for reinstatement was because

---

[3] The Senior Applicant Medical Checklist has another category that is not at issue here.

[4] The deposition of Hawkins spanned two days because a lawyer representing one of the parties left early on the first day.  Doc. 135-6, 218.

of the serum albumin."   Doc. 135-9, 12.  Hawkins also testified that she consulted neither

Wiener's treating physician, Dr. Barry Boyd, nor AXA's medical director, even though she

could not read Dr. Boyd's handwriting.  Doc. 135-6, 214; 135-9, 34.  Furthermore, Dr. Boyd

contacted AXA to clarify his notes and one of Hawkins colleagues told Hawkins, in an email,

"Please contact the insured's doctor Barry Boyd," Doc. 136-14, 8, but Hawkins never returned

the call because she claims that she did not have an authorization to call Dr. Boyd.  Doc. 141-9,

31.

Defendants have filed motions in limine to exclude the testimony and reports of three

proffered expert witnesses:  Dr. Ori Beh-Yehuda, Dr. Barry Boyd—both of whom have been

Wiener's treating physicians—and Larry Stern.  Docs. 124, 122, 120.  Wiener claims that AXA

inappropriately denied his reinstatement application in March 2014, and wants to introduce the

testimony of three experts to establish (1) that he is medically qualified for reinstatement and (2)

that Defendants used faulty procedures to service and process his reinstatement application.

## II.    Legal Standard

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony.

Pursuant to this Rule:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:  (a) the expert's scientific, technical, or other
> specialized knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue; (b) the testimony is based
> on sufficient facts or data; (c) the testimony is the product of reliable
> principles and methods; and (d) the expert has reliably applied the
> principles and methods to the facts of the case.

Fed. R. Evid. 702.  The party offering the testimony has the burden of establishing its

admissibility by a preponderance of the evidence.  *Bourjaily v. United States*, 483 U.S. 171, 175–

76 (1987).

"As the Supreme Court explained in *Daubert*, Rule 702 requires the district court to ensure that 'any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)).  In interpreting Rule 702, district courts, under *Daubert*, may consider the following non-exhaustive list of factors to determine whether evidence is sufficiently reliable:  (1) whether a theory or technique had been and could be tested, (2) whether it had been subjected to peer review, (3) what its error rate was, and (4) whether scientific standards existed to govern the theory or technique's application or operation. *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005).  In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), "the Supreme Court held that the trial judge's gatekeeping obligation applies not only to testimony based on 'scientific' knowledge, as in *Daubert*, but also to testimony based on 'technical' or 'other specialized' knowledge." *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 358 (2d Cir. 2004).

Additionally, a proposed expert witness must be, in fact, an expert in the area about which he or she intends to testify.  *Nimely*, 414 F.3d at 396 n.11.  The Second Circuit has explained that the question of whether the expert is indeed qualified is important because under the Federal Rules of Evidence, an expert witness has "substantially more leeway than 'lay' witnesses" in testifying as to opinions that are not based on his or her perception.  *Id.*  As Rule 702 states, an expert may be qualified by virtue of his or her "knowledge, skill, experience, training, or education[.]"  The "the totality of a witness's background" matters.  *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 422 (S.D.N.Y. 2009) (citing 29 Wright & Gold, Federal Practice and Procedure § 6265, at 246 (2008)).  The witness's background only qualifies him or her to testify about the "issues or subject matter[s] within his or her area of expertise."

*Haimdas v. Haimdas*, 2010 WL 652823, at *2 (E.D.N.Y. Feb. 22, 2010) (citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir.1997)).  The district judge thus must "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."  *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).  After all, "an expert who is qualified in one field cannot offer an opinion about aspects of the case in another field for which she is not qualified."  *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 2008 WL 1971538, at *6 n.48 (S.D.N.Y. May 7, 2008).

## III.    Discussion

Defendants move to preclude the testimony of Dr. Ben-Yehuda, Dr. Boyd, and Larry Stern.  Broadly speaking, if called, Dr. Ben-Yehuda and Dr. Boyd would testify about Wiener's health and Stern would testify about AXA's internal procedures.  Defendants move to preclude the testimony of Dr. Ben-Yehuda and Dr. Boyd as irrelevant, and Stern's testimony as irrelevant and unreliable.  Defendants also move to preclude reports submitted by Dr. Ben-Yehuda and Stern after the close of discovery.

Because of the similarity between the testimony of Dr. Ben-Yehuda and Dr. Boyd, the Court addresses the challenges to their evidence together.

## A.    Dr. Ben-Yehuda and Dr. Boyd's Testimony

Dr. Ben-Yehuda, a doctor Board Certified in cardiovascular disease and internal medicine, treated Wiener from 2007 to 2010, and has held the following positions:  Director of Coronary Care Unit at University of California, San Diego, ("UCSD"); cardiologist at UCSD and Columbia University Medical Center; Professor of Clinical Medicine at UCSD; Assistant Professor of Medicine at Columbia University; Medical Director at Merck; and Executive Director of the Clinical Trials Center at the Cardiovascular Research Foundation in New York.

Doc. 140, 11.  Additionally, Dr. Ben-Yehuda has published and edited peer-reviewed articles in medical journals.  *Id.*

Dr. Boyd is similarly well-credentialed.  A Board Certified doctor in internal medicine, Dr. Boyd has treated Wiener since 1998, has received training in hematology and oncology, has served on the faculty of Yale Medical School since 1986, and has focused on the impacts of nonmalignant disease and survivorship.  Doc. 136, 12.

Dr. Ben-Yehuda seeks to testify about Wiener's treatment, medical records, albumin levels, hemoglobin, atrial fibrillation, MGUS, cognitive functions, stroke, and activities of daily living.  Doc. 135, 11–12.  Dr. Boyd seeks to testify about Wiener's atrial fibrillation, stroke, cognitive function, memory loss, gait instability, MGUS, and albumin levels.  Doc. 136, 12–13.

The Defendants agree that both doctors are qualified to give expert testimony in a case where a party's medical status is at issue.  Doc. 123, 6; Doc. 125, 8.  The parties, however, disagree on whether Wiener's medical status is at issue in this case.  Pursuant to the policies, Wiener was eligible for reinstatement if, *inter alia*, he "provide[d] evidence of insurability satisfactory to" AXA.  Doc. 140-3, 12.  Defendants claim that "[c]ourts have generally construed this requirement to mean that the party seeking reinstatement of the policy must have evidence of insurability that would be acceptable to the reasonable insurer."   Doc. 125, 2; Doc. 123, 9.  They cite *Ryman v. Am. Nat. Ins. Co.*, 488 P.2d 32 (Cal. 1971), from the Supreme Court of California, for this proposition.  They claim that because "the issue that must be decided in this case is whether the plaintiff was insurable, not whether his physician thinks he is healthy," neither doctors' testimony is relevant. Doc. 125, 8; Doc. 123, 6.

Wiener argues that "[e]vidence of insurability embraces more than merely good health or good physical condition."  *Massachusetts Mut. Life Ins. Co. v. Thacher*, 222 N.Y.S.2d 339, 344

(N.Y. App. Div. 1961).[5]  Here, according to Wiener, the only factors considered by the underwriter and that allegedly led to the denial of his application for reinstatement, were questions of medical diagnostics, and "[s]ince the factors leading to the denial were purely medical, it follows that expert testimony concerning accurate medical diagnosis and analysis are not only germane, it is the very heart of this litigation."  Doc. 135, 15–16.  *See also* Doc. 136, 16–17 (same).

Wiener fundamentally misapprehends the question to be answered here.  The question is not whether he was in good health.  The question is whether AXA acted arbitrarily and capriciously by applying certain underwriting guidelines in determining that he was not insurable.  That, at base, is an underwriting decision, not a medical one.  Insurability may depend on a range of considerations, from health to behavior, but, as evidenced by Hawkins' testimony, "[t]he reason [AXA] declined Mr. Wiener's request for reinstatement was because of the serum albumin."[6]  Doc. 135-9, 12.  Thus, liability will ultimately be determined by a finding, from an underwriting or insurance risk perspective, that AXA reasonably relied on Wiener's albumin level to determine whether he was insurable.  As a result, the treating physicians' testimony is not relevant to the question of insurability and they may not testify as experts because each acknowledges that he is not an expert in life insurance underwriting guidelines.  Dr. Ben-Yehuda testified:

---

[5]  Wiener also cites *Kirby v. Prudential Ins. Co. of Am.*, for the statement that "the weight thereof is to the effect that the term 'insurability' is broader than 'good health and an insurable interest.'"  191 S.W.2d 379, 383 (Mo. Ct. App. 1945)).

[6]  There appears to be no dispute that Wiener's serum albumin levels were in a range that the Senior Medical Checklist would counsel an underwriter to "usually decline."

Q.  Are you able to testify about the reasonableness of use of serum albumin in underwriting in standards for life insurance companies in the United States?
. . .
A.  I am not sure I can answer that question because it is so broad. So, I am having a hard time answering it.
Q.  It's broad because you are not an expert in underwriting, correct?
A.  That's correct.

125-6, 47–48.

Dr. Boyd testified:

Q. . . . You are not in a position as a medical doctor to have an opinion with respect to whether an insurance company's reliance on various labs is appropriate in the underwriting process?
A.  Correct. . . .
Q.  Put differently, you are not an expert in insurance underwriting?
A.  No, but I do have a perspective on using values clinically . . .
Q.  And that's an understanding of the clinic use of these.
A.  Correct.  Correct.
Q.  And you would acknowledge that the clinical environment is different from the underwriting environment?
A.  Right.

Doc. 129-4, 71–72.

Furthermore, Larry Stern also testified about the applicability of medical testimony to

underwriting practices:

Q.  All right.  So you're not here to offer any opinions as to whether or not the underwriting standards that were used by AXA, whether those standards are in accordance with industry standards?
A.  No, I'm not here to opine on that.
Q.  It would require an underwriter to do that, correct?
A.  Yes.
Q.  A medical direct—a medical doctor who is unfamiliar with the practice—with underwriting would not be qualified to do that, right?
. . . .
A.  I don't believe that medical doctor who is unfamiliar with the insurance practice of underwriting would be able to do that.

12

Doc. 125-5, 5–6.

The cases Wiener relies on do not counsel a different result. Rather, those cases simply stand for the straightforward proposition that insurance companies making reinstatement decisions are required to act reasonably, and not arbitrarily and capriciously, in determining whether an applicant has submitted satisfactory evidence of insurability. *See Thompson v. Postal Life Ins. Co.*, 123 N.E.750, 751 (N.Y. 1919) (construing requirement that applicant "furnish satisfactory evidence of his insurability" and finding that company acted arbitrarily in rejecting applicant where his submission "g[a]ve no hint of a defect in health or habits" and the company provided no reason as to why the submission was unsatisfactory); *see also Miller v. Cont'l Cas. Co.*, 261 A.D. 395, 397 (App. Div.), aff'd, 39 N.E. 2d 275 (N.Y. 1941) (noting that the question presented was whether the insurance company acted honestly, and not arbitrarily and unreasonably, and finding that company's failure to reinstate was "clearly arbitrary" where company had not required a physical examination and the decision was based, *inter alia*, on the underwriter's "suspicion" of a recurring condition). As stated succinctly by the California Supreme Court in construing identical language, an agreement to reinstate an insurance policy upon satisfactory evidence of insurability does not bestow on the insurer "absolute discretion to disapprove [an] application for reinstatement; so long as an applicant's insurability would be satisfactory to a reasonable insurer." *Ryman v. Am. Nat. Ins. Co.*, 488 P.2d 32, 43 (Cal. 1971) (internal quotation marks omitted). Here, there was evidence that Wiener was not insurable; namely, his serum albumin levels. Whether that measure is reasonable is a matter of life insurance underwriting, a topic on which neither Dr. Ben-Yehuda or Dr. Boyd is expert. *Reliastar Life Ins. Co. v. Laschkewitsch*, No. 13 Civ. 210, 2014 WL 1430729, at *1 (E.D.N.C.

Apr. 14, 2014) (precluding individual who was both an insurance broker and lawyer from testifying about the underwriting process because he had no experience in underwriting).

## B.     Larry Stern Testimony

Defendants also seek to preclude Stern from testifying.  Stern seeks to testify on the following topics:  the requirement to send premium reminder notices; an insurance agent's specific duty and standard of care to service the policies; the proper procedures for determining whether to reinstate a policy; and the damages that Wiener suffered because of AXA's decision to deny Wiener's reinstatement application.  Doc. 139, 13–14.

Stern graduated from Indiana University School of Business with a Bachelor of Science. Over his 47 year career, he has held the following positions:  actuarial student, assistant actuary, and manager of the actuarial department at State Life Insurance Company between June 1971 to March 1981; associate actuary in the individual product development department of Durham Life Insurance Company from March 1981 to March 1983; Senior Vice President and Chief Actuary at United Presidential Life Insurance Company from March 1983 to March 1991; Principal and Consulting Actuary at Tillinghast –Towers Perrin from March 1991 to July 2000; Executive Vice President and Group Head of the Financial Solutions Department at Scottish Annuity & Life Holdings from August 2000 to September 2002; and President of Canterbury Consulting, LLC, from October 2002 to the present.  Doc. 121-1, 29–31.  In these positions:  he designed, developed, priced, explained, and marketed life insurance products; and he played roles in underwriting products and in drafting the policies.  Doc. 139, 20, 24–25, 29–30.  Additionally, he has held multiple positions within the Society of Actuaries, published articles in the Society of Actuaries periodicals, and spoken at industry meetings and seminars.  Doc. 121-1, 31–32.

Defendants challenge his qualifications and the relevancy of his testimony.

1.      **Qualifications and Opinions on Notice, Standard of Care, and Procedures**

First, they argue that he is not qualified to testify on any of the issues disputed in this case

because his expertise relates to an insurance company's actuarial function, not its underwriting

function.  As Defendants point out, Stern:  has never served as an underwriter; has never

supervised underwriters; has never evaluated underwriters; has never received the designations

for Certified Financial Planner, Chartered Life Underwriter, or Chartered Financial Consultant;

has never belonged to an underwriting association; he has never written an article on

underwriting; has never served as an insurance agent; has never held a license to sell insurance;

and has neither written articles nor participated in industry seminars on agent standard of care.

Doc.  120-1, 12. *See also* Doc. 127, 15–16 (making similar points about Stern's lack of

experience).  Furthermore, they note that, during his deposition, he testified that his experience

with actuarial principles does not relate, *per se*, to his testimony on notice, standard of care, and

reinstatement:

> Q. . . . What about send of a notice, is that actuarial?
> . . .
> A.      No, *per se*.
> . . .
> Q.      . . . What about the agent standard of care, does that involve
> actuarial principles?
> A.      In the same vein, no, *per se*.
> Q.      . . . .  What about reinstatement application or reinstatement
> evaluation, does that involve actuarial principles?
> A.      No, *per se*.

Doc. 121-2, 77.  Defendants argue that in such circumstances, courts have precluded

acknowledged experts in one area within the insurance industry from testifying about an area in

which they were not expert.  Doc. 120-1, 7–11 (citing *Travelers Prop. Cas. Co. of Am. v. Nat'l*

*Union Ins. Co. of Pittsburgh, PA*, 557 F. Supp. 2d 1040 (W.D. Mo. 2008) (precluding an

insurance broker from testifying on subrogation); *Certain Underwriters at Lloyds, London v.*

*Inlet Fisheries, Inc.*, 389 F. Supp. 2d 1145 (D. Alaska 2005) (precluding an insurance industry consultant from testifying on underwriting marine pollution insurance policies); *Reliastar Life Ins. Co.*, 2014 WL 1430729, at *1 (precluding lawyer and insurance broker from testifying about the underwriting process)).

Notwithstanding Stern's lack of direct experience in the proffered areas, Wiener argues that his experience working over twenty years with three life insurance companies and consulting work in developing and pricing universal life insurance policies, as well as in drafting the policy forms for those products, allowed him to develop an expertise on notice requirements, agent standard of care, and reinstatement processes. Doc. 134, 20, 23–26, 29–30. Additionally, he asserts that Stern's opinion on the notice requirement derives from his reading of the policies. *Id.* at 21. He also cites to several cases that found that an expert witness's "job title is not dispositive of his qualifications to offer expert testimony." *Id.* at 17–18 (citing *U.S. Fid. & Guar. Co. v. Sulco, Inc.*, 171 F.R.D. 305 (D. Kan. 1997); *Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC*, 248 F.R.D. 298 (N.D. Ga. 2008); *Grinnell Mut. Reinsurance Co. v. Heritage Ins. Agency*, No. Civ. 00-1632DWFAJB, 2001 WL 902777, at *1 (D. Minn. Aug. 10, 2001); *Helton v. Am. Gen. Life Ins. Co.*, No. 09 Civ. 00118-JHM, 2013 WL 2443166, at *1 (W.D. Ky. June 4, 2013)).

Wiener's arguments are unpersuasive. First, in his report, Stern wrote that he made his opinions on notice, standard of care, and reinstatement "based on the foregoing and my knowledge of industry practice and experience, *from an actuarial perspective*." Doc. 121-1, 12, 15, 24 (emphases added). However, in his deposition, Stern conceded that his opinions on notice, standard of care, and reinstatement do not involve actuarial principles. Doc. 121-2, 77. If his experience was from an actuarial perspective and, if his opinions do not involve actuarial

principles, the Court is constrained to conclude that he is not qualified to testify as an expert on these subjects.

Second, Defendants argue that Stern's opinions on notice are improper because the subject does not require expert testimony:

> Q. . . .  You simply read the policy and made a determination as to what the policy said, correct?
> A.  Correct.
> Q.  Okay.  So in other words, you reached the same conclusion that generally one would expect anybody reading the policy to make, correct?
> A.  Correct.
> Q.  In fact you used the words that clearly the policy requires certain notice provisions, correct?
> A.  Correct.

Doc. 120-1, 15–17 (citing Doc. 121-2, 78–79); *see also id.* at 85 (Q. . . . Now, your opinion that the policy—that AXA had to send our premium reminder notices is based on your reading of the policy, correct?  A. Correct."). [7]

Third, Defendants claim that Stern's testimony about insurance agents' standard of care is based simply on his opinion—not industry practice:

> Q.  So as you understand this, an agent has an affirmative obligation on an annual basis to call a client to see if they need any assistance?
> A.  Yes –
> Q.  Okay
> A. – that's my feeling.
> Q.  That's your feeling?
> A.  That's my opinion.
> . . .
> Q.  So in terms of what you're offering as an opinion in this case, is it your opinion that this is what the industry requires or is your opinion this is what should happen in your view?

---

[7] Defendants also claim that Stern's testimony on the duty to provide notice is irrelevant because Wiener cannot prove that he relied on premium reminders.  Doc. 121, 17.  Wiener responds by writing, "[t]he probative value of Mr. Stern's testimony overwhelmingly outweighs any unlikely juror confusion."  Doc. 134, 28.

> A.  Both.  I think the industry should require the agents to have this
> level of service.
> Q.  Okay.  Now what about what the industry actually does
> require, do you have an opinion as to whether or not the industry
> actually does require the agents to contact every policyholder
> whose policies have lapsed?
> A.  I can't answer that because I didn't survey every insurance
> company.
> Q.  Okay.  In fact you didn't even survey any insurance companies,
> correct?
> A.  That's correct.
> Q.  *And in fact you don't know what the standard is across the
> industry, correct?  You just have an idea as to what you think it
> should be, but you don't know what the industry standard is -
> correct?*
> . . .
> A.  *Yes, that's correct.*

Doc. 121-2 at 107, 153–154 (emphasis added).

Similarly, Defendants assert that Stern's testimony on the proper procedure for deciding a

reinstatement application should be precluded because it is based purely on his personal

opinion—not on any specialized knowledge or a survey of the industry:

> Q.  Ok. Well, you've also testified you have no idea if there's any
> process in any insurance company today with respect to that
> review, correct?
> A.  I didn't survey insurance companies about – about their
> process.
> Q.  So, again, what we're talking about is what you think should
> exist, not what actually does exist in companies, right?
> . . .
> A.       It's my opinion that this process should be in place.

*Id.* at 185.

While it is apparent that Stern is well-qualified to provide expert testimony on certain

aspects of the life insurance industry, the Court finds that he is not qualified to testify on notice,

the agent's duty of care, and the procedures for reviewing a reinstatement application.  *See In re*

*MTBE Prod. Liab. Litig.*, 2008 WL 1971538, at *6 n.48 ("[A]n expert who is qualified in one

18

field cannot offer an opinion about aspects of the case in another field for which she is not qualified.").

Courts within this Circuit have routinely excluded expert testimony when the testimony was based on nothing more than experience and common sense. *Algarin v. New York City Dep't of Correction*, 460 F. Supp. 2d 469, 477 (S.D.N.Y. 2006) (excluding a report based on the expert's personal experience and common sense because "his report is not based on reliable principles and methods"); *Reyes v. Delta Dallas Alpha Corp.*, No. 92 Civ. 4418 (AGS), 2000 WL 526851, at *3 (S.D.N.Y. May 2, 2000) (excluding testimony where "there is no evidence that [the expert] relies on anything more than common sense guidelines, as opposed to industry standards"). Here, Stern plainly acknowledged that he did not perform any analysis to form his opinion about industry standards for notice, agent care, and reinstatement processes. Instead, he claims that his opinions derive from the policies' language and his experience in a related sector in the industry. Under *Daubert* and the Second Circuit's subsequent interpretation, Stern's opinions on these topics are inadmissible.

Finally, the Second Circuit has observed, "For an expert's testimony to be admissible . . . it must be directed to matters within the witness' scientific, technical, or specialized knowledge and not to lay matters which a jury is capable of understanding and deciding without the expert's help." *Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989).

**2.      Damages**

Defendants separately assert that the basis for Stern's damages calculation is inaccurate. Specifically, they claim that Stern calculated damages based on the assumption that "[t]he MIB[8]

---

[8] In her deposition, Hawkins testified that MIB referred to the "Medical Information Bureau." Doc. 135-6, 23.

codes entered as a result of Hallie Hawkins' decision in 2013 may deter another insurance company from issuing a life insurance policy to Mr. Wiener." Doc. 121, 20. They claim that this statement is inaccurate because, as Stern recognized during his deposition, insurance companies must independently investigate all underwriting decisions and may not rely on MIB codes. Doc. 121-2, 59.

Wiener argues that Stern did not base his damages calculation on the assumption that the decision to deny his reinstatement application would deter other companies from offering comparable insurance. Instead, Stern would testify that Wiener, given his age and health, will have to pay higher premiums to receive an analogous life insurance plan. Doc. 121-1, 24–26. He has significant experience designing, developing, and pricing universal life insurance. Doc. 139, 32. He formed his opinion by reviewing illustrations of policy performance from three independent insurance companies. *Id.* Defendants have only questioned one aspect of this analysis: the view that MIB codes entered by Hawkins will make it more difficult for Wiener to secure other life insurance. This assumption, however, is not "so unrealistic and contradictory as to suggest bad faith" and, as a result, their challenges "go[es] to the weight, not the admissibility, of the testimony." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213–14 (2d Cir. 2009) (internal quotation marks and citations omitted) (affirming a district court's decision to allow an engineer to testify as an expert witness in a maritime case). Stern may testify on this subject.

C.      **Reports**

Defendants seek to preclude expert reports submitted by Dr. Ben-Yehuda[9] and Stern after the close of discovery.  As explained below, each expert submitted an expert disclosure on November 15, 2017, and then sought to submit an additional report in February, 2018, after discovery had closed.

Federal Rule of Civil Procedure 26(a)(2)(A) provides that "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705."  Rule 26(a)(2)(D) provides, "A party must make these disclosures at the times and in the sequence that the court orders."  Rule 26(e)(1)(A) provides:

> A party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

"For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition."  Fed. R. Civ. P. 26(e)(2).  This supplemental information "must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due."  *Id.*  Pursuant to Rule 26(a)(3)(B), "Unless the court orders otherwise, these disclosures must be made at least 30 days before trial."  *Id.*[10]

---

[9] Because the Court has already determined that Dr. Ben-Yehuda may not testify as an expert, this issue is moot as to his report.

[10] The parties debate how courts determine whether a report qualifies as a supplement.  Defendants claim that "[i]t is only if the expert subsequently learns of information that was previously unknown or unavailable, that renders information previously provided in an initial report inaccurate or misleading because it was incomplete, that the duty to supplement arises" and that experts ought not otherwise be allowed "to continually bolster, strengthen, or improve their reports by endlessly researching the issues they already opined upon."  Doc. 125, 11–12; Doc. 120-1, 23–24.  *See Sandata Techs., Inc. v. Infocrossing, Inc.*, No. 05 Civ. 09546LMMTHK, 2007 WL 4157163, at ** 4–6

Federal Rule of Civil Procedure 37(c)(1) creates an enforcement mechanism: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

In deciding whether to preclude testimony pursuant to Rule 37(c)(1), the Court considers four factors: "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997).

The Court finds Stern's second report inadmissible. On November 15, 2017, Stern made his initial disclosure pursuant to Rule 26(a)(2). Doc. 121-1. In this disclosure, he provided a copy of his resume and described his experience, as it related to his expert opinion. *Id.* On December 1, 2017, Defendants deposed Stern and raised questions about whether he was qualified to offer expert opinions. Doc. 121-2. On February 1, 2018, Defendants filed a letter with the Court to request a pre-motion conference to seek leave to file motions to preclude Wiener's experts, including Stern. Doc. 109. On February 14, 2018, Stern filed an additional disclosure pursuant to Rule 26(a)(2). Doc. 121-3. In this disclosure, he added detail about the

---

(S.D.N.Y. Nov. 16, 2007) and *Lidle v. Cirrus Design Corp.*, No. 08 Civ. 1253 BSJ/HBP, 2009 WL 4907201, at *6 (S.D.N.Y. Dec. 18, 2009). Wiener suggests a different rule: "Where a supplemental report does not expound a wholly new and complex approach designed to fill a significant and logical gap, but rather support[s] an initial position, it falls within the definition of a supplement to an initial report." Doc. 134, 33 (internal quotation marks omitted). This quotation derives from *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 280 (S.D.N.Y. 2011) (finding that "[Expert's] Declaration does not 'expound a wholly new and complex approach designed to fill a significant and logical gap,' but rather 'support[s] an initial position,' and is within the bounds of [the Expert's] report"). However, the Court need not decide this issue because regardless of whether the report is supplemental, Stern's report, like his testimony on the same topics, is inadmissible as unqualified.

experiences that informed his opinions on the agent standard of care and the reinstatement process. *Id.* at 121-3, 6.

Defendants argue that the report is just an attempt to bolster Stern's initial disclosure. Doc. 120-1, 24. They also claim that, even if the report qualified as supplemental, the Court should find it inadmissible because Stern is not qualified to proffer expert opinions on the agent standard of care and the reinstatement process. *Id.* at 25.

Wiener responds that Defendants will not be prejudiced because they can still depose Stern before trial. That argument is unavailing. First, as explained above, this issue is moot because the Court has already determined that Stern is not qualified to give expert opinion on the standard of care and the reinstatement process—the subject matter of the report. Second, two of the four factors from *Softel, Inc*, weigh in favor of preclusion: (1) Wiener has not explained why Stern did not disclose this information during his initial report; and (2) this information is not important to Stern's testimony because Stern will not testify on these topics. As a result, the Court finds this second report inadmissible.

## IV.     Conclusion

For the reasons stated above, Defendants' motions are GRANTED in part and DENIED in part. The parties are directed to appear for a status conference on April 10, 2019, at 11:45 a.m. The Clerk of the Court is respectfully directed to terminate the motions, Docs. 120, 124, 126, and 128.

It is SO ORDERED.

Dated:     March 15, 2019
           New York, New York

Edgardo Ramos, U.S.D.J.