UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MALCOLM H. WIENER, | ) | |
| | ) | Civil Action No. 1:16-CV-04019-ER |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AXA EQUITABLE LIFE INSURANCE | ) | |
| COMPANY, AXA ADVISORS, LLC, | ) | |
| AXA NETWORK, LLC, and DAVID | ) | |
| HUNGERFORD, | ) | |
| | ) | April 17, 2020 |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT DAVID HUNGERFORD'S MOTION FOR SUMMARY JUDGMENT

WINGET, SPADAFORA & SCHWARTZBERG, LLP
Brian J. Palmeri, Esq. (NY No. 4560793)
S.D.N.Y. Bar Code: BP1982
One Canterbury Green
201 Broad Street, Suite 1000
Stamford, CT 06901
T:  203-328-1200
F:  203-328-1212
Palmeri.B@wssllp.com

*Attorneys for the Defendant,
David Hungerford*

## TABLE OF CONTENTS

Table of Authorities ................................................................................................... III

I.    **PRELIMINARY STATEMENT** .................................................................. 1

II.   **STATEMENT OF FACTS** ............................................................................ 2

III.  **STANDARD OF REVIEW FOR SUMMARY JUDGMENT** ..................... 8

IV.   **ARGUMENT** ................................................................................................. 9

    A.   **Summary Judgment is Appropriate as to Plaintiff's Negligence Claim** ............... 9

      1.   **Mr. Hungerford did not breach his limited duty of care as an insurance agent** ............... 10

      2.   **Mr. Hungerford did not have a special relationship with Plaintiff to expand his limited duty** ............... 2

      3.   **Mr. Hungerford did not breach his limited duty of care by advising Plaintiff to submit the reinstatement application** ............... 18

    B.   **Breach of Fiduciary Duty** .......................................................... 20

      1.   **Mr. Hungerford did not owe a fiduciary duty to Plaintiff** ............... 20

    C.   **Plaintiff does not have an expert to opine regarding an insurance agent's standard of care** ............... 21

    D.   **Mr. Hungerford did not cause Plaintiff's alleged damages** ............... 25

V.    **CONCLUSION** .......................................................................................... 28

<u>Table of Authorities</u>

*Federal*

**United States Supreme Court**

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986).............................................................................................8

*Celotex Corporation v. Catrett*
    477 U.S. 317 (1986).............................................................................................8

**United States Court of Appeals**

*Caronia v. Philip Morris USA, Inc.*
    715 F.3d 417 (2d Cir. 2013).................................................................................9

*GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc.*
    449 F.3d 377 (2d Cir. 2006)........................................................... 10-13, 20, & 25

*Sitts v. U.S.*
    811 F.2d 736 (2d Cir. 1987)......................................................................... 24-25

*Western World Insurance Company v. Stack Oil, Inc.*
    922 F.2d 118(2d Cir. 1990).................................................................................8

*Ying Jing Gan v. City of New York*
    996 F.2d 522 (2d Cir. 1993).................................................................................8

**United States District Court**

*Berk v. St. Vincent's Hospital and Medical Center*
    380 F.Supp.2d 334 (S.D.N.Y. 2005).................................................................22

*Drake v. Laboratory Corporation of America Holdings*
    2007 WL 776818 (E.D.N.Y.)...............................................................................9

*Emerald Town Car of Pearl River, LLC v. Philadelphia Indemnity Insurance Company*
    2017 WL 1383773 (S.D.N.Y.).............................................................................11

*Liberty Mutual Insurance Co. v. Harvey Gerstman Associates, Inc.*
    2012 WL 5289606 (E.D.N.Y.)............................................................................19

*Moslem v. Parietti & McGuire Insurance Agency*
    2011 WL 721653 (S.D.N.Y.) ........................................................................18

*Pasternack v. Laboratory Corporation of America*
    892 F. Supp.2d 540 (S.D.N.Y. 2012) ............................................................9

*Sedamanos v. Tracy-Driscoll & Co., Inc.*
    2012 WL 13027406 (D. Conn.) ....................................................................23

*Sofia v. Massachusetts Mutual Life Insurance Company*
    2004 WL 1792441 (W.D.N.Y.) ....................................................................21

**Federal Rules of Civil Procedure**

    Rule 56 ................................................................................................. 1 & 8

*State*

**New York Decisions**

*Akins v. Glens Falls City School District*
    53 N.Y.2d 325 (1981) ....................................................................................9

*Benson v. Dean*
    232 N.Y. 52 (1921) ................................................................................. 24-25

*Chase Scientific Research, Inc. v. NIA Group, Inc.*
    96 N.Y.2d 20 (2001) ............................................................................ 10 & 18

*Core-Mark International v. Swett & Crawford, Inc.*
    71 A.D.3d 1072, 1073 (2d Dep't 2010) ......................................................22

*D'Agostino v. Allstate Insurance Company*
    2015 WL 5797022 at *12 (N.Y. Sup. Ct. Richmond Cnty.)............................23

*De Long v. Erie County*
    60 N.Y.2d 296 (1983) ..................................................................................22

*Empire Industrial Corp. v. Insurance Companies of North America*
    226 A.D.2d 580 (2d Dep't 1996) ................................................................22

*Finch v. Steve Cardell Agency*
    136 A.D.3d 1198 (3d Dep't 2016) ..............................................................12

iv

*Holskin v. Hurwitz*
211 A.D. 731 (1st Dep't 1925) ................................................................. 10-11

*Joseph v. Interboro Insurance Company*
144 A.D.3d 1105, 1108 (2d Dep't 2016) ........................................................12

*Kaufmann v. Leatherstocking Cooperative Insurance Company*
52 A.D.3d 1010 (3d Dep't 2008) ...................................................................18

*MAAD Construction, Inc. v. Cavallino Risk Management, Inc.*
178 A.D.3d 816 (2d Dep't 2019) ...................................................................21

*Murphy v. Kuhn*
90 N.Y.2d 266 (1997) ........................................................... 10, 12, 18-20, & 22

*Payette v. Rockefeller University*
220 A.D.2d 69 (1st Dep't 1996) ....................................................................22

*People ex rel. Cuomo v. Wells Fargo Insurance Services, Inc.*
62 A.D.3d 404 (1st Dep't 2009), *affirmed* 16 N.Y.3d 166 (2011) ...................20

*Sawyer v. Rutecki*
92 A.D.3d 1237 (2012) ................................................................................13

*Silvers v. State*
68 A.D.3d 668 (1st Dep't 2009) ....................................................................21

*Voss v. Netherlands Insurance Company*
22 N.Y.3d 728 (2014) ..................................................................................12

*Waters Edge @ Jude Thaddeus Landing, Inc. v. B&G Group, Inc.*
129 A.D.3d 706, 708 (2015) .........................................................................20

## New York Statutes

*N.Y. Ins. Law* § 3203 ....................................................................................11

## Other States

*Dimeo v. Burns, Brooks & McNell, Inc.*
6 Conn.App. 241, 245 (1986) .......................................................................23

*Dulaney v. State Farm Fire & Casualty Insurance Co.*
375 Mont. 117 (2014) ..................................................................................23

Pursuant to Federal Rule of Civil Procedure 56, Defendant David Hungerford, by and through his undersigned counsel, respectfully submits the following memorandum of law in support of his Motion for Summary Judgment with respect to Counts X (Negligence) and XII (Breach of Fiduciary Duty) of the Plaintiff's, Malcolm H. Wiener ("Plaintiff"), operative Third Amended Complaint (the "Complaint").[1]

## I.   <u>PRELIMINARY STATEMENT</u>

This action arises out of Plaintiff's failure to make required payments on three flexible premium life insurance policies acquired by Plaintiff in the late 1980s (the "Policies"), the resulting termination of those Policies in December 2013, and denial of reinstatement of the Policies by AXA Equitable in March 2014.  Plaintiff's failure to remit the required payment is the sole reason the Policies were cancelled.  The cancellation of the Policies is not surprising because Plaintiff and his staff previously allowed the Policies to lapse an astounding 68 times before they were finally terminated.  Mr. Hungerford did not sell Plaintiff the Policies.  He was assigned by AXA Equitable to be the agent of record for the Policies after the agent that sold Plaintiff the Policies left AXA.  Yet Plaintiff seeks to hold Mr. Hungerford liable for Plaintiff's own failure to make timely payments by alleging that Mr. Hungerford: (i) was negligent in failing to advise Plaintiff regarding the lapse of the Policies, (Palmeri Decl. at Exh. A, Count X); (ii) was negligent in providing Plaintiff with misleading or incorrect advice in connection with the reinstatement application for the Policies, *id.*; and/or (iii) breached a fiduciary duty owed to Plaintiff by virtue of either of the foregoing, *id.*, Count XII.

These allegations are simply untenable in this case because insurance agents have no continuing duty to advise after the sale of an insurance policy absent a "special relationship," which

---

[1] The Complaint is attached hereto as Exhibit "A" of the Declaration of Brian J. Palmeri, Esq. in Support of David Hungerford's Motion for Summary Judgment ("Palmeri Decl.").

is not present here.  *See infra* IV.  The undisputed facts – including most notably Plaintiff's own testimony – belie any possible contention that Plaintiff and Mr. Hungerford shared a "special relationship," such that Mr. Hungerford should be held liable to Plaintiff.  For example, it is undisputed that Plaintiff and Mr. Hungerford never spoke via telephone, never communicated via U.S. mail or email, and Plaintiff himself testified that he did not rely on Mr. Hungerford for advice with respect to the Policies.  *Infra* II.  Even if Plaintiff and Mr. Hungerford had any type of substantive relationship, Plaintiff does not have an expert to establish the standard of care of an insurance agent, or that Mr. Hungerford breached that standard of care. Plaintiff also cannot establish that Mr. Hungerford's conduct caused his damages, because Plaintiff testified that he did not rely on Mr. Hungerford to ensure that the Policies remained in force, and according to Plaintiff's own allegations the cause of his alleged damages was that he failed to make the required payments and as a result AXA Equitable terminated the Policies.  *Infra* IV.D. Each of these grounds on its own is a basis to grant summary judgment in favor of Mr. Hungerford, but when considered together, the case for summary judgment in favor of Mr. Hungerford is overwhelming.

## II.   STATEMENT OF FACTS

### THE POLICIES

Plaintiff acquired the Policies from AXA Equitable on October 14, 1986 and May 14, 1987. Palmeri Decl. at Exh. A ¶ 9.  The Policies had a cumulative death benefit of sixteen-million dollars: policy number 36224259 had a death benefit of nine million dollars ($9,000,000.00), which was later reduced to seven million two hundred thousand dollars ($7,200,000.00); policy number 37205147 had a death benefit of nine million dollars ($9,000,000.00), which was later reduced to seven million two hundred thousand dollars ($7,200,000.00); and policy number 37205155 had a

death benefit of two million dollars ($2,000,000.00), which was later reduced to one million six hundred thousand dollars ($1,600,000.00).  *Id.*

The Policies were universal life insurance policies that would stay in force throughout Plaintiff's life provided that the conditions of the Policies were met.  *Id.* ¶ 10.  In particular, while the Policies did not require fixed premium payments, they required Plaintiff to maintain the cash value of the Policies at a level sufficient to cover the cost of deductions. I*d*. ¶ 31.  For the policies to remain in force, each policy's Net Cash Surrender Value (the policy account value less any applicable surrender charge, policy loan, or accrued loan interest) must be sufficient to cover the monthly deduction for the cost of insurance. If the cash value of the Policies was insufficient to cover the cost of deductions, AXA Equitable would send Plaintiff a policy lapse notice indicating the minimum payment due.  *Id.* ¶ 32; Palmeri Decl. Exh. N.  If the minimum payment was not remitted, the Policies would terminate. *Id*.; Palmeri Decl. Exh. O.

### PLAINTIFF'S HOME STAFF SENT ALL NOTICES TO HIS FORMER COMPANY, WHICH AGREED TO PAY THE POLICY PREMIUMS FOR PLAINTIFF

Plaintiff had an agreement with his former company, Millburn Corporation ("Millburn"), whereby Milburn was responsible for maintaining the Policies on Plaintiff's behalf, including making any payments due on the Policies.  Palmeri Decl. at Exh. A, ¶ 24.  From 2009 to 2013, Plaintiff received mail from AXA Equitable, including all payment reminder notices and lapse notices, at his home address in Greenwich, Connecticut.  *Id*. ¶ 27.  Plaintiff's home staff would then forward any and all mail relating to the Policies received at his personal residence directly to Millburn, which was located in New York City.  *Id*. ¶ 28; Palmeri Decl. at Exh. B, *Deposition Transcript of Karen Nielson* ("*Nielsen Dep*."), 88:12-19.

During this period, Plaintiff and his home staff did not have a system in place to track when notices from AXA Equitable were scheduled to arrive, when notices were actually received, what

mail was forwarded to Millburn, or what mail was received by Millburn. *Id.*, *Nielsen Dep.*, 48:5-16; 94:9-17; 98:1-4; Palmeri Decl. at Exh. C, *Deposition Transcript of Christina Padgett* ("*Padgett Dep.*"), 10:1-23; Palmeri Decl. at Exh. D, *Deposition Transcript of Carolyn Wiener (*"*C. Wiener Dep.*"*)*, 25:1-25, 26:1-2. Plaintiff did not have any awareness of where notices regarding the Policies were sent until this litigation commenced. Palmeri Decl. at Exh. J, *Deposition Transcript of Malcolm Wiener* ("*M. Wiener Dep.*"), 39:13-15.

### AS A MATTER OF PRACTICE, MILLBURN MADE PAYMENTS INTO THE POLICY AFTER RECEIVING LAPSE NOTICES

At all relevant times, it was the admitted practice of Millburn to make payments on the Policies during the 61-day grace period following receipt of a lapse notice, rather than upon receipt of the payment reminder notice. Palmeri Decl. at Exh. E, *Deposition Transcript of Maria Loh* ("*Loh Dep.*"), 39:19-22 ("[I]t was practice in my office that we pay based on the lapse notices."); Palmeri Decl. at Exh. D, *C. Wiener Dep.*, 41:16-19 ("They were paying pursuant to lapse notices because that was the only document that would give them the minimum payment amount, and they had decided to pay only the minimum amount."); Palmeri Decl. at Exh. F, *Deposition Transcript of Wanda Brogdon* ("*Brogdon Dep.*"), 16:9-20.

Millburn also did not maintain the cash value of the Policies at a level sufficient to cover the cost of deductions, meaning additional payments needed to be made or the Polices would lapse, and ultimately terminate. Palmeri Decl. at Exh. G, *Deposition Transcript of Gregg Buckbinder* ("*Buckbinder Dep.*"), 39:16-19 ("Those three policies where there was nothing left in the policy and premiums had to be paid."). Despite this practice, Millburn did not maintain a calendar of when to expect the lapse notices, or when payments on the Policies were due. *Id.*, *Buckbinder Dep.*, 94:3-24. Since inception, Plaintiff and/or Millburn allowed each of the Policies to lapse sixty-eight (68) times. Palmeri Decl. at Exh. H. The Policies were also terminated and

subsequently reinstated on at least three occasions.  Palmeri Decl. at Exh. L.  Plaintiff was not aware, or could not recall, that the Policies had ever lapsed or been terminated prior to this litigation.  Palmeri Decl. at Exh. J, *M. Wiener Dep*., 38:24-39:1-3; 50:10-18.

### MR. HUNGERFORD WAS MERELY THE AGENT OF RECORD

In April and May of 1990, Mr. Hungerford was assigned as the agent of record for the Policies, but Mr. Hungerford did not sell Plaintiff the Policies.  Palmeri Decl. at Exh. I, *Deposition Transcript of David Hungerford* ("*Hungerford Dep.*"), 17:15-18; 88:13-17.  AXA Equitable assigned Mr. Hungerford to serve as the agent of record for the Policies after the selling agent left AXA.  *Id.* ¶ 18; Palmeri Decl. at Exh. I, *Deposition Transcript of David Hungerford* ("*Hungerford Dep.*"), 17:15-18; 88:13-17.

As the agent of record, Mr. Hungerford was copied on the payment reminder notices and lapse notices Plaintiff received.  *Id.*, *Hungerford Dep.*, 61:20-25, 62:1-4.  Mr. Hungerford also had access to correspondence sent to Plaintiff regarding the Policies through an email-alert system.  *Id.*, *Hungerford Dep.*, 52:2-6.  In his capacity as the agent of record, Mr. Hungerford would answer questions and provide information regarding his clients' policies when requested, but would not monitor the various notices his clients received.  *Id.*, *Hungerford Dep.*, 42:1-6; 43:4-12; 50:20-25; 94:25, 95:1-5; 54:1-12.  Mr. Hungerford received a commission on the Policies, which was calculated as a fixed percentage of the premiums paid.  *Id.*, *Hungerford Dep.*, 35:4-9.  Mr. Hungerford did not receive any other form of compensation related to Plaintiff or the Policies.  *Id.*, *Hungerford Dep.*, 224:23-225:4.

### MR. HUNGERFORD AND PLAINTIFF NEVER COMMUNICATED

Since Mr. Hungerford became agent of record for the Policies, Plaintiff has never requested Mr. Hungerford's advice with respect to the financial management of the Policies.  Palmeri Decl.

at Exh. I, *Hungerford Dep.*, 96:5-7; Palmeri Decl. at Exh. J, *Wiener Dep.*, 26:24-5, 27:1-20; 68:20-22.  Mr. Hungerford has never met Plaintiff, never spoken to Plaintiff via telephone, and never sent communications to Plaintiff via U.S. mail or email.  Palmeri Decl. at Exh. I, *Hungerford Dep.*, 96:5-7; Palmeri Decl. at Exh. J, *M. Wiener Dep.*, 26:24-5, 27:1-20; 68:20-22.  Instead, Plaintiff relied on Millburn and specifically, Gregg Buckbinder – an executive of Millburn – for advice with respect to the Policies and to ensure the Polices remained in force.  Palmeri Decl. at Exh. J, *M. Wiener Dep.*, 53:5-14; 55:1-4; 65:6-21; 75:7-12; 76:6-20; 83:12-25.

Mr. Hungerford's relationship with Millburn was nearly as minimal as his relationship with the Plaintiff. Mr. Buckbinder never requested Mr. Hungerford's advice with respect to the financial management of the Policies, including the amount and frequency of payments.  Palmeri Decl. at Exh. G, *Buckbinder Dep.*, 44:2-45:7.  Indeed Mr. Buckbinder never attempted to speak with Mr. Hungerford, or Mr. Hungerford's office, and did not anticipate receiving any communication from Mr. Hungerford regarding the payments.  *Id.* at 44:2-45:7; 54:21-23.  Both Plaintiff and Mr. Buckbinder could not recall ever reviewing an annual report with respect to the Policies.  *Id.* at 122:23-123:5; Palmeri Decl. at Exh. J, *M. Wiener Dep.*, 56:10-13.  Plaintiff, "regarded [the Policies] as the most routine sort of life insurance and paid no attention to it, really." *Id.* at 38:19-22; *see also* 59:8-11.  The Policies were not, "something [Buckbinder] was spending a lot of time focusing on."  Palmeri Decl. at Exh. G, *Buckbinder Dep*, 158:24-159:3.

### PLAINTIFF FAILS TO MAKE THE MINIMUM REQUIRED PAYMENTS AND THE POLICIES ARE TERMINATED

On October 1, 2013, the Net Cash Surrender Value of each Policy was less than the monthly deduction. AXA then generated a Policy Lapse Notice which advised Plaintiff that additional minimum payments were due by December 1, 2013 to keep the Policies in force. Palmeri Decl. at Exh. N. Millburn did not make the minimum required payments by December 1, 2013.  Palmeri

Decl. at Exh. O.  As a result on December 2, 2013, by way of regular mail sent to his home address Plaintiff received three notices of policy termination from AXA Equitable for each of the Policies, along with applications for reinstatement.  Palmeri Decl. at Exh. A ¶ 37.  Mr. Hungerford was copied on the notices of policy termination.  Palmeri Decl. at Exh. I, *Hungerford Dep.*, 61:20-25. Plaintiff never contacted Mr. Hungerford to discuss reinstatement of the Policies.  Palmeri Decl. at Exh. J, *M. Wiener Dep*., 26:24-5, 27:1-20; 68:20-22.  Messrs. Buckbinder and Hungerford spoke for the first time following the termination of the Policies in December 2013.  Palmeri Decl. at Exh. G, *Buckbinder Dep*., 43:4-25.  Ultimately Mr. Hungerford advised Mr. Buckbinder that Plaintiff should complete and submit the reinstatement applications.  *Id*., *Buckbinder Dep*., 107:12-22.  The application for reinstatement from AXA Equitable explicitly stated, "[p]lease do not submit a payment with this form."  Palmeri Decl. at Exh. K.

On December 23, 2013, Plaintiff submitted a reinstatement application with medical evidence of insurability to AXA Equitable.  Palmeri Decl. at Exh. A ¶ 44.  Before AXA Equitable responded to the reinstatement application, Millburn sent a letter to AXA Equitable on Plaintiff's behalf on February 21, 2014, seeking reinstatement of the Policies and informing AXA Equitable that Plaintiff purportedly had not received the three lapse notices related to the Policies prior to their termination.  Palmeri Decl. at Exh. A ¶ 47.  Along with that correspondence, Millburn included a payment of $96,093.00 which was based on the last payments it had made on or around July 1, 2013.  *Id*.  On March 5, 2014 AXA Equitable provided Plaintiff with copies of the three lapse notices that were sent to him in October 2013, and also refunded the previously tendered payment of $96,093.00.  *Id*. ¶ 51.  On March 24, 2014 AXA Equitable notified Plaintiff that his reinstatement application had been denied.  *Id.* ¶ 54.

### III.     STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is proper if the record shows that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party initially has the burden of proving the absence of genuine issues of material fact and that it is entitled to judgment.  *See e.g., Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986).  With respect to issues which the nonmoving party would bear the burden of proof at trial, the moving party can satisfy its burden by: (i) presenting affirmative evidence negating an essential element of the nonmoving party's claim; or (ii) pointing to the failure of proof concerning an essential element of the nonmoving party's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Once this initial burden is met, the burden shifts to the nonmoving party, "to set forth specific facts showing that there is a genuine issue of material fact to be tried," in order to avoid summary judgment.  *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993) (internal citations omitted).   "The non-movant cannot escape summary judgement merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through 'mere speculation or conjecture.' "  *Western World Ins. Co. v. Stack Oil, Inc*., 922 F.2d 118, 121 (2d Cir. 1990) (internal citations omitted).  Additionally, the nonmoving party may not rest on the, "mere allegations or denials," contained in its pleadings.  *See Ying Jing Gan*, 996 F.2d at 532-33 (further holding that the nonmoving party may not rely on conclusory statements or on argument that affidavits in support of motion for summary judgment are not credible).

## IV.   ARGUMENT

### A.   Summary Judgment is Appropriate as to Plaintiff's Negligence Claim

In order to prevail on a claim for negligence, a plaintiff must show: "(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 428 (2d Cir. 2013) (*quoting Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333 (1981)). With respect to the first element, "[t]he existence of a duty is an essential element of a negligence claim because, '[i]n the absence of a duty, as a matter of law, no liability can ensue.'" *Pasternack v. Lab. Corp. of Am.*, 892 F. Supp.2d 540, 552 (S.D.N.Y. 2012) (brackets in original; internal citations omitted). "Although juries determine whether and to what extent a particular duty was breached, it is for the courts first to determine whether any duty exists." *Drake v. Lab. Corp. of Am. Holdings*, 2007 WL 776818 at *2 (E.D.N.Y.).

Here, the undisputed record establishes that Plaintiff cannot meet its burden to prove that Mr. Hungerford breached any applicable duty of care for insurance agents, either by: (i) allegedly failing to advise Plaintiff regarding the lapse of the Policies, (Palmeri Decl. at Exh. A ¶ 44); and/or (ii) allegedly providing Plaintiff with misleading or incorrect advice in connection with the reinstatement application for the Policies, *id.* ¶ 42. First, Plaintiff cannot establish that Mr. Hungerford breached his limited duty as an insurance agent, which does not include continual advice. Second, Plaintiff cannot establish that Mr. Hungerford had the "special relationship" required to expand that limited duty. Third, Plaintiff has not disclosed an expert who can establish the standard of care that governed Mr. Hungerford's conduct as an insurance agent, and who can opine as to whether Mr. Hungerford breached that standard of care. Fourth, even assuming

Plaintiff could establish that Mr. Hungerford breached an applicable duty of care – which he cannot – Plaintiff also fails to establish that Mr. Hungerford's conduct was the cause of his damages.

### 1. Mr. Hungerford did not breach his limited duty of care as an insurance agent

Plaintiff cannot prevail on his claim for negligence because Mr. Hungerford did not breach his limited duty of care as an insurance agent. In an attempt to end run the limited duties of an insurance agent, Plaintiff frames his negligence claim against Mr. Hungerford in broad strokes – asserting that Mr. Hungerford, "failed to exercise reasonable care and skill in the performance of his duties in the servicing and maintenance of the Policies," by allegedly failing, "to ever advise Plaintiff or Millburn as to the significance of these [lapse] notices and/or the proper method for ensuring sufficient premium was being paid into the Policies."  Palmeri Decl., Exh. A ¶¶ 152-53. However, it is well established that insurance agents do not have a continual duty to advise.

It is well established that, "insurance agents [in New York] have a common-law duty to obtain requested coverage for their clients within a reasonable time or inform the client of the inability to do so; however, they have no continuing duty to advise, guide or direct a client to obtain *additional* coverage."  *GlobalNet Financial.com, Inc. v. Frank Crystal & Co., Inc*., 449 F.3d 377, 388 (2d Cir. 2006) (*quoting Murphy v. Kuhn*, 90 N.Y.2d 266, 270 (1997)) (brackets and emphasis in original).  *See also Chase Scientific Research, Inc. v. NIA Grp., Inc*., 96 N.Y.2d 20, 30 (2001) ("[A]s this Court recently made clear, an insurance agent has a common-law duty to obtain requested coverage, but generally not a continuing duty to advise guide or direct a client based on a special relationship of trust and confidence." (*citing Murphy*, 90 N.Y.2d at 273)).

Insurance agents also <u>do not</u> have a general duty to prevent a lapse in coverage, "[i]t was [the insured's] duty to inform himself of the expiration date, to take steps to renew the policy, if he cared to do so."  *GlobalNet*, 449 F.3d at 387-98 (*quoting Holskin v. Hurwitz*, 211 A.D. 731,

732-33 (1ˢᵗ Dep't 1925)) (brackets in original).  "[The broker] did not obligate himself to advise [the insured] of the expiration date of the policy nor was it [the broker's duty], either under the allegations of the complaint or as matter of law, to advise [the insured] that the policy expired at any particular time."  *Id.* (brackets in original). While New York law requires insurers to provide a sixty-one day grace period in the event of a lapse in flexible premium policies like the Plaintiff's, it does not impose further obligations on the agent.  *See N.Y. Ins. Law* § 3203.

Finally, and most importantly, insurance agents have, "no continuing duty to advise, guide, or direct [an insured] with regard to whether [an insured] was failing to pay its premium."  *Emerald Town Car of Pearl River, LLC v. Philadelphia Indem. Ins. Co.*, 2017 WL 1383773 at *6 (S.D.N.Y.).  Similar to the Plaintiff here, the plaintiff in *Emerald* failed to remit the necessary payment and its policy terminated.  It was this failure that caused the plaintiff's alleged damages, and not any omission on the part of the insurance agent.  The Court in *Emerald* dismissed the claims against the agent, "because [the defendant] was not the cause of the cancellation of coverage, rather the only viable inference is that [the plaintiff's] failure to pay the premium on time in accordance with the terms of the policy lead to the cancellation."  *Id.* at *7 (internal quotation marks and citation omitted).  The same inaction and result occurred in the instant case. As discussed below, Plaintiff (or Millburn, as the case may be) chose to wait for a lapse notice to make the payments required to keep the Policies in force.  They also knew that the Policies would terminate if these minimum payments were not made on time.  Unfortunately, they did not make the payment in a timely fashion despite knowing the consequences.  As discussed below, Plaintiff did not have any conversations with Mr. Hungerford regarding payments nor did he expect to have such conversations.  As such, Mr. Hungerford did not have a duty to continually advise Plaintiff or prevent a lapse in the Policies and summary judgment for Mr. Hungerford is warranted.

11

### 2. Mr. Hungerford did not have a special relationship with Plaintiff to expand his limited duty

The only way for Plaintiff to expand the limited duties owed by Mr. Hungerford as an insurance agent is to establish a special relationship between Plaintiff and Mr. Hungerford.  Far from such a special relationship, the undisputed facts show the complete absence of a relationship between Plaintiff and Mr. Hungerford.  Invoking a continuing duty requires the existence of an exceptional situation that gives rise to a special relationship that carries the additional duty of advisement.  *See Joseph v. Interboro Ins. Co.*, 144 A.D.3d 1105, 1108 (2d Dep't 2016).  "The question whether a special relationship exists between an insurance agent and a client giving rise to a duty to guide and advise the client is a factual determination that, 'is governed by the particular relationship between the parties and is best determined on a case-by-case basis.'"  *Finch v Steve Cardell Agency*, 136 A.D.3d 1198, 1201 (3d Dep't 2016) (*quoting Murphy*, 90 N.Y.2d at 272).  The special relationship is an elusive rarity – "we reiterate that special relationships in the insurance brokerage context are the exception, not the norm."  *Voss v. Netherlands Ins. Co.*, 22 N.Y.3d 728, 736 (2014).

New York courts have identified three specific and exceptional circumstances, which would create additional or continuing duties:

> (1) the agent receives compensation for consultation apart from payment of the premiums; (2) there was some interaction regarding a question of coverage, with the insured relying on the expertise of the agent; or (3) there is a course of dealing over an extended period of time which would have put objectively reasonable insurance agents on notice that their advice was being sought and specially relied on.

*Joseph*, 144 A.D.3d at 1108 (*citing Voss*, 22 N.Y.3d at 735 *and Murphy*, 90 N.Y.2d at 272).  In these very limited and well-defined circumstances an insurance agent, "may be liable under a theory of negligence for failing to inform an insured client about the cancellation of an insurance

12

policy," so long as the insured was not concurrently negligent. *GlobalNet*, 449 F.3d at 387 (internal citations omitted). As discussed above, Plaintiff was indisputably negligent in this case, which should preclude his claim. However, there is no evidence by which a factfinder could reasonably infer the existence of a special relationship between Plaintiff and Mr. Hungerford, such that Mr. Hungerford should be held liable to Plaintiff with respect to the cancellation of the Policies.

First, it is undisputed that Mr. Hungerford only received an annual commission on the Policies, which was a fixed percentage of the premiums paid, and he did not receive any other form of compensation related to the Policies. Palmeri Decl. at Exh. I, *Hungerford Dep.*, 35:4-9; 224:23-225:4. *See Sawyer v. Rutecki*, 92 A.D.3d 1237, 1238 (2012) (granting summary judgment where agent did not receive compensation, "over and above commissions," and was not the plaintiffs' "exclusive agent")

Second, there was no interaction between Plaintiff and Mr. Hungerford regarding any questions of coverage. As detailed above, it is undisputed that Plaintiff and Mr. Hungerford never spoke via telephone, and never communicated via U.S. mail or email. Palmeri Decl., Exh. I, *Hungerford Dep.*, 96:5-7; Palmeri Decl. at Exh. J, *M. Wiener Dep.*, 26:24-5, 27:1-20; 68:20-22. Plaintiff further testified that he relied on Mr. Buckbinder, and not Mr. Hungerford, with respect to the Policies. *Id.*, *Wiener Dep.*, 53:5-14; 55:1-4; 65:6-21; 75:7-12; 76:6-20; 83:12-25. It is undisputed that Mr. Buckbinder never requested Mr. Hungerford's advice with respect to the financial management of the Policies, and did not anticipate receiving any communication from Mr. Hungerford. Palmeri Decl. at Exh. G, 44:2-45:7; 54:21-23.

Third, the complete lack of a relationship between Plaintiff and Mr. Hungerford over the course of 20 plus years is enough to conclude as a matter of law that a reasonable agent would not

have been put on notice that his advice was being sought or relied on.  In fact, the evidence in this case conclusively establishes that neither Plaintiff nor Milburn was seeking Mr. Hungerford's advice, much less relying on his advice.  The Complaint is devoid of any allegations describing the nature of the relationship between Plaintiff and Mr. Hungerford, and Plaintiff's own testimony eliminates any possible contention that they shared any sort of relationship, let alone a special relationship.  Indeed, the evidence completely contradicts the allegation that, "Plaintiff, through Millburn, relied on Mr. Hungerford's advice in maintaining the Policies."  Palmeri Decl. at Exh. A ¶ 153.

The undisputed facts demonstrate that Mr. Hungerford was available to Plaintiff and Millburn if they wanted to request advice regarding the Policies.  Palmeri Decl. at Exh. I, *Hungerford Dep.*, 96:5-7; Palmeri Decl. at Exh. J, *M. Wiener Dep.*, 26:24-5, 27:1-20; 68:20-22.  They did not.  Palmeri Decl. at Exh. I, *Hungerford Dep.*, 105:2-24.  In fact, since Mr. Hungerford became the agent of record for the Policies in April and May of 1990, Plaintiff has never requested his advice with respect to the financial management of the Policies.  *Id.* at 96:5-7; Palmeri Decl. at Exh. J, *Wiener Dep.*, 26:24-5, 27:1-20; 68:20-22.  Mr. Hungerford has never met Plaintiff, never spoken to Plaintiff via telephone, and never sent communications to Plaintiff via U.S. mail or email.  Palmeri Decl. at Exh. I, *Hungerford Dep.*, 96:5-7; Palmeri Decl. at Exh. J, *M. Wiener Dep.*, 26:24-5, 27:1-20; 68:20-22.

Rather than rely on Mr. Hungerford, Plaintiff admittedly relied on Millburn, and specifically Mr. Buckbinder, to ensure that the Polices remained in force.  Palmeri Decl. at Exh. J, *Wiener Dep.*, 53:5-14; 55:1-4; 65:6-21; 75:7-12; 76:6-20; 83:12-25.  The record establishes that Mr. Buckbinder understood that premiums on the Policies had to be paid in order for the Policies to remain in force.  Palmeri Decl. at Exh. G, *Buckbinder Dep.*, 39:16-19.  Yet Mr. Buckbinder

never requested Mr. Hungerford's advice with respect to the financial management of the Policies. Palmeri Decl. at Exh. G, *Buckbinder Dep*., 44:2-45:7.  Indeed, Mr. Buckbinder never attempted to speak with Mr. Hungerford, or Mr. Hungerford's office, and did not anticipate receiving any communication from Mr. Hungerford regarding payment on the Policies.  *Id*., *Buckbinder Dep*., 44:2-45:7; 54:21-23.  Both Plaintiff and Mr. Buckbinder could not recall ever reviewing an annual report with respect to the Policies.  *Id*., *Buckbinder Dep*., 122:23-123:5; Palmeri Decl. at Exh. J, *M. Wiener Dep*., 56:10-13.  Plaintiff himself, "regarded [the Policies] as the most routine sort of life insurance and paid no attention to it, really," (Palmeri Decl. at Exh. J, *M. Wiener Dep*., 38:19-22, *see also* 56:10-13), and the Policies were not, "something [Buckbinder] was spending a lot of time focusing on," (Palmeri Decl. at Exh. G, *Buckbinder Dep*., 158:24-159:3).

The deposition testimony from the three key witnesses in this case Plaintiff, and Messrs. Buckbinder and Hungerford, shows an attenuated customer-agent relationship that falls far short of the exceptional circumstances required to establish a special relationship under New York law.

### Plaintiff

- "I don't recall ever seeing any annual report.  I think my general attitude was, this was the most common garden variety of life insurance and there was nothing for me to be concerned about or look at."  Palmeri Decl. at Exh. J, *M. Wiener Dep*., 56:10-13.

- Q: "Prior to December of 2013, did you ever have any discussions with a gentleman named David Hungerford?"
  A: "Not that I recall.  The name is not familiar to me."  *Id.*, *M. Wiener Dep*., 26:24-27:5.

- Q: "Okay. But as you sit here today, you don't recall having relied on any advice that Mr. Hungerford ever gave you?"
  A: "No, I don't recall."  *Id.*, *M. Wiener Dep*., 28:17-20.

- Q:  "Is it fair to say prior to this litigation and the events in 2013 leading to this litigation that you did not know who David Hungerford was?"
  A:  "I have no recollection of having known who he was."  *Id.*, *M. Wiener Dep*., 84:17-20.

- Q: "Have you ever asked anybody at Millburn Corporation if they ever contacted David Hungerford concerning these policies?"
  A: "I have no specific recall.  It's possible when I became aware of all of this that I might have inquired who he was..."  *Id.*, *M. Wiener Dep.*, 69:7-15.

- Q: "Do you have any recollections of conversations you had with either Mr. Buckbinder or Mr. Beker regarding David Hungerford?"
  A: "No."
  Q: "Do you have any recollection of conversations you had with Mr. Buckbinder or Mr. Beker about communications that they had with David Hungerford?"
  A: "No." *Id.*, *M. Wiener Dep.*, 89:16-24.

### Mr. Hungerford

- A: "I had no conversations at all, unfortunately, with Mr. Weiner at all." Palmeri Decl. at Exh. I, *Hungerford Dep.*, 96:6-7.

### Mr. Buckbinder

- Q: "How long have you known David Hungerford?"
  A: "I don't really know David Hungerford."  Palmeri Decl. at Exh. G, *Buckbinder Dep.*, 43:4-7.

- Q: "So prior to the lapse of 2013 you would not have had any discussions with [David Hungerford]?"
  A: "I don't recall ever speaking with David."
  Q: "Did you ever attempt to speak with him or his office?"
  A: "I don't recall having, no." *Id.*, *Buckbinder Dep.*, 54:17-23.

- Q: "Have you ever looked at [annual reports] before?"
  A: "I don't recall looking at these before."
  Q: "Did you ever have any discussions with David Hungerford about these documents?"
  A: "I don't recall." *Id.*, *Buckbinder Dep.*, 122:23-123:5.

Regarding the ramifications of failing to make required payments, as well as the lapse and termination of the Policies, the witnesses testified:

### Plaintiff

- Q: "And is that something you would have been relying on Millburn Corporation to address for you?"

16

A: "Yes…The first person I would have thought of calling would be Gregg Buckbinder." Palmeri Decl. at Exh. J, *M. Wiener Dep*., 53:1-13.

- Q: "Okay. So is it fair to say that you left it to Mr. Buckbinder's judgment to determine what amounts would be paid on the policies so long as those policies were kept in force?"
  A: "Yes." *Id.*, *M. Wiener Dep*., 76:6-10.

### Mr. Buckbinder

- Q: "So in none of the prior times that the policies lapsed or terminated you didn't have any discussions with Mr. Hungerford?"
  A: "No. Frankly, I don't even recall the other policies being terminated and reinstated. I learned that they were after this, you know, this matter happened." Palmeri Decl. at Exh. G, *Buckbinder Dep*., 44:2-8.

- Q: "In terms of payments that were made on the Wiener policies did you have any discussions with Mr. Hungerford at any time about any payments being made on the Weiner's policies?"
  A: "No."
  Q: "Did you ever anticipate receiving any communication from Mr. Hungerford concerning any payments on these policies?"
  A: "No." *Id.*, *Buckbinder Dep*., 44:22-45:7.

- Q: "Is it fair to say that you never really relied on Mr. Hungerford for any assistance with respect to these policies?"
  A: "Again, we just pay the bills." *Id.*, *Buckbinder Dep*., 158:9-12.

Regarding the maintenance of the Policies, the witnesses testified:

### Plaintiff

- "I don't recall when I first heard about the -- the problem. I regarded this as the most routine sort of life insurance and paid no attention to it, really." Palmeri Decl. at Exh. J, *M. Wiener Dep*., 38:19-22.

### Mr. Hungerford

- "We were on call the whole time to answer any questions that came up, and any information that was requested would be responded timely." Palmeri Decl. at Exh. I, *Hungerford Dep*., 149:8-13.

Rather than a special relationship, the undisputed testimony indicates that Plaintiff made no effort to contact his agent, and scarcely knew of his existence. Mr. Buckbinder, Plaintiff's

intermediary, worked with Mr. Hungerford, but only after the Policies were cancelled and more than 20 years of silence.  This attenuated relationship falls well short of the required circumstances to establish a special relationship.  *See e.g., Kaufmann v. Leatherstocking Co-op. Ins. Co.*, 52 A.D.3d 101, 1012 (3d Dep't 2008) (affirming summary judgment when the evidence showed no special relationship to support a claim that broker was, "negligent in failing to inform [plaintiff] when his payments were past due so that he could avoid cancellation of the policy."); *and Moslem v. Parietti & McGuire Ins. Agency*, 2011 WL 721653 at *4 (S.D.N.Y.) (Declining to find special relationship between insurance agent and insured where the parties, "had no more than a few interactions," and the insured, "never contacted them with any questions or concerns regarding his policy.").

Summary judgment is appropriate because there is no question of material fact that Plaintiff and Mr. Hungerford had no relationship, never mind a special relationship, and Plaintiff's claims fail as a matter of law.

### 3. Mr. Hungerford did not breach his duty of care by advising Plaintiff to submit the reinstatement application

Plaintiff also claims that Mr. Hungerford was negligent in advising him to submit an application for reinstatement of the Policies following their termination, rather advising them to remit the missed payments.  Palmeri Decl. at Exh. A ¶ 42.  There are two problems with this claim: first, Mr. Hungerford had no obligation to advise Plaintiff regarding the process for reinstatement, and second, Mr. Hungerford gave the correct advice for obtaining reinstatement.

Beginning with the first, as noted above, "an insurance agent has a common-law duty to obtain requested coverage, but generally not a continuing duty to advise guide or direct a client based on a special relationship of trust and confidence."  *Chase Scientific Research, Inc.*, 96 N.Y.2d at 30 (*citing Murphy*, 90 N.Y.2d at 273).  Once again Plaintiff must prove a special

relationship to extend the agent's duty beyond that of the common law. However given the testimony quoted above, no reasonable jury could conclude that Mr. Hungerford maintained a "special relationship" with Plaintiff that was beyond his ordinary duties as an insurance agent, and thus Plaintiff is unable to sustain his negligence claim as a matter of law. *See e.g.*, *Murphy*, 90 N.Y.2d at 270-71 (1997) (holding that no special relationship existed between insurance agent and insured, where the only relationship between them arose out of insured's purchase of commercial auto insurance policies from agent); *Liberty Mut. Ins. Co. v. Harvey Gerstman Assocs., Inc.*, 2012 WL 5289606 at *7 (E.D.N.Y.) ("[I]n the absence of any factual allegations that would support the Gerstman Affiliates' conclusory statement that a special relationship existed between the parties, it appears that there was no 'special relationship' between the parties as a matter of law.").

Furthermore the undisputed evidence indicates that Mr. Hungerford was correct in advising Plaintiff to apply for reinstatement, rather than simply tendering a belated payment. The application for reinstatement from AXA Equitable expressly stated, "[p]lease do not submit a payment with this form," and AXA further required medical evidence of insurability. Palmeri Decl. at Exh. K; Palmeri Decl. at Exh. A ¶ 39. Mr. Hungerford's recommendation to Mr. Buckbinder that Plaintiff complete and submit the reinstatement application was consistent with what Plaintiff had previously done when the Policies were cancelled in 2009 due to non-payment of amounts due and subsequently reinstated. Palmeri Decl. at Exh. G, *Buckbinder Dep*., 107:12-22. Mr. Hungerford's recommendation thus cannot support Plaintiff's claim for negligence, because Mr. Hungerford was correct, and in any event Plaintiff cannot demonstrate that if Mr. Hungerford provided him with different advice that AXA would have reinstated the Policy (as further discussed below).

### B.   <u>Breach of Fiduciary Duty</u>

#### 1.   Mr. Hungerford did not owe a fiduciary duty to Plaintiff

In New York an insurance agent owes no fiduciary duty to his client aside from the common law duty to obtain the requested coverage, absent a finding of a "special relationship" between the two. *GlobalNet*, 449 F.3d at 388 (*citing Murphy*, 90 N.Y.2d at 270). This is because, "[i]nsurance agents are not personal financial counselors and risk managers, approaching guarantor status. Insureds are in a better position to know their assets…" *Murphy*, 90 N.Y.2d at 273. *See also People ex rel. Cuomo v. Wells Fargo Ins. Servs., Inc.*, 62 A.D.3d 404 (1ˢᵗ Dep't 2009), *aff'd* 16 N.Y.3d 166 (2011) ("[A]n insurance broker may not be liable to its client for breach of fiduciary duty absent a special relationship…") (internal citations omitted); *and Waters Edge @ Jude Thaddeus Landing, Inc. v. B&G Group, Inc.*, 129 A.D.3d 706, 708 (2015) (affirming dismissal when, "[P]laintiff failed to state a cause of action against defendants…to recover damages for breach of fiduciary duty because they failed to allege the existence of a special relationship above and beyond the ordinary broker-client relationship.") (internal citations omitted).

The fiduciary duty analysis is nearly identical to the special relationship analysis and Mr. Hungerford respectfully incorporates his arguments from Section IV.A.2 *supra*. To reiterate, (i) Mr. Hungerford only received a commission on the Policies, which was a fixed percentage of the premiums paid, and did not receive any other form of compensation related to the Policies, (Palmeri Decl. at Exh. I, *Hungerford Dep.*, 35:4-9; 224:23-225:4); (ii) Plaintiff admittedly did not share any relationship of trust and reliance with Mr. Hungerford – the parties have never even communicated, (Palmeri Decl. at Exh. J, *M. Wiener Dep*., 53:5-14; 55:1-4; 65:6-21; 75:7-12; 76:6-20; 83:12-25; Palmeri Decl. at Exh. I, *Hungerford Dep*., 105:2-24); (iii) Plaintiff relied upon Mr.

Buckbinder with respect to the Policies, who never requested Mr. Hungerford's advice, (Palmeri Decl. at Exh. G, *Buckbinder Dep*., 44:2-45:7).

These undisputed facts demonstrate that there is no question of material fact in this case – there was no special relationship and therefore no fiduciary duty.  *See e.g. Silvers v. State*, 68 A.D.3d 668, 669 (1st Dep't 2009) (noting that an "arm's-length business relationship, such as that between [an insurance] claimant and the [insurance company's] field representative, is not generally considered to be of the sort of a confidential or fiduciary nature that would support a cause of action for negligent misrepresentation…"); *Sofia v. Mass. Mut. Life Ins. Co*., 2004 WL 1792441 at *3 (W.D.N.Y.) ("I find that no reasonable jury could conclude that Mooney's duties exceeded those of an insurance agent.  First, Mooney received no fees other than the commission on the SPIA arising from his business relationship with Mrs. Sofia…Lastly, they had only two business dealings in two years."); *and MAAD Constr., Inc. v. Cavallino Risk Mgmt., Inc.*, 178 A.D.3d 816, 819 (2d Dep't 2019) (in the absence of a consultation fee, "apart from payment of the premium," and of, "a course of dealing over an extended period of time…," agent did not have a duty to advise the plaintiff to obtain additional coverage after his policy was cancelled due to non-payment of a premium.).

The evidence does not permit a finding that Plaintiff and Mr. Hungerford had a special relationship in insurance matters.  In the absence of a special relationship there can be no fiduciary duty, and no breach thereof.  As a result Plaintiff's second claim fails as a matter of law.

C.  **Plaintiff does not have an expert to opine regarding an insurance agent's standard of care**

Even if Plaintiff could establish that Mr. Hungerford had a special relationship with him, his case suffers from another fatal flaw: the lack of expert testimony about the proper standard of care and whether Mr. Hungerford breached that standard of care.  This case does not involve a

question of whether an insurance agent did or did not execute a simple instruction from a client – *i.e.* to procure the requested coverage.  Plaintiff is instead asking far more complex questions, implicating nuanced alleged duties of an agent, which are beyond the knowledge of an average factfinder.

"As a general rule the admissibility of expert testimony on a particular point is addressed to the discretion of the trial court.  The guiding principle is that expert opinion is proper when it would help to clarify an issue calling for professional or technical knowledge, possessed by the expert and beyond the ken of the typical juror." *De Long v. Erie Cnty.*, 60 N.Y.2d 296, 307 (1983) (internal citations omitted).  Stated another way, "Whatever the nature of the action, expert testimony is appropriate when it serves to clarify an issue that is beyond the ken of the lay juror and calls for professional or technical knowledge." *Payette v. Rockefeller Univ.*, 220 A.D.2d 69, 74 (1st Dep't 1996) (*citing De Long*).  *E.g.*, "Expert testimony is normally required to establish the applicable standard of practice and, in an appropriate case, to determine whether an alleged deviation from that standard was the proximate cause of a plaintiff's injuries." *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F.Supp.2d 334, 343 (S.D.N.Y. 2005).

An insurance agent's common law duty is to procure the requested coverage.  *Core-Mark Int'l v. Swett & Crawford, Inc.*, 71 A.D.3d 1072, 1073 (2d Dep't 2010) (internal citations omitted).  However, "exceptional circumstances may arise in which insurance agents, through their conduct, may assume duties in addition to those fixed at common law." *Id.* (*citing Murphy*, 90 N.Y.2d at 272).  However the demarcation between the two tiers of duty is unclear, "[u]nder New York law, the duty owed by an insurance agent to an insurance customer is ordinarily defined by the nature of the request a customer makes to the agent." *Empire Indus. Corp. v. Ins. Companies of North America*, 226 A.D.2d 580, 580 (2d Dep't 1996).

22

In short, since the Plaintiff is alleging that Mr. Hungerford had duties beyond those recognized by New York law, only an expert can opine on the contours and scope of those duties. *See D'Agostino v. Allstate Ins. Co.*, 2015 WL 5797022 at *12 (N.Y. Sup. Ct. Richmond Cnty.) ("because plaintiffs are asserting that the defendants breached a duty, plaintiffs must establish what the standard is in the insurance industry for obtaining information when an application is made or renewed. Expert testimony was needed to establish what the practice of insurance agents and brokers in New York City is in this regard."). *See also Dulaney v. State Farm Fire & Cas. Ins. Co.*, 375 Mont. 117, 123 (2014) ("The only way for a jury to resolve whether an insurance agent placing a business policy had the legal duty to perform [certain] tasks would be to receive expert testimony on the duties of an insurance agent under these circumstances."); *and Sedamanos v. Tracy-Driscoll & Co., Inc.*, 2012 WL 13027406 at * 3 (D. Conn.) ("[S]elling insurance is a specialized field with specialized knowledge and experience…[T]he standard of care is not that of ordinary negligence but the knowledge, skill and diligence of insurance agents in Connecticut at the time the policy is sold.") (*quoting Dimeo v. Burns, Brooks & McNell, Inc.*, 6 Conn.App. 241, 245 (1986) (brackets in original)).

In November 2017 Plaintiff disclosed actuary Larry Stern as an expert witness. Mr. Stern was supposed to opine on the standard of care applicable to life insurance agents among other areas. Mr. Hungerford moved to preclude Stern's testimony citing the mismatch between his credentials and the issue at hand, as well as his speculative opinions regarding the practices of insurance agents. The court granted that motion on March 15, 2019, and specified that Mr. Stern was, "not qualified to testify on notice, the agent's duty of care, and the procedures for reviewing a reinstatement application." Dkt. No. 160, p. 18. Plaintiff has not disclosed any additional experts on the subject of an agent's duty of care.

Defendant Hungerford by contrast has disclosed an expert witness competent to articulate an insurance agent's duties. Gregory G. Wimmer has worked as an insurance agent for 43 years, and he managed other agents for 25 of those years. Palmeri Decl. at Exh. M, *Deposition Transcript of Greogory G. Wimmer*, 22:18-25 & 33:19-23. Wimmer was also responsible for training new agents. *Id* at 34:22-13. He testified that once a policy is in effect an agent's only duty is to be available to the customer, should the customer have additional questions or needs related to the policy. *Id.* at 35:18-23; 36:6-23; 37:15-19; 38:11-18; 131:18-23; 138:16-139:1. Mr. Wimmer testified that during his more than four decades as an insurance agent, "I have always used the standard in this business, which is, you have a duty to respond to policy owner questions and concerns. If they contact you, you have a duty to respond." *Id.* at 38:5-9.

Most importantly, Mr. Wimmer testified that an insurance agent does not have a duty to monitor the status of the policy: "He does not have a duty to go through and review every lapse notice he gets," *id.* at 140:1-3; nor is he obligated to contact the customer upon receipt of a lapse notice, *id.* at 83:24-84:12. To be sure, an agent is always available to respond to his customers, but he has no duty to proactively review the extant policies or his customer's statements of account. *Id.* at 90:3-5. An agent, "has the right to assume that the policy owner, number one, received it; and number two, will make a decision whether or not he wants to pay it." *Id.* at 141:10-13. As far as the agent is concerned the, "[s]ame information went to the policy owner. He is as informed on the status of his policy as I am. If he has any questions, or she has any questions, I'm there." *Id.* at 91:1-9. Should the customer decide to call, the notices are a useful reference. *Id.* at 124:12-19 & 149:8-12.

This presentation of expert testimony shifts the burden to the plaintiff to present evidence of a different standard. For example in a medical malpractice case, "[e]ven where it might initially

appear that the matter would be within the trier's ordinary competence, however, as where, for example, the surgeon left a needle inside the patient's body, if the defendant can proffer any evidence to support the view that a proper standard of care was followed, the plaintiff cannot prevail without introducing expert medical testimony." *Sitts v. U.S.*, 811 F.2d 736, 740 (2d Cir. 1987) (*citing Benson v. Dean*, 232 N.Y. 52, 57-58 (1921)).

Mr. Hungerford has established the standard of care and his lack of breach through expert testimony.  As a result plaintiff must present countervailing expert testimony that there is a different standard of care and that Mr. Hungerford breached that standard.  Plaintiff does not have such an expert.  In the absence of rebuttal expert testimony describing alternative duties, Plaintiff's claims cannot survive.

### D.   Mr. Hungerford did not cause Plaintiff's alleged damages

Even assuming Plaintiff could establish that Mr. Hungerford breached an applicable standard of care – which he did not – Plaintiff cannot establish that Mr. Hungerford's conduct was the cause of his damages.  The absence of this proof further undermines the claims of negligence and breach of fiduciary duty.  *See GlobalNet*, 449 F.3d at 388 (affirming dismissal because the agent, "was not the cause of the cancellation of coverage," when the Insured was, "fully aware of the monthly payment schedule, its obligations to make the monthly premium payments, and the consequences of its failure to pay the premiums each month.").  The factual record is completely devoid of any evidence that Plaintiff would have made the minimum payments on the Policies had Mr. Hungerford reminded him to do so, or that remitting payments after the Policies had lapsed would have changed AXA Equitable's decision on Plaintiff's reinstatement application. Additionally, Plaintiff's own negligence was the undisputable cause of his damages.

25

The testimony in this case further undermines any possible inference that Plaintiff would have heeded Mr. Hungerford's advice to make certain payments on the Policies. This is evident from the following selections: (i) Plaintiff relied on Mr. Buckbinder, not Mr. Hungerford, (Palmeri Decl. at Exh. J, *M. Wiener Dep.*, 53:5-14; 55:1-4; 65:6-21; 75:7-12; 76:6-20; 83:12-25); (ii) Mr. Buckbinder never requested Mr. Hungerford's advice, (Palmeri Decl. at Exh. G, *Buckbinder Dep.*, 44:2-45:7); (iii) Mr. Buckbinder did not anticipate receiving any communication from Mr. Hungerford, (*id.*, *Buckbinder Dep.*, 44:2-45:7; 54:21-23); (iv) neither Mr. Buckbinder nor Plaintiff could recall ever reviewing an annual report with respect to the Policies (*id.*, *Buckbinder Dep.*, 122:23-123:5; Palmeri Decl. at Exh. J, *M. Wiener Dep.*, 56:10-13); and (v) Mr. Buckbinder and Plaintiff admitted that they did not pay much attention to the Policies, (*id.*, 59:18-11; *Buckbinder Dep.*, 158:24-159:3; Palmeri Decl. at Exh. J, *M. Wiener Dep.*, 38:19-22).  Accordingly, Plaintiff cannot establish based on the undisputed factual record that he would have paid additional premiums on the Policies had Mr. Hungerford told him to do so, and thus, Mr. Hungerford cannot be the cause of Plaintiff's alleged damages.

Plaintiff also cannot prove that Mr. Hungerford's advice to submit a reinstatement application after the Policies had lapsed caused his damages.  Plaintiff's claimed damages are that he was 'robbed' of, "his rights and benefits under the Policies, namely the pay out of death benefits to his beneficiaries."  Palmeri Decl. at Exh. A ¶178.  At the time of Plaintiff's reinstatement application, the Policies had already lapsed and the beneficiaries of the Policies were no longer entitled to death benefits.  Palmeri Decl. at Exh. A ¶¶ 41-42.  Thus, Plaintiff's alleged damages had already accrued.

Moreover, Plaintiff cannot establish that subsequent payment of the amounts past-due after the Policies had lapsed would have changed AXA Equitable's decision on Plaintiff's reinstatement

application.  The application for reinstatement from AXA Equitable expressly stated, "[p]lease do not submit a payment with this form," and further required medical evidence of insurability. Palmeri Decl. at Exh. K; Palmeri Decl. at Exh. A ¶ 39.  AXA Equitable then denied Plaintiff's reinstatement application on medical grounds unrelated to Plaintiff's missed payments.  Palmeri Decl. at Exh. A ¶ 54.  Indeed, Mr. Buckbinder actually tendered payment after Plaintiff submitted his reinstatement application, which AXA Equitable returned to him.  *Id*. ¶ 51.  Once the reinstatement application was submitted, the decision whether to reinstate Plaintiff's Policies was simply, "out of [Hungerford's] hands."  Palmeri Decl. at Exh. I, *Hungerford Dep.*, 176:12-15.  As such, Mr. Hungerford's advice to submit a reinstatement application cannot be the cause of Plaintiff's alleged damages.

Finally, the record demonstrates that it was Plaintiff's own negligence that caused the Policy to lapse.  Plaintiff made his personal staff responsible for receiving mail from AXA Equitable, including all notices, and forwarding all mail related to the Policies directly to Millburn. Palmeri Decl. at Exh. A ¶ 28.  However Plaintiff and his staff maintained no system to track when notices from AXA Equitable were scheduled to arrive, when notices were actually received, what mail was forwarded to Millburn, and what mail was received by Millburn.  Palmeri Decl. at Exh. B, *Nielsen Dep*., 48:5-16; 94:9-17; 98:1-4; Palmeri Decl. at Exh. C, *Padgett Dep*., 10:1-23; Palmeri Decl. at Exh. D, *C. Wiener Dep.*, 25:1-25, 26:1-2.  Until this litigation commenced, Plaintiff was unaware that the lapse notices were being delivered to his own home, was unaware that the Policies had lapsed a total of 68 times, and was unaware that the Policies had been terminated and subsequently reinstated at least three times prior to December 2013.  Palmeri Decl. at Exh. J, *M. Wiener Dep*., 39:13-15; 38:24-39:1-3; 50:10-18.

Exacerbating matters, Millburn had an admitted practice of paying monies into the Policies following receipt of a lapse notice, rather than upon receipt of payment reminder notices.  Palmeri Decl. at Exh. E, *Loh Dep*., 39:19-22; Palmeri Decl. at Exh. D, *C. Wiener Dep*., 41:16-19; Palmeri Decl. at Exh. F, *Brogdon Dep*., 16:9-20.  Millburn also admittedly did not maintain the cash value of the Policies at a level sufficient to cover the cost of deductions.  Palmeri Decl. at Exh. G, *Buckbinder Dep.,* 39:16-19.  Despite these risky practices, Plaintiff and Millburn did not maintain a calendar of when payments on the Policies were due, or when to expect the lapse notices.  *Id*., *Buckbinder Dep*., 94:3-24.  In total, the Policies lapsed a remarkable 68 times and were terminated and subsequently reinstated at least 3 times.  Palmeri Decl. at Exh. H; Palmeri Decl. at Exh. L; Palmeri Decl. at Exh. J, *M. Wiener Dep*., 39:13-15.  Plaintiff was not aware or could not recall that any of the Policies had ever previously lapsed or been terminated.  *Id*., *M. Wiener Dep*., 38:24-39:1-3; 50:10-18.  Unsurprisingly Plaintiff admitted that he, "paid no attention to [the Policies], really."  Palmeri Decl. at Exh. J, *M. Wiener Dep*., 38:19-22; *see also Id., Wiener Dep*., 59:18-11.

There is no material question of fact that the cause of Plaintiff's damages was that he (or Millburn, acting on his behalf), failed to pay required payments on the Policies, and AXA Equitable accordingly terminated the Policies.   Mr. Hungerford was not responsible for disseminating lapse notices or for terminating the Policies.  He had no control over reinstatement and Plaintiff cannot show that Mr. Hungerford's advice caused the reinstatement denial.  Under these circumstances summary judgment is appropriate in favor of Mr. Hungerford.

## V.   <u>CONCLUSION</u>

WHEREFORE, Defendant David Hungerford respectfully requests that the court grant his Motion for Summary Judgement with respect to Counts X (Negligence) and XII (Breach of Fiduciary Duty) of the Third Amended Complaint.

Dated:     Stamford, Connecticut
           April 17, 2020

By:    /s/ Brian J. Palmeri
       Brian J. Palmeri, Esq. (NY No. 4560793)
       S.D.N.Y. Bar Code: BP1982
       WINGET, SPADAFORA & SCHWARTZBERG, LLP
       One Canterbury Green
       201 Broad Street, Suite 1000
       Stamford, CT 06901
       T:  203-328-1200
       F:  203-328-1212
       Palmeri.B@wssllp.com

       *Attorneys for the Defendant,*
       *David Hungerford*

---

## CERTIFICATION

I hereby certify that on this 17th day of April, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's CM/ECF system.

By:    /s/ Brian J. Palmeri
       Brian J. Palmeri, Esq. (NY No. 4560793)
       S.D.N.Y. Bar Code: BP1982
       WINGET, SPADAFORA & SCHWARTZBERG, LLP
       One Canterbury Green
       201 Broad Street, Suite 1000
       Stamford, CT 06901
       T:  203-328-1200
       F:  203-328-1212
       Palmeri.B@wssllp.com