UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MALCOLM H. WIENER,<br><br> Plaintiff,<br><br>v.<br><br>AXA EQUITABLE LIFE INSURANCE COMPANY, DAVID HUNGERFORD, AXA ADVISORS, LLC, and AXA NETWORK, LLC,<br><br> Defendants. | Civil Action No.: 1:16-cv-04019-ER<br><br><br>April 17, 2020 |

**DEFENDANTS' LOCAL RULE 56.1(A) STATEMENT**

Pursuant to Local Rule 56.1(a), the defendants, AXA Equitable Life Insurance Company, AXA Advisors, LLC, and AXA Network, LLC (collectively "AXA Equitable"), hereby submit this statement of undisputed material facts in support of their motion for summary judgment with respect to all counts of Plaintiff's Third Amended Complaint (docket no. 79) (the "Complaint" or "Compl.").

**Preliminary Statement**

This lawsuit arises from Plaintiff's failure to make the required payment to keep three separate life insurance policies in place, despite AXA Equitable's mailing three separate Notices of Policy Lapse to his home in Greenwich that provided 60 days' advanced notice to make payment. On October 1, 2013, AXA Equitable advised Plaintiff by way of three separate Notices of Policy Lapse that were mailed to his residence using AXA Equitable's standard mailing procedures that his polices lapsed and would terminate without value unless he paid the required amounts stated in the notices by December 1 ("Notices of Policy Lapse"). Despite overwhelming evidence of these notices being mailed to Plaintiff's home address, he failed to make the necessary payments.

Although Plaintiff claims he did not receive the three separate Notices of Policy Lapse, it cannot be disputed that all three notices were mailed in the ordinary course of business using the same protocol AXA Equitable uses for all mailing to its policyholders. A Federal District Court has already determined that AXA Equitable's mailing procedures used here were sufficient to support summary judgment in a similar lawsuit involving a claim for improper termination of a life insurance policy. See Cash v. AXA Equitable Life Insurance Company, 229 F. Supp. 3d 542 (W.D. Tx. 2017)). Plaintiff's only argument is that neither he nor anyone on his staff recalls receiving them. However, prior Courts have rejected these arguments as insufficient to rebut the presumption notices were properly mailed. Further, evidence demonstrates that Plaintiff and his staff lack any type of controls or procedure to ensure that mail is properly received and processed.

Plaintiff also claims, without an expert or evidentiary support, that AXA Equitable improperly denied his application for reinstatement. The uncontradicted evidence establishes that AXA Equitable requested and received Plaintiff's medical records from his treating physician and, based on medical concerns raised in those records, made an underwriting decision to deny his application. The reinsurer who reviewed the reinstatement application around the same time frame made the same independent determination based on the same records. Further, Plaintiff has no expert willing to opine that AXA Equitable should have reinstated the policies, or that AXA Equitable's decision to decline was arbitrary. The following material facts are undisputed.

## **The Polices, Generally**

1. The policies at issue were universal life insurance policies that did not require fixed premium payments. Pursuant to the polices, the policyholder "may skip planned premium payments or change their frequency and amount." (Lewer Aff., ¶4). After expense charges are deducted from the premium payments made by the policyholder, the net premiums are put into a Policy

Account which earns interest each policy month which interest is declared annually by AXA Equitable but is never less than an effective annual rate of 4.5%. (Id.)

2. At the beginning of each policy month, AXA Equitable makes a deduction from the Policy Account for the monthly cost of insurance and any benefits provided by riders. The monthly cost of insurance is the current monthly "cost of insurance rate" times the 'net amount at risk" at the beginning of the policy month, plus any extra charge shown in the Policy Information section times the Face Amount of Insurance at the beginning of the policy month as set forth in the Policy.   (Id., ¶5).

3. Although the premiums are flexible, the amount and frequency of the payments impact the balance of funds available in the Policy Account and the duration of insurance coverage. (Id., ¶6).

4. For the policies to remain in force, each policy's respective Net Cash Surrender Value (the Policy Account Value less any applicable surrender charge, policy loan or accrued loan interest) must be sufficient to cover the monthly deductions.  (Id., ¶7).

5. If the Net Cash Surrender Value on any monthly anniversary is less than the monthly deductions for that month, the policies lapse and a grace period of 61 days begins ("Grace Period"). (Id., ¶8).

6. AXA Equitable uses an automated system to monitor the Net Cash Surrender Value of the Policies, and on the first day of each policy month, it automatically compares the Net Cash Surrender Value to the monthly deduction for that policy month.  (Id., ¶¶13-14).

7. If the Net Cash Surrender Value is insufficient to cover the monthly deduction, the system automatically generates a Notice of Policy Lapse to the address of record indicating the amount sufficient to cover three monthly deductions in order to keep the policy in force and the end date of the Grace Period.  (Id., ¶¶8, 15).

8. If the required payment amount is not paid by the end of the grace period, the policy terminates. (Id., ¶9).

## Plaintiff & His Staff

9. Plaintiff is the retired founder of Millburn Corporation ("Millburn"), a financial services firm. (Kolstad Decl., ¶3, Exh. A, tr. p. 12:12.).

10. Plaintiff relied on Millburn to handle all aspects of his financial portfolio, including making necessary payments to keep his life insurance in force. (Kolstad Decl., ¶3, Exh. A, tr. pp. 40:20-23, 53:12, 54:19-25, 75:7-12).

11. Maria Loh ("Loh") was Millburn's tax director and ultimately responsible for making the required payments. (Kolstad Decl., ¶7, Exh. E, tr. p. 25:11).

12. Karen Nielson ("Nielson") is Plaintiff's wife, Carolyn Wiener's personal assistant and the household manager. (Kolstad Decl., ¶4, Exh. B, tr. p. 21-22).

13. Plaintiff's executive assistant, Christina Padgett, was responsible for sending unopened envelopes from AXA Equitable along with other mail to Milburn in a single pouch for processing. (Kolstad Decl., ¶5, Exh. C, tr. p. 28).

## History of Subject Policies

14. Plaintiff purchased three universal life insurance policies as follows:

    a. On October 14, 1986, Plaintiff purchased policy number 36 224 259 in the amount of $9,000,000.00, which was later reduced to $7,200,000.00. (Compl., ¶9(a));

    b. On May 14, 1987, Plaintiff purchased policy number 37 205 147 in the amount of $9,000,000.00, which was later reduced to $7,200,000.00. (Compl., ¶9(b)); and,

    c. On May 14, 1987, Plaintiff purchased policy number 37 205 155 in the amount of $2,000,000.00, which was later reduced to $1,600,000.00. (Compl., ¶9(c)).

15. Millburn was responsible for maintaining all three policies, including making payment. (Compl., ¶24).

16. Millburn paid only the minimum amount necessary to cover the monthly deductions for three months at a time in accordance with the Notice of Policy Lapse sent to Plaintiff. As a result, the polices lapsed 209 times between 1994 and their termination. (Lewer Aff., ¶11).

## Plaintiff's Mail Process

17. Since March 2009, two household staff members, Nielson or Joe Koenig (another employee of the Wieners), would retrieve mail from the mailbox at 66 Vista Drive in Greenwich, Connecticut on a daily basis. (Kolstad Decl., ¶5, Exh. C, tr. p. 32).

18. Thereafter, mail would be sorted either in Nielson's office or on the kitchen table (id., tr. p. 29).

19. Mail pertaining to AXA Equitable would be placed, unopened, in a pouch with other mail to be sent to Millburn, which is periodically sent by Padgett (id., tr. p. 28).

20. In the Millburn mailroom, the pouch is processed and transferred to Loh for review and approval (Kolstad Decl., ¶¶9-10, Exh. G, tr. p. 46; Exh. H, tr. p. 16:2).

21. If the mail contained a Notice of Policy Lapse, which it did on at least 200 occasions, the notices were transferred to Wanda Brogdan ("Brogdan"), who would draft a check for the amount stated in the Notice of Policy Lapse to keep the policy in force (Kolstad Decl., ¶¶9-10, Exh. G, tr. p. 46; Exh. H, tr. p. 15:21).

22. Brogdan would then bring the Notice of Policy Lapse to Harvey Becker of Millburn with a check in the correct amount for his signature (id.).

23. Plaintiff's household staff did not maintain logs of the mail received or processed, nor retain copies of mail transmitted from the Wiener residence to Milburn. (Kolstad Decl., ¶6, Exh. D, tr. p. 10.)

24. Similarly, Milburn, a company responsible for managing client money, kept no records of mail received from Plaintiff.  (Kolstad Decl., ¶7, Exh. E, tr. pp. 32, 37-8).

### **Policies Lapse and Terminate**

25. On October 1, 2013, the Net Cash Surrender Value of each Policy was less than the monthly deductions. (Lewer Aff., ¶12).

26. Accordingly, AXA Equitable's automated computer system generated three separate Notices of Policy Lapse indicating payments of $43,242.00, $43,242.00, and $9,609.00, respectively, were due by December 1, 2013. (Lewer Aff., ¶20).

27. The Notices of Policy Lapse were sent electronically to an output queue for printing by Broadridge Financial Solutions, Inc. ("Broadridge"). (Lewer Aff., ¶¶14-19).

28. More particularly, on October 1, 2013 Broadridge received four files from AXA Equitable in the job uniquely identified as "ULCLNTPS.CLIENT5."  (Coleen O'Brien  Aff., ¶7).

29. Each Notice of Policy Lapse was then transferred to Pitney Bowes Presort Services, Inc. ("Pitney Bowes"), (id., ¶¶7, 8, 10).

30. Pitney Bowes verified that three pieces of mail were collected from Broadridge for delivery to Plaintiff at the address of record for his three polices at 66 Vista Drive, Greenwich, CT on October 3, 2013. (Kolstad Decl., ¶8, Exh. F, tr. pp. 14, 38).

31. Pitney Bowes then delivered the mail to USPS for delivery to Plaintiff's residence in Greenwich. (id., tr. p. 56).

32. The amounts stated in the Notices of Policy Lapse were not received by AXA Equitable by December 1, 2013, so AXA Equitable's automated computer system generated policy termination notices using the same procedure it did for the Notices of Policy Lapse; they were sent to Malcolm Wiener at 66 Vista Drive, Greenwich, CT. (Lewer Aff., ¶24, Exh. D; Compl., ¶¶ 37, 41.)

33. Nielson admits she received these termination notices. (Kolstad Decl., ¶20, Exh. R).

## **Plaintiff's Failure to Provide Evidence of Medical Insurability**

34. Plaintiff submitted three reinstatement applications on December 24, 2013, which were forwarded to AXA Equitable's underwriter, Hallie Hawkins, (Kolstad Decl., ¶11, Exh. I, tr. p. 20:2).

35. Hawkins then requested an Attending Physician Statement ("APS") from Plaintiff's physician, Dr. Barry Boyd. (Kolstad Decl., ¶21, Exh. S.)

36. As an underwriter, Hawkins' role was to review both medical and financial records "to review the application and determine if the person is insurable under our guidelines." (Kolstad Decl., ¶12, Exh. J, tr. pp. 16, 21:15).

37. Hawkins compared Plaintiff's medical records against the Senior Applicant Medical Checklist and the Underwriting Manual. (id., tr. pp. 70-72, 98).

██████████████████████████████████████████████████████████

████████████████████████████████████████████ (Kolstad Decl., ¶12, Exh. J, tr. pp. 71:9, 117:13, 123:12, 134:15).

██████████████████████████████████████████████████████████

██████████████████████████████ (id., tr. pp. 72:10, 168:3, 211-12).

██████████████████████████████████████████████████████████

████████████████████████████████████████████ (id., tr. pp. 65:15; 71:12, 171:1).

41. ████████████████████████████████████████████████

████ (id., tr. p. 71:7).

42. ████████████████████████████████████████████████

████████████████████████ (id., tr. p. 71:18-25).

43. In light of these risk factors, Hawkins recommended a decline. (Id., tr. p. 73:21.)

44. After its own review of the same records, RGA Reinsurance also declined Plaintiff's reinstatement application. (Kolstad Decl., ¶23, Exh. U).

45. AXA Equitable advised Plaintiff that the reinstatement requests were denied thereafter. (Kolstad Decl., ¶24, Exh. V).

**Plaintiff Has Not Applied For Replacement Insurance**

46. Plaintiff has yet to formally apply for other life insurance, though his agent, Sandy Robbins, did make informal inquires on his behalf. (Kolstad Decl., ¶¶3, 13, Exh. A, tr. p. 23:5-17; Exh. K, p. 2).

47. In response to those inquiries, every insurer either declined coverage based on Plaintiff's medical records, like AXA Equitable, or provided a tentative offer with rates that were unacceptable to Plaintiff, again based on the risks posed by his medical records. (Kolstad Decl., ¶14, Exh. L, tr. pp. 22:17-23:5, 33:19-20; 36:11-12).

**DEFENDANTS,**
AXA EQUITABLE LIFE INSURANCE COMPANY, ET AL.

BY:   /s/ Robert W. Cassot
Robert W. Cassot, Esq.
Federal Bar No.: ct24094
Morrison Mahoney LLP
One Constitution Plaza, 10th Floor
Hartford, CT 06103
Telephone: (860) 616-4441
Fax: (860) 244-3800
E-Mail: rcassot@morrisonmahoney.com

## CERTIFICATION OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically on April 17, 2020, and was served by mail to anyone unable to accept electronic filing and to plaintiff's counsel named below. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

*Attorneys for Plaintiff, Malcolm H. Wiener*
Attorneys Tracy Alan Saxe, Kristen Alexandra M. O'Neill, Theresa A. Guertin,
Saxe Doernberger & Vita, P.C.
35 Nutmeg Drive, Suite 140
Trumbull, Connecticut 06611
T 203.287.2100
F 203.287.8847
E: tag@sdvlaw.com
E: tas@sdvlaw.com

*Attorney for Plaintiff, Malcolm H. Wiener*
Attorney Lawrence F Reilly
90 Grove Street
Ridgefield, Connecticut 06877
T 203-438-3651
F 203-403-2658
E: Larry@lreillylaw.com

*Attorneys for Defendant, David Hungerford*
Attorney Brian J. Palmeri
Winget, Spadafora & Schwartzberg, LLP
177 Broad Street, 10th Floor
Stamford, Connecticut 06901
T 203.328.1200
F 203.328.1212
E: palmeri.b@wssllp.com

BY:   /s/ Robert W. Cassot
         Robert W. Cassot, Esq.