UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MALCOLM H. WIENER,

                              Plaintiff,

– against –

AXA EQUITABLE LIFE INS. CO.,
DAVID HUNGERFORD, AXA
ADVISORS, L.L.C., and AXA
NETWORK, L.L.C.,

                              Defendants.

**OPINION AND ORDER**

16 Civ. 4019 (ER)

RAMOS, D.J.:

        Malcolm H. Wiener initiated this action on May 26, 2015.  Doc. 1.  In his

operative complaint, Wiener asserts thirteen claims collectively against Defendants

regarding the termination of three of his life insurance policies.  Doc. 79.  Pending before

the Court are:  a motion for summary judgment by AXA Equitable Life Insurance Co.

("AXA Equitable"), AXA Advisors, L.L.C. ("AXA Advisors"), and AXA Network,

L.L.C. ("AXA Network") (collectively, "AXA Defendants"); a motion for summary

judgment by David Hungerford; and a cross-motion for partial summary judgment by

Wiener regarding his claim for breach of contract against AXA Equitable for its alleged

failure to send premium reminder notices in November 2013.  Docs. 186, 194, and 202.

        For the reasons set forth below, AXA Defendants' and Hungerford's motions are

GRANTED, and Wiener's cross-motion is DENIED.

I.      **BACKGROUND**

        **A. Factual Background**

        Unless noted otherwise, the following facts are undisputed.  Wiener was born in

1935 and is the retired founder of Millburn Corporation ("Millburn"), a financial services

firm located in New York.  Docs. 79 ¶¶ 11, 24 and 217 ¶ 9.  Wiener currently resides in

Connecticut.  Doc. 79 ¶ 1.  AXA Equitable is a life insurance company headquartered in

New York. *Id.* ¶ 2.  AXA Advisors and AXA Network are financial services and consulting companies located in New York, and are affiliated companies of AXA Equitable. *Id.* ¶¶ 4–5, 13–14.  AXA Equitable assigns employees from AXA Advisors and AXA Network to serve as agents of record for its life insurance policies. *Id.* ¶ 15. Hungerford, a resident of New York, was a life insurance agent with AXA Equitable at all relevant times. *See id.* ¶ 3; *see also* Doc. 214 ¶¶ 8, 10.

Wiener purchased the three universal life insurance policies at issue from AXA Equitable. Doc. 217 ¶ 14.  Wiener purchased the first policy (# 36-224-259) on October 14, 1986 in the amount of $9,000,000; that amount was later reduced to $7,200,000. *Id.* ¶ 14(a).  He purchased the other two policies on May 14, 1987:  one for $9,000,000 that was later reduced to $7,200,000 (# 37-205-147), and the other for $2,000,000 that was later reduced to $1,600,000 (#37-205-155). *Id.* ¶ 14(b), (c).  In 1990, AXA Equitable assigned Hungerford to serve as the agent of record on these policies, and he remained the agent of record at all relevant times. Doc. 214 ¶¶ 8, 10.

The policies provided that AXA Equitable would send premium reminder notices for the planned payment period selected by the policyholder, unless the policyholder selected otherwise. *See, e.g.*, Doc. 216-1 at 11.  However, Wiener's policies did not require fixed premium payments. Doc. 217 ¶ 1.  Rather, under the terms of those policies, Wiener could "skip planned premium payments or change their frequency and amount." *Id.*  Under the policies, after expense charges were deducted from the premium payments a policyholder made, those net premiums were then put into a policy account that earned interest each policy month. *Id.*  At the beginning of each policy month, AXA Equitable made a deduction from the policy account for the monthly cost of insurance and benefits. *Id.* ¶ 2.  For the policies to remain in effect, the amount in each policy's respective account, less certain interest and administrative charges, must be sufficient to cover the monthly deductions. *Id.* ¶ 4.  If that amount (the "Net Cash Surrender Value") was less than the deduction for a given month, the policy would lapse and enter a sixty-

one-day grace period, and AXA Equitable would send a policy lapse notice to the policyholder. *Id.* ¶¶ 4–5, 16. If the delinquent amount was not paid by the end of the grace period, the policy would then terminate without value. *Id.* ¶ 8.

Wiener relied on Millburn to handle all aspects of his financial portfolio— including making the necessary payments to keep his life insurance policies in effect. *Id.* ¶ 10. Notably, from 1994 to October 2013, Millburn would not pay the monthly premiums until it received a policy lapse notice from AXA Equitable. *See* Docs. 214 ¶ 6 and 217 ¶ 16. As a result, during that time, the three policies lapsed a total of 209 times. Doc. 217 ¶ 16. After Millburn received the policy lapse notices, Milburn paid only the minimum amount necessary to cover the monthly deductions for three months at a time, in accordance with the policy lapse notices sent to Wiener. *See* Docs. 214 ¶ 6 and 217 ¶ 16.

Through March 2009, Wiener's premium reminder notices and policy lapse notices were mailed directly to Millburn. *See* Doc. 217 ¶¶ 17, 21; *see also* Doc. 231 ¶¶ 29–30. However, by June 2009, Wiener's address of record for these policies was changed, such that all premium reminder notices and policy lapse notices were sent to his Connecticut address instead.[1] *See* Doc. 217 ¶ 21; *see also* Doc. 231 ¶¶ 29–30. A copy of the address change confirmation was mailed to both Millburn's address and Wiener's Connecticut address. Doc. 231 ¶ 29.

Since 2009, Wiener had a system in place at his residence to process any mail that he received—including mail that he received from AXA Equitable. *See* Doc. 217 ¶¶ 17–19, 21. Two of Wiener's household staff retrieved mail from the mailbox on a daily basis, and the mail then would be sorted either in the office of one of the staff or on the kitchen table. *Id.* ¶¶ 17–18. Wiener's executive assistant was responsible for sending mail from AXA Equitable to Millburn for processing. *Id.* ¶¶ 13, 19. Wiener's household staff did

---

[1] The parties dispute whether Wiener authorized that change when it was made.

not maintain logs of the mail received or processed, nor did they retain copies of mail sent from Wiener's address to Millburn. *Id.* ¶ 23.  From there, Millburn employees would review any policy lapse notices, and draft and mail checks in connection with premium payments. *See id.* ¶¶ 11, 20.

On October 1, 2013, the Net Cash Surrender Value for each of Wiener's policies was less than the monthly deductions, meaning that the policies lapsed and entered a sixty-one-day grace period. *See id.* ¶ 25; *see also* Doc. 214 ¶ 15.  During the grace period, AXA Equitable did not send Wiener any premium reminder notices.  Although the parties dispute whether AXA Equitable mailed and Wiener received policy lapse notices, it is undisputed that Millburn failed to pay the minimum premiums owed on the policies during the sixty-one-day grace period that followed; as a result, the policies were terminated on December 1, 2013.  Docs. 214 ¶¶ 16–17 and 217 ¶¶ 32–33.  On December 2, 2013, Wiener received a termination notice at his Connecticut address for each of the policies, along with an application for reinstatement of his policies.  Docs. 214 ¶ 17 and 217 ¶¶ 32–33.  Hungerford was copied on the termination notices, as he had been with all premium reminder notices and policy lapse notices.  Docs. 214 ¶ 18 and 231 ¶ 26.

The applications for reinstatement explicitly stated "[p]lease do not submit a payment with this form."  Doc. 214 ¶ 21.  Under the terms of the policies, Wiener could apply for one of two types of reinstatement:  a technical reinstatement and a regular reinstatement.  A technical reinstatement occurs automatically if AXA Equitable made a technical or processing mistake that resulted in a lapsed policy, while a regular reinstatement requires evidence of insurability.  Docs. 216-1 at 11, 39, 216-2 at 25, and 216-14 at 99:19–101:16.  On December 26, 2013, Wiener submitted a reinstatement application with medical evidence of insurability to AXA Equitable.  Docs. 214 ¶ 22 and 217 ¶ 34.  That application was forwarded to AXA Equitable's underwriter, Hallie Hawkins.  Doc. 217 ¶ 34.  As an underwriter, Hawkins's role was to review both medical and financial records to review a reinstatement application and determine whether the

person was insurable under AXA Equitable's guidelines.[2]  *Id.* ¶ 36.  Additionally, in reviewing Wiener's application, Hawkins assessed his medical records against AXA Equitable's applicant medical checklist for seniors and the company's underwriting manual.  *Id.* ¶ 37.  Pursuant to this review process, Hawkins requested a physician statement from Wiener's physician, Dr. Barry Boyd.  *Id.* ¶ 35.  Although the parties have a number of disputes regarding Wiener's medical records, it is undisputed that those records showed that, at various times, Wiener's serum albumin levels were below 3.8.  *See* Doc. 192-17; *see also* Doc. 192-10 at 71:9–11, 117:6–23, 123:10–12.

On February 21, 2014, along with a follow-up letter on behalf of Wiener regarding his reinstatement application, Millburn sent a check to AXA Equitable for $96,093 in an effort to cover the missing amount for the lapsed policies, basing that figure on the amount it had paid to address the preceding lapse notice in July 2013.  Docs. 214 ¶ 23 and 216-16.  AXA Equitable initially cashed the check; however, on March 5, 2014, it provided Wiener with copies of the October 2013 lapse notices and provided him with a check reimbursing him for the checks it had cashed.  Doc. 214 ¶ 24.  On March 24, 2014, AXA Equitable notified Wiener that it had denied his reinstatement application.  *Id.* ¶ 25; *see also* Doc. 217 ¶ 45.

### B. Procedural History

Wiener filed the instant suit in Connecticut state court on May 26, 2015.  Doc. 1 at 1.  On June 10, 2015, AXA Equitable removed the action to federal court in the District of Connecticut, asserting that the court had diversity jurisdiction pursuant to 28 U.S.C. § 1332.  *Id.* at 1–2.  On May 10, 2016, the parties filed a joint motion and stipulation to transfer venue to this District, and the Connecticut district court granted that request.  *See* Docs. 58 and 58-1.

---

[2] The parties dispute whether Hawkins reviewed Wiener's financial records as part of her review of his application for reinstatement.  *See* Doc. 217 ¶ 36.

In his operative complaint, filed August 12, 2016, Wiener asserts thirteen claims. Doc. 79. Against AXA Equitable, Wiener asserts the following claims: declaratory and injunctive relief; equitable reinstatement; breach of contract for failure to send the October 1, 2013 policy lapse notices; breach of contract for failure to send the premium reminder notices on November 1, 2013; waiver; violation of the Connecticut Unfair Trade Practices Act ("CUTPA"); fraudulent misrepresentation; and breach of the covenant of good faith and fair dealing. *Id.* Against AXA Advisors and AXA Network, Wiener asserts the following: negligence, breach of fiduciary duty, and violation of CUTPA. *Id.* Against Hungerford, Wiener asserts the following: negligence and breach of fiduciary duty. *Id.*

On April 17, 2020, the parties filed the instant motions. The AXA Defendants moved for summary judgment regarding all of Wiener's claims against them, Doc. 186, as did Hungerford for the claims against him, Doc. 202. Wiener cross-moved for partial summary judgment on his claim for breach of contract for failure to send premium reminder notices in November 2013. Doc. 194.

## II.   DISCUSSION

### A. Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome of the litigation under the governing law. *H.Daya Int'l Co., Ltd. v. Arazi*, 348 F. Supp. 3d 304, 308 (S.D.N.Y. 2018). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets her burden, "the nonmoving party must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture, or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). "Only disputes over 'facts that might affect the outcome of the suit under the governing law' will preclude a grant of summary judgment." *Malmsteen v. Universal Music Grp., Inc.*, 940 F. Supp. 2d 123, 130 (S.D.N.Y. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). As such, to defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson*, 477 U.S. at 256–57).

"When confronted with cross-motions for summary judgment, the Court analyzes each motion separately, 'in each case construing the evidence in the light most favorable to the non-moving party.'" *Peterson v. Kolodin*, No. 13 Civ. 793 (JSR), 2013 WL 5226114, at *1 (S.D.N.Y. Sept. 10, 2013) (quoting *Novella v. Westchester Cnty.*, 661 F.3d 128, 139 (2d Cir. 2011)); *see also Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."). The Court is not required to resolve the case on summary judgment merely because all parties move for summary judgment. *Morales*, 249 F.3d at 121.

### B. Choice of Law

At the outset, the Court must determine the source of law that governs the instant suit.  Generally, "[w]here jurisdiction is predicated on diversity of citizenship, a federal court must apply the choice-of-law rules of the forum state." *Thea v. Kleinhandler*, 807 F.3d 492, 497 (2d Cir. 2015).   But where a case is transferred from one district to another pursuant to 28 U.S.C. § 1404(a), the transferee court must adopt the choice-of-law principles of the transferor court.  *Abbott Laboratories v. Feinberg*, 477 F. Supp. 3d 57, 60 (S.D.N.Y. 2020) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964)). Accordingly, the Court "must pretend, for the purpose of determining the applicable state rules of decision, that it is sitting in" Connecticut.  *See Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 153 (2d Cir. 2013).

Wiener brings claims that sound in contract, tort, and CUTPA.  In Connecticut, the applicable "conflict of laws rule depends upon the nature of the plaintiff's claim." *Reclaimant Corp. v. Deutsch*, 211 A.3d 976, 982 (Conn. 2019).  Further, under Connecticut law, the Court must examine the conflicts of laws rule for each of Wiener's claims.  *See id.* at 982–83; *see also Macomber v. Travelers Prop. and Cas. Corp.*, 894 A.2d 240, 256–57 (Conn. 2006); *Bulldog N.Y. LLC v. Pepsico, Inc.*, 8 F. Supp. 3d 152, 161–62 (D. Conn. 2014).

Still, regardless of the nature of the claim, the threshold choice of law issue in Connecticut is whether there is an outcome determinative conflict between applicable laws of the states with a potential interest in the case, *i.e.*, whether there is an actual conflict of law.  *See W. Dermatology Consultants, P.C. v. VitalWorks, Inc.*, 153 A.3d 574, 586–87 (Conn. 2016); *Cohen v. Roll-A-Cover, LLC*, 27 A.3d 1, 16 (Conn. App. Ct. 2011); *Burns v. Quinnipiac Univ.*, 991 A.2d 666, 673 (Conn. App. Ct. 2010).  If there is no such conflict, then "there is no need to perform a choice of law analysis, and the law common to the jurisdiction[s] should be applied."  *See W. Dermatology*, 153 A.3d at 583 n.13 (quoting *Cohen*, 27 A.3d at 16); *see also Burns*, 991 A.2d at 673.  Relatedly, under

Connecticut law, a "false conflict" exists where the application of law of either jurisdiction produces the same result and, therefore, eliminates the need for a choice of law analysis. *See Dugan v. Mobile Med. Testing Servs., Inc.*, 830 A.2d 752, 758 (Conn. 2003). But where "there is no controlling appellate court precedent in Connecticut," a court must address "the conflict of laws issue to determine which state's law to apply." *Id.*

Notably, in Connecticut, the party seeking a choice of law determination bears the burden of demonstrating that there is an actual conflict of law between two jurisdictions. *See W. Dermatology*, 153 A.3d at 583 n.13; *see also Cohen*, 27 A.3d at 16 (concluding that choice of law analysis was inappropriate where party failed to indicate in brief how application of other jurisdictions conflicts with Connecticut law at issue); *Burns*, 991 A.2d at 673. "When the applicable law of a foreign state is not shown to be otherwise," courts in Connecticut "presume it to be the same as" the law of Connecticut. *Cohen*, 27 A.3d at 16 (quoting *Walzer v. Walzer*, 376 A.2d 414, 421 (Conn. 1977)); *see also W. Dermatology*, 153 A.3d at 583 n.13.

### 1. Choice of Law Analysis for Contract Claims

For analyzing choice of law issues involving contracts that do not contain a choice of law provision, Connecticut courts apply the "most significant relationship" test set forth in §§ 6 and 188 of the Restatement (Second) of Conflicts of Laws ("Restatement"). *See Gen. Accident Ins. Co. v. Mortara*, 101 A.3d 942, 946 (Conn. 2014). Section 188, in turn, directs the Court to other provisions for specific types of contracts. *Id.* With respect to life insurance contracts, the starting point is § 192 of the Restatement. *Cf. id.*; Restatement § 192.

Under § 192, the rights created under life insurance contracts are determined "by the local law of the state where the insured was domiciled at the time the policy was applied for, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties,

in which event the local law of the other state will be applied."  Restatement § 192.  Thus,

according to § 192, there is a presumption that Connecticut law governs because Wiener

was domiciled there when he applied for his policies.  *See id.*  However, that presumption

may be overcome where another state's interest outweighs Connecticut's and is

sufficiently compelling to trump the presumption, as determined by evaluating the policy

factors set forth in § 6.  *See Gen. Accident*, 101 A.3d at 946–47; *see also Am. States Ins.

Co. v. Allstate Ins. Co.*, 922 A.2d 1043, 1050–51 (Conn. 2007).[3]  Those factors are:

> (a) the needs of the interstate and international systems, (b)
> the relevant policies of the forum, (c) the relevant policies of
> other interested states and the relative interests of those
> states in the determination of the particular issue, (d) the
> protection of justified expectations, (e) the basic policies
> underlying the particular field of law, (f) certainty,
> predictability and uniformity of result, and (g) ease in the
> determination and application of the law to be applied.

Restatement § 6(2); *see also Gen. Accident*, 101 A.3d at 947; *Am. States*, 922 A.2d at

1051.  To refine their review of these policy-based factors in the context of contract-based

claims, Connecticut courts first turn to § 188(2), which notes that

> the contacts to be taken into account in applying the
> principles of § 6 to determine the law applicable to an issue
> include:   (a) the place of contracting, (b) the place of
> negotiation of the contract, (c) the place of performance, (d)
> the location of the subject matter of the contract, and (e) the
> domicil, residence, nationality, place of incorporation and
> place of business of the parties.

Restatement § 188(2); *see also Gen. Accident*, 101 A.3d at 947–48; *Am. States*, 922 A.2d

at 1051.  Section 188(3) also notes that, generally, "[i]f the place of negotiating the

---

[3] Both *General Accident* and *American States* dealt with contracts of fire, surety, or casualty insurance, so
in those cases the Supreme Court of Connecticut relied on § 193—not § 192, as here—of the Restatement.
*See* 101 A.3d at 946–47; 922 A.2d at 1050.  Because the policies at issue are life insurance contracts, the
Court must rely on § 192 rather than § 193.  *See Am. States*, 922 A.2d at 1047; *see also* Restatement § 192.
Given the similarities between §§ 192 and 193, the Court concludes that the same presumption framework
relating to § 193 applies with § 192.  *Compare* Restatement §§ 192 and 193.

contract and the place of performance are in the same state, the local law of this state will usually be applied."  Restatement § 188(3).

### 2. Choice of Law Analysis for Tort and CUTPA Claims

"When evaluating choice of law questions sounding in tort," Connecticut courts apply "the 'most significant relationship' test set forth in the [Restatement (Second) of Conflict of Laws]."  *W. Dermatology*, 153 A.3d at 584.  Further, "the choice of law principles applicable to tort actions also apply to claims brought under CUTPA."  *Id.* According to the relevant provision of the Restatement, § 145, "[t]he rights and liabilities of the parties with respect to an issue [in tort] are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in [§ 6 of the Restatement]."  *Id.* (quotation omitted); *see also* Restatement § 145(1).  To refine their review of the § 6 factors noted above, Connecticut courts turn to § 145(2) of the Restatement, "which establishes black-letter rules of priority to facilitate the application of the principles of § 6 to tort cases."  *W. Dermatology*, 153 A.3d at 584 (quotation omitted).  That section provides:

> Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.

Restatement § 145(2); *see also W. Dermatology*, 153 A.3d at 584.  Notably, "it is the significance, and not the number, of § 145(2) contacts that determines the outcome of the choice of law inquiry" under Connecticut law.  *W. Dermatology*, 153 A.3d at 585 (quoting *Jaiguay v. Vasquez*, 948 A.2d 955, 975 (Conn. 2008)); *see also* Restatement § 145(2).

**C. Breach of Contract – Failure to Send Premium Reminder Notices (Count IV)**

AXA Equitable and Wiener cross-move for summary judgment on Wiener's claim for breach of contract for failure to send premium reminder notices on November 1, 2013.

As an initial matter, the Court must determine which state's law governs this contract claim. The parties disagree whether New York or Connecticut law applies. Wiener argues that, first, the Court need not conduct a choice of law analysis because there is no actual conflict between the laws of both jurisdictions and, second, if there is a conflict, Connecticut has the most significant relationship with the claim. Defendants disagree, asserting that New York has the most significant relationship with the claims.

The Court agrees with Wiener that it need not engage in a choice of law analysis regarding this claim. In Connecticut, the elements of a breach of contract claim are (1) the formation of an agreement, (2) performance by one party, (3) breach of the agreement by the other party, and (4) damages. *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 87 A.3d 534, 540 (Conn. 2014). Further, the damages asserted by a party must "fairly and reasonably be considered [as] arising naturally, *i.e.*, according to the usual course of things, from [the] breach of contract itself." *Meadowbrook Ctr., Inc. v. Buchman*, 90 A.3d 219, 227 (Conn. App. Ct. 2014) (quoting *West Haven Sound Dev. Corp. v. West Haven*, 514 A.2d 734, 742 (Conn. 1986)); *see also Winakor v. Savalle*, 234 A.3d 1122, 1135 (Conn. App. Ct. 2020) (noting that damages for breach of contract requires that injuries were foreseeable to a defendant and naturally and directly resulted from the defendant's conduct). Similarly, under New York law, the elements of a claim for breach of contract are (1) the existence of a contract, (2) the performance by one party, (3) breach by the other party, and (4) damages suffered as a result of the breach. *See Beautiful Jewellers Priv. Ltd. v. Tiffany & Co.*, 438 F. App'x 20, 21–22 (2d Cir. 2011) (summary order); *see also EMR (USA Holdings) Inc. v. Goldberg*, No. 18 Civ. 7849 (ER),

2020 WL 4038358, at *7 (S.D.N.Y. July 17, 2020).  Accordingly, the Court concludes that there is no actual conflict regarding this claim.  *See In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 127 (2d Cir. 2013) ("[S]tate contract law defines breach [of contract] consistently such that the question will usually be the same in all jurisdictions."); *see also Hanks v. Voya Ret. Ins. & Annuity Co.*, No. 16 Civ. 6399 (PKC), --- F. Supp. 3d ----, 2020 WL 6439185, at *4 (S.D.N.Y. Sept. 30, 2020) (noting that "the law of breach [of contract] is materially uniform across state jurisdictions, meaning that there are no actual conflicts of law.").

Further, to the extent that the Court must interpret the terms of Wiener's insurance policies to evaluate his breach of contract claims, both Connecticut and New York law share the same principles for interpreting insurance policies.  In Connecticut, "[a]n insurance policy is to be interpreted by the same general rules that govern the construction of any written contract." *Karas v. Liberty Ins. Corp.*, 228 A.3d 1012, 1020 (Conn. 2019) (quotation omitted).  "In accordance with those principles, [t]he determinative question is the intent of the parties, that is, what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy." *Lexington Ins. Co. v. Lexington Healthcare Grp., Inc.*, 84. A.3d 1167, 1173 (Conn. 2014) (quotation omitted).  "If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning." *Karas*, 228 A.3d at 1020 (quotation omitted).  When interpreting insurance policies, courts "must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result." *Id.* (quotation omitted).  In doing so, however, courts "will not torture words to import ambiguity [when] the ordinary meaning leaves no room for ambiguity." *Id.*  (quotation omitted).  To determine the "commonly approved usage of a word [in an insurance policy], it is appropriate to look to the dictionary definition of the term." *Lexington*, 84 A.3d at 1175 n.8 (quotation

omitted).  Critically, "any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." *Karas*, 228 A.3d at 1020 (quotation omitted).  A provision in an insurance policy is ambiguous only if "it is reasonably susceptible to more than one reading." *Id.* (quotation omitted).

Similarly, under New York law, "[a]n insurance agreement is subject to principles of contract interpretation." *Burlington Ins. Co. v. NYC Transit Auth.*, 79 N.E.3d 477, 481 (N.Y. 2017) (quoting *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 37 N.E.3d 78, 80 (N.Y. 2015)).  "Therefore, '[a]s with the construction of contracts generally, unambiguous provisions of an insurance contract must be given their plain and ordinary meaning, and the interpretation of such provisions is a question of law for the court.'" *Id.* (quoting *Vigilant Ins. Co. v. Bear Stearns Cos., Inc.*, 884 N.E.2d 1044, 1047 (N.Y. 2008)).  "Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent," "or where its terms are subject to more than one reasonable interpretation." *Universal Am. Corp.*, 37 N.E.3d at 80 (quotation omitted).  "However, parties cannot create ambiguity from whole cloth where none exists, because provisions 'are not ambiguous merely because the parties interpret them differently.'" *Id.* (quoting *Mount Vernon Fire Ins. Co. v. Creative Hous. Ltd.*, 668 N.E.2d 404, 406 (N.Y. 1996)).  Instead, "[i]nsurance contracts must be interpreted according to common speech and consistent with the reasonable expectations of the average insured." *Cragg v. Allstate Indem. Corp.*, 950 N.E.2d 500, 502 (N.Y. 2011).  To determine the plain and ordinary meaning of terms in a contract, New York courts will commonly refer to dictionary definitions. *See Universal Am. Corp.*, 37 N.E.3d at 81 (relying on dictionary to determine "common definition" of terms in a rider); *see also Citibank, N.A. v. Jacobsen*, No. 19 Civ. 959 (ER), 2020 WL 7046841, at *4 (S.D.N.Y. Dec. 1, 2020).

Because there is no actual conflict between both jurisdictions regarding this claim, the Court analyzes it under the law common to both jurisdictions. *See Cohen*, 27 A.3d at 16; *Burns*, 991 A.2d at 673.  As noted, in both jurisdictions, the elements for breach of

contract are (1) the formation of an agreement, (2) performance by one party, (3) breach of the agreement by the other party, and (4) damages caused by the breach.  *See Meyers*, 87 A.3d at 540; *Beautiful Jewellers*, 438 F. App'x at 21–22.  The parties agree that Wiener has satisfied the first element; they do, however, disagree about the other three elements.

The material facts regarding the second element are undisputed:  Wiener paid all of his obligations through September 2013, the policies lapsed as of October 1, 2013, and the sixty-one-day grace period had commenced at that time.  Based on these facts, Wiener contends that he performed under the terms of the life insurance policies at the time AXA Equitable allegedly breached.  In particular, because the policies entered their grace period following his lapse in payment, Wiener argues that the policies were still in effect when AXA Equitable allegedly failed to send the premium reminder notices.  AXA Equitable disagrees, arguing that Wiener failed to perform under the contract by lapsing on his payment.

The Court need not analyze the second element of this breach of contract claim because the record conclusively shows that Wiener fails to satisfy the third and fourth elements.  As to the third element, the parties dispute whether the insurance policies required AXA Equitable to send premium reminder notices on November 1, 2013.  At bottom, then, the dispute is one of contractual interpretation.  The insurance policies state that AXA Equitable "will send premium reminder notices to [Wiener] for the planned periodic premium shown in the Policy Information section unless" Wiener asks it not to in his application for the policies or by later written notice.  Docs. 216-1 at 11, 39 and 216-2 at 25.  According to the Policy Information sections, Wiener selected that his planned periodic premium be paid "semiannually."  *See* Docs. 216-1 at 3, 25, 31 and 216-2 at 10, 16, 39.

According to Wiener, these provisions obligated AXA Equitable to send premium notice reminders every six months—and relevant here, specifically on November 1, 2013. Wiener notes, and it is undisputed, that the policies require AXA Equitable to send

premium reminder notices so long as the policyholder does not request otherwise and the policies remain in effect, *see* Docs. 216-1 at 11, 39, 216-2 at 25, and 216-14 at 81:16–82:6, and that Wiener never requested that AXA Equitable stop sending him premium reminder notices, *see* Docs. 216-1 at 25 and 216-2 at 10, 39.  Further, as Wiener also notes and AXA Equitable acknowledges, the policies remain in effect even during the grace period.  *See, e.g.*, Doc. 216-1 at 11 (stating that policy ends if no payment is received by the end of the grace period); *see also* Doc. 216-14 at 79:23–80:2.  Thus, there is no question that AXA Equitable was still obligated to perform in accordance with the terms of the policies during the grace period.

From there, Wiener emphasizes the provision that states that AXA Equitable "will send premium reminder notices to [him] for the planned periodic premium shown in the Policy Information section" of his policies.  Docs. 216-1 at 11, 39 and 216-2 at 25.  According to that section, Wiener's planned periodic premium was to be "payable semiannually."  Docs. 216-1 at 3, 25, 31 and 216-2 at 10, 16, 39.  Wiener argues that, taken together, these provisions show that AXA Equitable was obligated to send premium reminder notices "semiannually," which Wiener understands to mean "every six months." *See Semiannual*, Merriam-Webster, https://www.merriam-webster.com/dictionary/semiannual (last visited March 30, 2021).  According to Wiener, because the beginning date of the policies was November 1, 1986, AXA Equitable was obligated to send premium reminder notices every six months from that point—*i.e.*, on May 1 and November 1 of every year.

AXA Equitable admits that it did not send premium reminder notices on November 1, 2013, but it argues that the plain language of the policies imposed no obligation for it do so on that date or even before the end of the grace period.  The Court agrees.  Although Wiener attempts to support his position in part by relying on testimony in the record, under both Connecticut and New York law, the focus of the Court's interpretation must be on the plain and ordinary meaning of the unambiguous language of

the insurance policies.  *See Karas*, 228 A.3d at 1020; *Burlington*, 79 N.E.3d at 481.
Wiener is correct that, according to the plain language of these policies, AXA Equitable
was required to send a premium reminder notice for each pay period.  And Wiener is
correct that, because he selected a semiannual payment period, the policies obligated
AXA Equitable to send premium reminder notices "semiannually."

However, the Court disagrees with Wiener that the policies imposed a
requirement that AXA Equitable send its premium reminder notices on May 1 and
November 1 of every year, as the policies contain no language specifying when these
notices must be sent during the payment period window.  Here, that window is
"semiannual," which the policies do not define; accordingly, the Court turns to dictionary
definitions to obtain the common and ordinary meaning of the word.  See *Lexington*, 84
A.3d at 1175 n.8; *Universal Am. Corp.*, 37 N.E.3d at 81.  "Semiannual" can not only
mean occurring "every six months" but also can mean occurring "twice a year."
*Semiannual*, Merriam-Webster, https://www.merriam-webster.com/dictionary/semiannual
(last visited March 30, 2021).  Interpreting "semiannual" to mean "every six months"
would be meaningless in the context of the contractual framework, *see Karas*, 228 A.3d
at 1020; *Universal Am. Corp.*, 37 N.E.3d at 80–81, as the policies fail to specify a start
date by which AXA Equitable is supposed to measure a six-month time span, *see* Docs.
216-1 at 11, 39 and 216-2 at 25.  Although Wiener contends that the contractual
framework implies that November 1 and May 1 are the dates when AXA Equitable must
send premium reminder notices, the policies do not state those as reference points for
sending out the notices.  By contrast, the policies do provide that, at the start of any grace
period, AXA Equitable will send a policy lapse notice to Wiener.  *See* Docs. 216-1 at 11,
39 and 216-2 at 25.  Thus, because the policies do not specify dates by which AXA
Equitable must send premium reminder notices, the Court concludes that the policies here
simply impose a requirement that AXA Equitable send a premium reminder notice twice
a year—*i.e.*, once during each semiannual payment period—rather than on May 1 and

November 1 of each year. That interpretation makes sense particularly given that, under the flexible premium plan that Wiener selected, "payment of scheduled premiums is not required to keep [a] policy in force" and that he therefore could skip planned payments, *see* Docs. 211-4 at 2; *see also* Docs. 216-1 at 1, 25, 28, 216-2 at 10, 13, 39, and 217 ¶ 1, and that Wiener's policies warn him that the premium payments shown on his applications may not be sufficient to keep the policies in force, Docs. 216-1 at 3, 28, 31 and 216-2 at 13, 16, 44. Further, whereas the policies require that the policy lapse notices state the amount necessary to prevent termination after the grace period ends, the policies impose no such requirement for the premium reminder notices. *See* Docs. 216-1 at 11, 39 and 216-2 at 25. Accordingly, imposing an obligation to send premium reminder notices when policy lapse notices have already been sent is neither compelled by the plain language of the policies nor consistent with the purpose of keeping Wiener apprised of his obligations to keep his policies in effect. *Cf. Halberstam as Tr. of Zupnick Fam. Tr. 2008 B v. Allianz Life Ins. Co. of N. Am.*, 349 F. Supp. 3d 164, 170 (E.D.N.Y. 2018) (noting that federal courts have predicted that the New York Court of Appeals would invalidate a notice that misstated the premium owed for a lapsed life insurance policy). Because AXA Equitable was not obligated to send premium reminder notices to Wiener on November 1 of each year, it did not breach the terms of the policies when it did not send one on November 1, 2013.

Even if Wiener is correct that the policies required AXA Equitable to mail him premium reminder notices on November 1, 2013, the evidence conclusively shows that Wiener did not suffer damages as a result of the breach. Wiener contends that, had he received the notices, he would have relied on them to remember to pay his premium. Based on the record, however, no reasonable juror could reach that conclusion. *See Senno*, 812 F. Supp. 2d at 467–68. It is undisputed that from 1994 until October 2013—a period of almost twenty years—Wiener, through Millburn, would not pay monthly premiums until he received a policy lapse notice from AXA Equitable, and then he would

make a payment that covered only the amount set forth in the notice.  Docs. 214 ¶ 6 and
217 ¶ 16.  Indeed, Wiener acknowledges in his briefing that historically he paid based on
these policy lapse notices, Doc. 229 at 10, and it is undisputed that he made payments
pursuant to lapse notices, as those were the only documents that stated the minimum
payment amount, and Millburn had decided to pay only the minimum amount, *see* Docs.
214 ¶ 6 and 217 ¶ 16; *see also* Doc. 205-5 at 39:5–24.  Additionally, a Millburn
representative testified that the company did not make payments as a result of receiving
premium reminder notices.  *See* Doc. 205-5 at 39:9–24.  Further, when the policies
previously entered grace periods, AXA Equitable refrained from sending the premium
reminder notices until after it received Wiener's payment in response to a policy lapse
notice, further undermining any argument that Wiener ever relied upon the premium
reminder notices to make payments.  *See* Docs. 211-5, 211-6, 211-7, and 211-8.  And as
the policies note, the amount stated in the premium reminder notices "may not be
sufficient to continue the policy," Docs. 216-1 at 3, 31 and 216-2 at 16, and Wiener could
"skip planned premium payments" so long as he was not in lapse, Docs. 216-1 at 11, 39,
216-2 at 25, and 217 ¶ 1, lending further support to the notion that Wiener did not rely on
the premium reminder notices to fully address any lapse in payment.  Wiener's statements
that he could have relied upon premium reminder notices to correct any lapse, then, are
merely unsupported conjecture and surmise.  *See Goenaga*, 51 F.3d at 18.  Thus, based on
the language of the policies and Wiener's payment history, the Court concludes that no
reasonable factfinder could conclude that Wiener's alleged damages were caused by AXA
Equitable's failure to send premium reminder notices on November 1, 2013.

Accordingly, on this claim, the Court grants summary judgment for AXA
Equitable and denies it for Wiener.

### D. Fraudulent Misrepresentation (Count VII)

AXA Equitable also moves for summary judgment on Wiener's fraudulent
misrepresentation claim.  As to that claim, Wiener alleges that AXA Equitable promised

to provide premium reminder notices to induce him to rely on those notices, yet knew that it would not provide those notices during policy grace periods.  Further, according to Wiener, he relied on those premium reminder notices to determine if any premiums were due and to learn the proper amount to pay AXA Equitable.

The parties again dispute whether Connecticut or New York law governs this claim.  Under Connecticut choice of law rules, the Court must conduct a separate choice of law analysis regarding this claim.  *See Reclaimant*, 211 A.3d at 982; *see also Macomber*, 894 A.2d at 256–57; *Bulldog*, 8 F. Supp. 3d at 161–62.  In Connecticut, the essential elements of a claim for fraudulent misrepresentation "are that:  (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury."  *Sturm v. Harb Dev., LLC*, 2 A.3d 859, 872 (Conn. 2010) (quoting *Suffield Dev. Assocs. Ltd. P'ship v. Nat'l Loan Invs., L.P.*, 802 A.2d 44, 51 (Conn. 2002)).  Further, the party alleging fraudulent misrepresentation must have relied on that misrepresentation and have suffered harm as a result of that reliance.  *See id.*  Similarly, in New York, to assert "a claim for fraudulent misrepresentation, a plaintiff must allege 'a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury.'"  *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1108 (N.Y. 2011) (quoting *Lama Holding Co. v. Smith Barney*, 668 N.E.2d 1370, 1373 (N.Y. 1996)).

In both jurisdictions, Wiener's claim would fail as a matter of law.  As noted, under Connecticut and New York law, a fraudulent misrepresentation claim requires that the defendant make a false statement that the defendant knew to be false.  *See Sturm*, 2 A.3d at 872; *Mandarin Trading Ltd.*, 944 N.E.2d at 1108.  Wiener alleges that AXA Equitable falsely represented that it would send premium reminder notices on November

1, 2013, asserting that the policies stated that AXA Equitable would do so.  Wiener also alleges that AXA Equitable knew that the representation was false when it printed the policies.  But as discussed above, the plain language of the policies did not require AXA Equitable to send out premium reminder notices on November 1, 2013.  *See supra* Section II.C.  Thus, there is no evidence to support the allegation that, through its policies, AXA Equitable made a false representation that it would send premium reminder notices at that time, and Wiener points to no other evidence in the record suggesting AXA Equitable otherwise made such a representation.  And as discussed, even if AXA Equitable made a false misrepresentation, Wiener provides no evidence to support the conclusion that he relied on that representation to his injury, as the record instead conclusively shows that he relied exclusively on the policy lapse notices to tender payment.  *See id.*  Because no reasonable factfinder could conclude that AXA Equitable made a false statement or that he relied on any such misrepresentation to his injury, Wiener's claim for a fraudulent misrepresentation fails as a matter of law in both Connecticut and New York.  Accordingly, the Court need not conduct a choice of law analysis for this claim, *see W. Dermatology*, 153 A.3d at 583 n.13; *Cohen*, 27 A.3d at 16, and summary judgment on this issue is granted for AXA Equitable.

### E. Breach of Contract – Failure to Send Policy Lapse Notices (Count III)

AXA Equitable also moves for summary judgment on Wiener's claim for breach of contract for AXA Equitable's alleged failure to send policy lapse notices to him on October 1, 2013.  Wiener argues that summary judgment should not be granted because there are two disputed issues of material fact:  (1) whether AXA Equitable incorrectly changed the address of record for notices and (2) whether Wiener received the October 1, 2013 policy lapse notices.  AXA Equitable contends that there are no disputes of material fact regarding these issues, asserting that (1) the record conclusively shows that Wiener continued to pay premiums after AXA Equitable changed the address of record and (2)

the record establishes an unrebutted presumption that Wiener received the October 2013 policy lapse notices.

Again, under Connecticut choice of law rules, the Court must separately determine whether Connecticut or New York law governs this claim for breach of contract.  *See Reclaimant*, 211 A.3d at 982; *see also Macomber*, 894 A.2d at 256–57; *Bulldog*, 8 F. Supp. 3d at 161–62.  Although, as noted, the elements of a breach of contract claim and the principles guiding the interpretation of insurance contracts are the same in both jurisdictions, *see supra* Section II.C, the Court concludes that there is an actual conflict of law that requires a choice of law determination as to this contract-based claim.

That conflict arises from the standard for rebutting the presumption of receipt of mail by an insurance policyholder.  Under both New York and Connecticut law, a presumption of receipt of such notice arises when "the record establishes office procedures, followed in the regular course of business, pursuant to which notices have been addressed and mailed."  *See Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 92 (2d Cir. 2010) (citing *Nassau Ins. Co. v. Murray*, 386 N.E.2d 1085, 1086 (N.Y. 1978)) (applying New York law); *Echavarria v. Nat'l Grange Mut. Ins. Co.*, 880 A.2d 882, 888–889 (Conn. 2005) (recognizing similar rule in Connecticut).  Additionally, under New York law, "[t]o rebut this presumption, a litigant must show that 'routine office practice was not followed or was so careless that it would be unreasonable to assume that notice was mailed.'"  *Ma*, 597 F.3d at 92 (citing *Nassau*, 386 N.E.2d at 1086).  Critically, "[m]ere denial of receipt is insufficient to rebut the presumption."  *Stein v. Am. Gen. Life Ins. Co.*, 665 F. App'x 73, 76 (2d Cir. 2016) (summary order) (quoting *Ma*, 597 F.3d at 92).  Connecticut, however, has not resolved whether mere denial of receipt is sufficient to rebut the presumption of receipt.  *Echavarria*, 880 A.2d at 889 n.11.  Although some trial courts in Connecticut have concluded that mere denial is insufficient to rebut that presumption, the Court has found no Connecticut appellate

22

decision, and the parties do not point to one, that reached the same conclusion.  *See Knowles v. The United Illuminating Co.*, No. 17 Civ. 6065277S, 2019 WL 295777, at *5 (Conn. Super. Ct. Jan. 2, 2019) (concluding that mere denial is insufficient to rebut presumption); *Zaneski-Nettleton v. Dep't of Soc. Servs.*, No. 16 Civ. 5011698S, 2017 WL 2452079, at *4 (Conn. Super. Ct. May 5, 2017) (concluding that mere denial can be sufficient to rebut presumption).  Accordingly, because there is no controlling appellate court precedent in Connecticut on this issue, the Court must conduct a choice of law analysis for this claim.  *See Dugan*, 830 A.2d at 758.

As noted, § 192 of the Restatement provides for a presumption that Connecticut law governs because Wiener was domiciled there when he entered into the life insurance policies.  Restatement § 192.  From there, the Court must examine §§ 188(2) and 6(2) of the Restatement to determine whether, contrary to that presumption, New York law should govern.  *See Gen. Accident*, 101 A.3d at 947.

The Court begins by examining the contact factors under § 188(2).  *See id.* at 948 (examining § 188(2) factors before § 6(2) factors); *see also Am. States*, 922 A.2d at 1051 (same).  New York was the place of both contracting and negotiation, as the policy applications were signed and the policies were issued there.  *See* Restatement § 188(2)(a), (b); *see also* Docs. 216-1 at 5, 21, 23, 33 and 216-2 at 7–8, 35, 37, 41–43.  The place of performance is also New York, as the contract was formed there.  *See* Restatement § 188(2)(c); *Gen. Accident Ins. Co. v. Mortara*, 72 A.3d 482, 492 (Conn. Super. Ct. 2012), *aff'd*, 101 A.3d 942 (concluding that "place of performance" should be the place the contract was made); *see also* Doc. 58-1 ¶ 7 (stipulating that the alleged events or omissions giving rise to Wiener's claims occurred in New York).  The Court concludes, however, that "the location of the subject matter" of the policies—*i.e.*, Wiener—is Connecticut, as he resides there.  *See* Restatement § 188(2)(d); *Gen. Accident*, 101 A.3d at 948; *see also* Restatement § 188 cmt. e.  Finally, although Wiener was domiciled in Connecticut, he conducted business with AXA Equitable through Millburn, Doc. 217

¶ 10, which was located in New York, where AXA Equitable also resides.  Restatement
§ 188(2)(e).

Notably, because the place of negotiating the contract and place of performance
are both in New York, those factors provide significant support for New York under
§ 188.  *See* Restatement § 188(3).  Moreover, although domiciled in Connecticut, Wiener
conducted his transactions with AXA Equitable almost exclusively in New York,
diminishing the weight afforded to Connecticut.  Accordingly, despite some support for
Connecticut law, the contact factors under § 188(2) heavily favor New York.  Thus,
although there is a presumption under § 192 that Connecticut law governs, as Wiener was
domiciled there when he applied for the policies, *see* Restatement § 192, the § 188(2)
contact factors show that New York's interest is sufficiently compelling to overcome that
presumption.

While the contacts analysis under § 188 heavily favors the application of New
York law, the Court must still consider the policy factors set forth in § 6.  *See Gen.
Accident*, 101 A.3d at 948; *see also Am. States*, 922 A.2d at 1052.  Those factors likewise
favor New York law.  Regarding the first factor—the needs of the interstate and
international systems—the Court concludes that, because AXA Equitable has multiple
places of business in various states, this factor is not accorded significant weight.  *See*
Restatement § 6(2)(a); *see also Gen. Accident*, 101 A.3d at 948.  Regarding the second
and third factors—the relevant policies of the forum and other interested states—the
parties have not provided, and the Court's independent research has not revealed, any
differences in policy so fundamental to favor New York or Connecticut.  *See* Restatement
§ 6(2)(b), (c); *see also Gen. Accident*, 101 A.3d at 949–50.  Indeed, as noted, both states
follow the same principles when interpreting insurance policies, and although
Connecticut appellate courts have not determined the sufficiency of evidence required to
rebut the presumption of receipt of mail, *see Echavarria*, 880 A.2d at 889 n.11, the trend
among Connecticut trial courts is that mere denial by the insured is not sufficient to rebut

that presumption, *see, e.g.*, *Knowles*, 2019 WL 295777, at *5, with some courts even explicitly relying on New York law, *see Cirillo v. Burns*, No. 14 Civ. 6049603, 2018 WL 3431445, at *2 (Conn. Super. Ct. June 25, 2018) (citing *Nassau*, 386 N.E.2d at 1086). Because both states appear not to have a fundamental policy difference, New York law need not be considered offensive to Connecticut's public policy—and vice versa.  *See Am. States*, 922 A.2d at 1052.  The Court therefore also accords these two factors little weight.

The remaining factors under § 6 strongly favor applying New York law. Regarding the fourth, fifth, and sixth factors—the protection of justified expectations; the basic policies underlying the particular field of law; and certainty, predictability, and uniformity of result—"the justified expectations of the contracting parties regarding the law that will apply to the insurance contract are relevant to all three of these factors," so the Court must consider what law the parties expected to apply at the time of contracting. *See Gen. Accident*, 101 A.3d at 949; *see also* Restatement § 6(2)(d), (e), and (f).  Wiener argues that the expectation was that Connecticut law applied, again noting that documents providing his policy information stated that he was domiciled there and, therefore, the parties knew that the presumption favoring Connecticut applied.  *See* Docs. 216-1 at 3, 31 and 216-2 at 16.  However, those documents, along with other items in the record, make multiple references to New York law, noting that the policies needed to comply with "the laws of New York State" as well as the procedures and standards set forth by New York regulatory agencies.  Docs. 216-1 at 5, 20, 33 and 216-2 at 6, 19, 34.  As such, the record reflects that the parties understood at the time of contracting that New York law would apply to the policies.  Accordingly, the application of New York law "protect[s] the justified expectations of the parties to [the policies] and would in turn promote the values of certainty, predictability[,] and uniformity of the result," so the fourth, fifth, and sixth factors all support the conclusion that New York governs.  *See Gen. Accident*, 101 A.3d at 948–49; *see also* Restatement § 6(2)(d), (e), and (f).  Finally, the seventh factor—the ease

in the determination and application of the law to be applied—favors the application of New York law, which, unlike Connecticut law, has conclusively established that mere denial is insufficient to rebut the presumption of receipt.[4]  *See id.* Restatement § 6(2)(g); *see also Gen. Accident*, 101 A.3d at 950; *Am. States*, 922 A.2d at 1056.

Thus, because both the § 188(2) contact factors and § 6(2) policy factors heavily favor New York law, the Court concludes that New York's interest is sufficiently compelling to overcome the presumption under § 192 that Connecticut law applies. Accordingly, the Court applies New York law to this contract claim.

As to the first asserted issue, the Court concludes there is no issue of material fact regarding whether AXA Equitable violated the terms of the policies by changing the address of record to Wiener's Connecticut address.  Wiener disputes whether he authorized the change for the address of record in 2009, noting that he had requested a change in address for two joint survivorship policies for the benefit of his children—not the three policies at issue here.  Further, Wiener asserts that, under the terms of the policies, AXA Equitable could not change the address of record without his authorization. However, this dispute is immaterial because, even assuming he had not initially authorized the change in address, Wiener subsequently waived that requirement.

In New York, contractual rights may be waived if they are knowingly, voluntarily, and intentionally abandoned, and courts may infer that abandonment by affirmative conduct or a failure to act that evinces an intent not to claim a purported advantage.  *See Kamco Supply Corp v. On the Right Track, LLC*, 149 A.D.3d 275, 280 (N.Y. App. Div. 2017) (citing *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 850 N.E.2d 653, 658 (N.Y. 2006)).  Of course, waiver should not be lightly presumed, and mere negligence, oversight, or thoughtlessness does not create a waiver.  *Id.*  "A waiver,

---

[4] The Restatement notes that, although choice of law rules should be simple and easy to apply, this policy factor should not be overemphasized, as "it is obviously of greater importance that choice-of-law rules lead to desirable results."  Restatement § 6 cmt. j; *see also W. Dermatology*, 153 A.3d at 586.

however, may be proved by 'undisputed acts or language so inconsistent with [the party's] purpose to stand upon his [or her] rights as to leave no opportunity for a reasonable inference to the contrary.'" *Id.* at 281 (quoting *Alsens Am. Portland Cement Works v. Degnon Contracting Co.*, 118 N.E. 210, 210 (N.Y. 1917)). Although a party may withdraw a waiver, the party whose performance has been waived must be given notice of the withdrawal and a reasonable time after that notice within which to perform. *Id.* at 285 (citing *Nassau Tr. Co. v. Montrose Concrete Prods. Corp.*, 436 N.E.2d 1265, 1270 (N.Y. 1982)).

Here, as a matter of law, Wiener's actions constitute a waiver of his right to challenge the change of address as to the October 2013 policy lapse notices. Notably, in 2009, Wiener received notices confirming that his address of record for the policies at issue had been changed to his Connecticut residence. *See, e.g.*, Docs. 216-43, 229-6, and 229-7. Wiener does not dispute that he received those notices but instead asserts that they do not clearly indicate that the policies at issue were affected. However, there are three problems with that argument. First, the notices actually do list the policy numbers that are affected by the address change in the top right corner, thereby affording notice to Wiener. *See, e.g.*, Docs. 216-43, 229-6, and 229-7. Second, Wiener concedes that he established procedures in 2009 to handle mail from AXA Equitable regarding the policies at issue and yet never sought to correct the change in address. *See* Doc. 216 at 41; *see also* Doc. 217 ¶¶ 13, 17–21. Third, and relatedly, Wiener, through Millburn, has since remitted payment eighteen times in response to policy lapse notices sent to his Connecticut address. *See* Doc. 213-4; *see also* Doc. 231 ¶¶ 29–30. Thus, even if Wiener had not initially authorized the change of address for the policies at issue, the record conclusively establishes that he waived the ability to challenge that change as to the October 2013 policy lapse notices. *See Kamco*, 149 A.D.3d at 280. Further, because there is no evidence showing that Wiener objected to receiving the notices at his Connecticut address, there was no withdrawal of his waiver. *See id.*

27

As to the second asserted issue, Wiener argues that there is an issue of fact regarding whether AXA Equitable sent and Wiener received the October 2013 policy lapse notices.  Wiener again emphasizes that he never requested a change in his address of record for the policies at issue, but as the Court concluded, that dispute is immaterial given that Wiener submitted several payments after receiving notices at his Connecticut address without objecting to the change.  Wiener also notes that both he and his staff testified that they did not receive the October 2013 policy lapse notices.  According to Wiener, that denial suffices to create a fact issue barring summary judgment under Connecticut law.

But even if that were the case under Connecticut law, New York law governs this claim.  Again, under New York law, a presumption of receipt of mail by an insurance policyholder arises when "the record establishes office procedures, followed in the regular course of business, pursuant to which notices have been addressed and mailed." *Ma*, 597 F.3d at 92 (citing *Nassau*, 386 N.E.2d at 1086); *see also Stein*, 665 F. App'x at 75–76.  This presumption can be established either by offering the testimony of the person who actually mailed the letter or through indirect evidence, *i.e.*, by offering proof that mail is sent pursuant to office procedures followed in the regular course of business.  *See Vangas v. Montefiore Med. Ctr.*, No. 11 Civ. 6722 (ER), 2014 WL 5786720, at *3 (S.D.N.Y. Nov. 5, 2014); *see also Ma*, 597 F.3d at 92.

Here, AXA Equitable has met this burden, as the record contains evidence that the policy lapse notices were sent in the regular course of business.  *See Ma*, 597 F.3d at 92. According to Henry Lewer, a senior director at AXA Equitable at all relevant times, AXA Equitable uses an automated computer system to administer its policies.  *See* Doc. 190 ¶¶ 2, 13.  Lewer attests that AXA Equitable's system monitors the Net Cash Surrender Value of the policies, and on the first day of each policy month, it generates a policy lapse notice if that amount is insufficient to cover a policy's monthly deduction.  *Id.* ¶ 14.  As noted, it is undisputed that the Net Cash Surrender Value was insufficient to cover

Wiener's monthly deductions on October 1, 2013. Doc. 217 ¶ 25. Lewer states that, on that day, AXA Equitable's system identified accounts with insufficient Net Cash Surrender Values and generated a policy lapse notice for each account—including the policies at issue here. Doc. 190 ¶¶ 18–19, 22; *see also* Doc. 190-3. Lewer notes that policy lapse notices for Wiener's policies were then sent electronically to AXA Equitable's third-party vendor, and identifies the file name of the document containing those notices. Docs. 190 ¶¶ 16–19 and 190-2. A representative from AXA Equitable's third-party vendor attests that notices from that file were transferred to a mailing services company, *see* Doc. 191 ¶¶ 2, 7–8, 10, and a representative from that company testified that three pieces of mail were collected for delivery to Wiener's Connecticut address and then delivered by USPS mail there, *see* Doc. 192-6; *see also* Doc. 190 ¶ 23. Based on this evidence, the Court concludes that AXA Equitable has established the presumption of receipt. *See Vangas*, 2014 WL 5786720, at *3.

To rebut this presumption, under New York law, Wiener "must show that 'routine office practice was not followed or was so careless that it would be unreasonable to assume that notice was mailed.'" *Ma*, 597 F.3d at 92 (quoting *Nassau*, 386 N.E.2d at 1086). Further, New York courts have been explicit that mere denial of receipt is insufficient to rebut the presumption. *Id.* Here, Wiener offers nothing more than him, his wife, and his agents denying that they received the October 2013 policy lapse notices at his Connecticut address. *See* Docs. 216-10 at 102:19–23, 216-11 at 22:16–23:2, 216-12 at 61:17–62:21. Accordingly, he has failed to rebut the presumption that he received the policy lapse notices. *See Ma*, 597 F.3d at 92. The Court therefore grants summary judgment for AXA Equitable on this issue.[5]

---

[5] As noted, although Connecticut appellate courts have not determined the sufficiency of evidence required to rebut the presumption of receipt, *see Echavarria*, 880 A.2d at 889 n.11, the trend among Connecticut trial courts is that mere denial by the insured is not sufficient to rebut that presumption. *See Knowles*, 2019 WL 295777, at *5; *Cirillo*, 2018 WL 3431445, at *2. Therefore, were Connecticut law to govern, the Court's conclusion would remain the same.

**F. Waiver (Count V)**

AXA Equitable moves for summary judgment on Wiener's claim for waiver. Regarding that claim, Wiener alleges that, by cashing the check that he mailed on February 21, 2014 for the lapsed premium, AXA Equitable accepted the payment and thereby waived its right under the policies to insist that Wiener's policies had been terminated. Additionally, Wiener argues that, by cashing that check, AXA Equitable also waived its right to assert the insurability requirement in the reinstatement process.

The Court need not conduct a choice of law analysis regarding this claim because there is no actual conflict between the laws of Connecticut and New York regarding waiver. *See Cohen*, 27 A.3d at 16; *Burns*, 991 A.2d at 673. In both jurisdictions, a party may waive its contractual rights if those rights are knowingly, voluntarily, and intentionally abandoned. *Compare RBC Nice Bearings, Inc. v. SKF USA, INC.*, 123 A.3d 417, 424 (Conn. 2015), *with Kamco*, 149 A.D.3d at 280 (citing *Fundamental Portfolio*, 850 N.E.2d at 658). Further, under both Connecticut and New York law, waiver need not be express; instead, waiver may be implied through acts or conduct, and courts may infer waiver where it is reasonable to do so. *Compare RBC*, 123 A.3d at 424, *with Fundamental Portfolio*, 850 N.E.2d at 658. And in both jurisdictions, although waiver may be implied by conduct, it should still not lightly be presumed but instead must be a clear manifestation of a party's intent to relinquish its contractual protection, such that the conduct is inconsistent with the intention to terminate the contract. *Compare RBC*, 123 A.3d at 424, *with Fundamental Portfolio*, 850 N.E.2d at 658. Accordingly, because there is no actual conflict of law between Connecticut and New York, the Court analyzes this claim according to the law common to both jurisdictions. *See W. Dermatology*, 153 A.3d at 583 n.13; *see also Cohen*, 27 A.3d at 16; *Burns*, 991 A.2d at 673.

Here, the record shows that, as a matter of law, AXA Equitable did not waive its right to terminate the policies on December 2, 2013. Notably, when AXA Equitable cashed the check, it had already terminated Wiener's policies. As the policies note, if a

policyholder does not pay to cover at least three monthly deductions at the end of the grace period, AXA Equitable sends the policyholder a termination notice stating "that this policy has ended without value." *See* Docs. 216-1 at 11, 39 and 216-2 at 25.  Again, it is undisputed that Wiener failed to pay the amount owed by the end of the grace period, Docs. 214 ¶ 16 and 217 ¶ 32, and that AXA Equitable sent and Wiener received termination notices informing him that his policies had ended without value.  Docs. 214 ¶ 17 and 217 ¶¶ 32–33.  Thus, there is no question that AXA Equitable exercised its right to terminate the policies at that time.  *See* Doc. 214 ¶ 16.  But in essence, Wiener argues that, by cashing the check during the reinstatement process, AXA Equitable retroactively waived its right to terminate Wiener's policies.  Even if AXA Equitable could retroactively waive a contractual right it had already acted upon two and a half months beforehand, no reasonable juror could conclude that AXA Equitable's actions constituted waiver of the right to terminate the policies.  *See Senno*, 812 F. Supp. 2d at 467–68.  Again, although waiver may be implied through conduct, that conduct must provide a clear manifestation of a party's intent to relinquish a contractual protection.  *See RBC*, 123 A.3d at 424; *Fundamental Portfolio*, 850 N.E.2d at 658.  As Wiener acknowledges, he submitted a check after his policies had been terminated despite Hungerford's instruction not to do so.  *See* Docs. 216 at 47, 216-6 at 165:11–22, and 216-16.  Further, within two weeks of cashing Wiener's check, AXA Equitable issued and sent Wiener a new check to refund that payment.  Doc. 214 ¶ 24.  Although the refund was not instantaneous, it shows that AXA Equitable never acted or intended to validate the payments to continue the policies.  *See Cash v. AXA Equitable Life Ins. Co*, 229 F. Supp. 3d 542, 551 (W.D. Tex. 2017) (concluding that similar circumstances did not raise fact issue regarding waiver).[6]  That is especially so in light of the fact that AXA Equitable had

---

[6] In Texas, as in Connecticut and New York, "waiver requires intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right."  *See Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 474 (Tex. 2017).

already informed Wiener months beforehand that the policies had been terminated. *See* Doc. 214 ¶ 17. Accordingly, these undisputed facts do not give rise to a reasonable inference that AXA Equitable intended to waive its right to terminate Wiener's policies.

For similar reasons, no reasonable juror could conclude that AXA Equitable waived its right to assert the insurability requirement in its reinstatement evaluation. Again, prior to the reinstatement process, Wiener was instructed not to pay the outstanding amount, consistent with the directions in the reinstatement application, which stated that applicants should not submit payment. *See* Doc. 214 ¶ 21. And as noted, although the refund was not instantaneous, the two-week turnaround shows that AXA Equitable never acted or intended to validate the payments to reinstate the policies outside of the pending review process, which included the insurability requirement. The Court therefore concludes that the evidence establishes that AXA Equitable did not waive its right to assert the insurability requirement. Accordingly, summary judgment is granted to AXA Equitable on this issue.

### G. Negligence (Counts IX and X)

Wiener also brings claims for negligence against AXA Advisors and AXA Network (count IX) and Hungerford (count X), and those defendants seek summary judgment on these claims.[7] Wiener's claim against AXA Advisors and AXA Network is based on their vicarious liability for the alleged actions of Hungerford. Regarding Hungerford's actions, Wiener argues that Hungerford failed to exercise reasonable care when he incorrectly changed the address of record for Wiener's policies to his Connecticut address. Second, Wiener alleges that Hungerford was negligent by not personally notifying Wiener between October 1, 2013 and December 2, 2013 that the policies had entered the grace period and would terminate if the premium payments were

---

[7] Although they do not directly address the issue of negligence in their brief, AXA Advisors and AXA Network move for summary judgment on all of Wiener's claims, and incorporate by reference and join all of Hungerford's arguments regarding negligence. Doc. 187 at 18–19.

not made.  Third, and relatedly, Wiener asserts that Hungerford was negligent by failing to advise Wiener about the need to promptly pay his premiums despite repeatedly seeing that Wiener lapsed on those payments.

Again, before analyzing the merits, the Court must determine the choice of law for Wiener's claims.  *See Reclaimant*, 211 A.3d at 982; *see also Macomber*, 894 A.2d at 256–57; *Bulldog*, 8 F. Supp. 3d at 161–62.  To do so, the Court must first determine whether there is an actual conflict of law.  *See W. Dermatology*, 153 A.3d at 586–87; *Cohen*, 27 A.3d at 16; *see also Bulldog*, 8 F. Supp. 3d at 162.  Under Connecticut law, the elements of a negligence claim are:  (1) duty, (2) breach, (3) causation, and (4) actual injury.  *Sturm*, 2 A.3d at 870.  Similarly, under New York law, the elements of a negligence claim are (1) duty, (2) breach, and (3) injury proximately resulting from the breach.  *Pasternack v. Lab'y Corp. of Am. Holdings*, 59 N.E.3d 485, 490 (N.Y. 2016).  Thus, there is no conflict between the jurisdictions regarding the elements of a negligence claim.  However, as discussed below, the outcome regarding causation turns on the presumption of receipt of Wiener's policy lapse notices.  Thus, as with Wiener's breach of contract claim for the alleged failure to send policy lapse notices, there is an actual conflict of law regarding the presumption of receipt between Connecticut and New York law.  *See supra* Section II.E.

Accordingly, the Court must conduct a choice of law analysis for this claim.  *See Cohen*, 27 A.3d at 16; *Burns*, 991 A.2d at 673.  As noted, Connecticut courts rely on § 145 of the Restatement to conduct that analysis for tort claims, and that section states that the law governing a tort claim should be determined by the law of the jurisdiction with the most significant relationship to the occurrence and the parties according to the principles stated in § 6 of the Restatement.  *See* Restatement § 145(1); *see also W. Dermatology*, 153 A.3d at 584.  To assist that analysis, Connecticut courts first turn to the contact factors set forth in § 145(2).  *See W. Dermatology*, 153 A.3d at 584; *see also* Restatement § 145(2).

Those factors indicate that New York law should govern this claim.  Regarding the first factor, the injury occurred in Connecticut.  *See* Restatement § 145(2)(a).  Regarding the second factor, and as both parties stipulated to in their joint motion to transfer venue, the alleged events giving rise to Wiener's claims occurred in New York.  *See id.* § 145(2)(b); *see also* Doc. 58-1 ¶ 7.  Given that the focus of the Court's analysis regarding these claims is on the actions of Hungerford, AXA Advisors, and AXA Network, this factor is accorded significant weight.  *See W. Dermatology*, 153 A.3d at 585; *see also* Restatement § 145(2); *Bulldog*, 8 F. Supp.3d at 166.  As to the third factor, the Court concludes that it is a neutral one:  Wiener is located in Connecticut, whereas AXA Equitable is headquartered in New York.  *See W. Dermatology*, 153 A.3d at 585; *see also* Restatement § 145(2)(c).  Finally, the Court concludes that the relationship between the parties is centered in New York, as Wiener signed the policies there—thereby beginning the legal relationship—and he relied upon Millburn representatives in New York to interact with AXA Equitable and Hungerford there.  *See W. Dermatology*, 153 A.3d at 585; *see also* Restatement § 145(2)(d).  Further, and as noted with the contract-based choice of law analysis, the policies reference New York law as well.  *See* Docs. 216-1 at 5, 20, 33 and 216-2 at 6, 19, and 34.  As with the second factor, the Court accords this factor significant weight given its importance to the evaluation of the claim.  *See W. Dermatology*, 153 A.3d at 585; *see also* Restatement § 145(2).  Based on these factors and their relative weight, the Court concludes that New York has the greatest contact with the parties in this case.

Likewise, the factors set forth in § 6(2) of the Restatement also favor applying New York law.  The first factor favors neither state's law.  Restatement § 6(2)(a).  Regarding the second and third factors, and as noted, the parties have not provided, and the Court's research has not revealed, any differences in policy so fundamental to favor either Connecticut or New York law, *see supra* Section III.E, so the Court accords these two factors little weight in its analysis.  *See id.* § 6(2)(b), (c); *see also Gen. Accident*, 101

A.3d at 950.  As to the fourth factor, the parties knew that the Hungerford, AXA Advisors, and AXA Network were located in New York and performed work on Wiener's policies there, and Wiener, through Millburn, interacted with them there.  *See* Restatement § 6(2)(d).  "Thus, on the basis of the breadth and depth of the parties' contacts with" New York, the Court concludes that it was much more reasonable for the parties to expect New York rather than Connecticut law to govern any negligence dispute arising out of their business relationship.  *See W. Dermatology*, 153 A.3d at 586.  As to the fifth factor—the basic policies underlying the particular field of law—the Court concludes that this is a neutral factor, as negligence in both Connecticut and New York is "intended to effectuate the same policies, namely, [t]he deterrence of tortious conduct and the provision of compensation for the injured victim."  *Id.* (quotation omitted); *see also* Restatement § 6(2)(e).  Finally, the remaining factors—the certainty, predictability, and uniformity of result, and the ease in determination and application of the law to be applied—favor New York law "because the vast majority of the plaintiff's contact with the defendants happened in [New York].  It would, therefore, be predictable and uniform, as well as easy, to determine and apply the law of that state."  *W. Dermatology*, 153 A.3d at 586 (quotation omitted); *see also* Restatement § 6(2)(f), (g).[8]  Accordingly, the Court concludes that New York has the most significant relationship with the parties as to Wiener's claims for negligence and therefore its law governs those claims.

The parties dispute whether Hungerford owed a duty to Wiener regarding his allegations and whether Hungerford breached that duty.  However, the Court need not evaluate the arguments regarding either of those elements because, even assuming *arguendo* that Hungerford owed such a duty to Wiener and breached it, the Court finds that no reasonable juror could conclude that Wiener's injuries proximately resulted from

---

[8] Connecticut courts have noted that these auxiliary factors should not be overemphasized, as they are ancillary to the goal of providing rational and fair choice of law rules.  *See W. Dermatology*, 153 A.3d at 586; *O'Connor v. O'Connor*, 519 A.2d 13, 22–23 (Conn. 1986).

the alleged breach, *see Pasternack*, 59 N.E.3d at 490, as the record is devoid of any evidence that Wiener would have made the requisite payments had Hungerford reminded him to do so, *see Senno*, 812 F. Supp. 2d at 467–68.

Regarding Hungerford's alleged failure to advise Wiener—either generally or regarding the policy lapse at issue—the Court first notes that the policies clearly state Wiener's payment obligations and the consequences for failure to timely pay, providing that "[i]f by the end of the grace period [AXA Equitable] do[es] not receive an amount sufficient to cover at least 3 monthly deductions, [it] will then send [Wiener] . . . a notice that this policy has ended without value." Docs. 216-1 at 11, 39 and 216-2 at 25. The plain language of the policies is clear and unambiguous that Wiener's policies would terminate if he failed to remit payment by the end of the grace period, thereby putting Wiener on notice of the consequences for the failure to meet his obligations. Moreover, it is undisputed that Wiener received over 200 policy lapse notices between 1994 and October 2013, and as a result of those notices paid the amount necessary to keep the policies in good standing. *See* Docs. 205-8, 214 ¶ 6, and 217 ¶ 16. Further still, it is undisputed that Wiener's policies had terminated prior to October 1, 2013, and he had previously filed for reinstatement pursuant to the process outlined by the terms of the policies. *See* Doc. 205-12. Thus, especially in light of Wiener's extensive background in the financial sector and the assistance he received from Millburn, the Court concludes that Wiener was fully aware of the payment schedule, his obligations to make timely premium payments, and the consequences of his failure to pay the premiums in accordance with the terms of the policies. *See GlobalNet Financial.com., Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 388 (2d Cir. 2006). Aware of those obligations, neither Wiener nor a representative from Millburn ever sought Hungerford's advice with respect to the financial management of his policies before December 2013. *See* Docs. 196-10 at 43:3–25, 54:17–23 and 214 ¶¶ 10–11. Instead, it is undisputed that Wiener, through Millburn, relied on the policy lapse notices to tender payment, paying only the minimum

amount necessary at the time to keep the policy in effect.  *See* Docs. 214 ¶ 6 and 217
¶ 16.  Accordingly, the Court concludes that Wiener's assertion that Hungerford's lack of
advice caused the termination of the policies is nothing more than conjecture or surmise.
*See Goenaga*, 51 F.3d at 18.

Likewise, there is no evidence that the termination of the policies proximately
resulted from any alleged negligence in changing the address of record.  *See Pasternack*,
59 N.E.3d at 490.  As noted above, after Wiener received notices confirming that his
address of record had been changed for his policies, he implemented new procedures to
handle mail regarding those policies at his residence in Connecticut, remitted payment
eighteen times after the address was changed, and never protested the change to
Hungerford or AXA Equitable.  *See supra* Section II.E.  Thus, even if Hungerford had
negligently changed the address of record for the policies, Wiener continued to act upon
those notices.  Further, under the presumption of receipt, the Court concludes that Wiener
received the October 2013 policy lapse notices—yet he failed to timely remit payment.
*See id.*; *see also Ma*, 597 F.3d at 92 (citing *Nassau*, 386 N.E.2d at 1086).  Accordingly,
Wiener is unable to prevail on his negligence claims because Hungerford—and by
extension AXA Advisors and AXA Network—were not the cause of the cancellation of
his coverage.  *See GlobalNet*, 449 F.3d at 388.  The Court therefore grants summary
judgment for Hungerford, AXA Advisors, and AXA Network on these claims.

### H. Breach of Fiduciary Duty (Counts XI and XII)

Wiener also asserts claims for breach of fiduciary duty against AXA Advisors and
AXA Network (count XI) and Hungerford (count XII), and those defendants seek
summary judgment on those claims.[9]  As with his negligence claims, Wiener's claim
against AXA Advisors and AXA Network is based on their vicarious liability for the

---

[9] As with the negligence claims, AXA Advisors and AXA Network do not directly address Wiener's breach
of fiduciary claim in their motion for summary judgment.  However, as noted, they move for summary
judgment on all of Wiener's claims, and they incorporate by reference and join all of Hungerford's
arguments regarding the breach of fiduciary duty claim.  Doc. 187 at 18–19.

alleged actions of Hungerford.  Regarding Hungerford, Wiener largely repeats the same allegations that underlie his negligence claims, stating that Wiener suffered damages because Hungerford failed to advise Wiener as to the financial management of the policies and the proper manner of paying Wiener's premiums to ensure they would not terminate.  Wiener also alleges that Hungerford failed to disclose his relationship with AXA Equitable, and that the relationship influenced his provision of services to Wiener.

The Court must first determine the law to apply to this claim.  In New York, the elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct.  *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 241 (2d Cir. 2020).  Similarly, in Connecticut, the elements of breach of fiduciary duty are (1) that a fiduciary relationship existed that gave rise to a duty of loyalty, an obligation to act in the best interest of the plaintiff, and an obligation to act in good faith in any matter relating to the plaintiff; (2) that the defendant advanced her own interests to the detriment of the plaintiff; (3) that the plaintiff sustained damages; and (4) that the fiduciary's breach of her fiduciary duty proximately caused those damages.  *Chioffi v. Martin*, 186 A.3d 15, 32 (Conn. App. Ct. 2018).  However, although the elements of a breach of fiduciary duty claim are similar in both jurisdictions, as with the negligence claims, there is an actual conflict of law regarding causation due to the presumption of receipt, and the Court therefore must determine whether Connecticut or New York law applies to these tort claims by reviewing the factors under §§ 145 and 6 of the Restatement.  *See supra* Section II.G; *see also W. Dermatology*, 153 A.3d at 586–87; *Cohen*, 27 A.3d at 16.  Given the overlap in the allegations underlying Wiener's breach of fiduciary duty claims with the allegations underlying his negligence claims, the Court concludes that both the §§ 145 and 6 factors similarly indicate that New York law should apply.  *See supra* Section II.G; *see also* Restatement §§ 6 and 145.  And relying on the same reasoning regarding the causation element of Wiener's negligence claims, the Court also finds that no reasonable

factfinder could conclude that Hungerford's alleged breach of a fiduciary duty directly caused Wiener's damages.  *See supra* Section II.G; *see also Yukos*, 977 F.3d at 241.  To the extent that Wiener alleges that the termination of the policies was directly caused by Hungerford's failure to disclose his relationship with AXA Equitable, the Court notes that there is no evidence to support this additional allegation.  As Wiener notes, Hungerford was copied on all payment reminder notices and policy lapse notices sent to him, so Wiener was well aware of Hungerford's relationship with AXA Equitable.  *See* Doc. 214 ¶ 9.  Further, given that Wiener relied on Millburn—not Hungerford—to handle keeping his life insurance policies active, *see id.* ¶¶ 10–11; *see also* Doc. 217 ¶ 10, and that neither he nor anyone at the company spoke to Hungerford regarding the financial management of his policies, Docs. 196-10 at 43:3–25, 54:17–23 and 214 ¶¶ 10–11, no reasonable factfinder could conclude that Hungerford's alleged failure to disclose directly caused the termination of the policies.  Accordingly, the Court grants summary judgment for Hungerford, AXA Advisors, and AXA Network on these claims.

### I. Violation of CUTPA (Counts VI and XIII)

AXA Defendants move for summary judgment on Wiener's CUTPA claims. Regarding those claims, Wiener alleges that AXA Equitable engaged in unfair and deceptive acts by failing to send out the October 2013 policy lapse notices and the premium reminder notices on November 1, 2013, and encouraging Wiener to apply for reinstatement of his policies while misrepresenting that medical factors would be considered in that review process.  Wiener also alleges that AXA Advisors and AXA Network, vicariously through Hungerford, failed to take action in response to the policy lapse notices.

As AXA Defendants note, there is an actual conflict of law, as a CUTPA claim can be brought only if Connecticut law governs these claims.  *See Alpha Beta Cap. Partners, L.P. v. Pursuit Inv. Mgmt., LLC*, 219 A.3d 801, 827–28 (Conn. App. Ct. 2019) (barring CUTPA claim where New York law applied); *see also W. Dermatology*, 153 A.3d at 586–

87 (determining that CUTPA did not apply where Connecticut law did not govern); *McLoughlin v. People's United Bank, Inc.*, No. 08 Civ. 944 (VLB), 2009 WL 2843269, at *6 (D. Conn. Aug. 31, 2009) (citing *Bailey Emp. Sys. Inc. v. Hahn*, 655 F.2d 473, 475–76 (2d Cir. 1981)).  Accordingly, the Court must determine whether Connecticut or New York law applies.  *See W. Dermatology*, 153 A.3d at 586–87; *Cohen*, 27 A.3d at 16.  The choice of law principles applicable to tort actions also apply to CUTPA claims, so the Court turns to §§ 145 and 6 of the Restatement for its analysis.  *See W. Dermatology*, 153 A.3d at 584.  As an initial matter, the Court notes that Wiener relies on many of the same allegations underlying his negligence and breach of fiduciary duty claims, so the Court's analysis for these claims will significantly overlap with its analysis for those claims.  *See supra* Sections II.G and II.H.

The factors under § 145(2) indicate that New York law should govern this claim.  Although the injury occurred in Connecticut, *see* Restatement § 145(2)(a), both parties stipulated and the record reflects that the alleged events giving rise to Wiener's claims occurred in New York, as AXA Defendants made their decisions regarding Wiener's policies and AXA Equitable reviewed the reinstatement application there, *see id.* § 145(2)(b); *see also* Doc. 58-1 ¶ 7.  The Court also concludes that the third factor is neutral:  Wiener is located in Connecticut, whereas AXA Defendants are headquartered in New York.  *See W. Dermatology*, 153 A.3d at 585; *see also* Restatement § 145(2)(c).  Finally, the Court concludes that the relationship between the parties is centered in New York, as Wiener signed the policies and relied upon Millburn representatives there, and again, AXA Defendants made decisions relating to the notices and AXA Equitable conducted the reinstatement review there.  *See W. Dermatology*, 153 A.3d at 585; *see also* Restatement § 145(2)(d).  Given that the focus of the Court's analysis regarding this claim is on the actions AXA Defendants took, the Court accords the second and fourth factors significant weight in its analysis.  *See W. Dermatology*, 153 A.3d at 585; *see also*

Restatement § 145(2).  Accordingly, the Court concludes that New York has the greatest contact with the parties regarding Wiener's CUTPA claims.

Likewise, the § 6 factors also favor applying New York law.  Because of overlapping allegations, the Court's § 6 analysis regarding Wiener's CUTPA claim is identical to its analysis regarding his negligence and breach of fiduciary duty claims, with the exception of the fourth and fifth factors.  *See supra* Sections II.G and II.H.  The Court therefore concludes that the first factor is neutral, the second and third factors are accorded little weight, and the sixth and seventh factors favor New York.  Regarding the fourth factor, the parties knew that AXA Defendants were located in New York and performed work on Wiener's policies there, and Wiener, through Millburn, interacted with AXA Equitable there.  *See, e.g.*, Doc. 58-1 ¶ 7; *see also* Restatement § 6(2)(d).  Thus, the Court concludes that this factor favors New York.  *See W. Dermatology*, 153 A.3d at 586.  Finally, as to the fifth factor—the basic policies underlying the particular field of law—the Court concludes that this a neutral factor, because the laws regarding unfair trade practices in Connecticut and New York are both intended to effectuate the deterrence of tortious conduct and the provision of compensation for injured victims.  *See W. Dermatology*, 153 A.3d at 586 (citing Restatement § 145 cmt. b); *see also* Restatement § 6(2)(e).  Based on these factors, New York has the most significant relationship with the parties as to these claims and therefore its law governs.

Because Connecticut law does not apply, Wiener cannot assert his CUTPA claims.  *See Alpha Beta*, 219 A.3d at 827–28; *see also W. Dermatology*, 153 A.3d at 586–87; *McLoughlin*, 2009 WL 2843269, at *6.  Accordingly, the Court grants summary judgment to AXA Defendants on these issues.

### J. Equitable Reinstatement (Count II)

AXA Equitable moves for summary judgment on Wiener's claim for equitable reinstatement of his policies.  Wiener divides his claim based on alternative forms of

relief:  technical reinstatement and regular reinstatement.[10]  As noted, a technical reinstatement occurs automatically if AXA Equitable made a technical or processing mistake that resulted in a lapsed policy, while a regular reinstatement requires evidence of insurability.  *See* Docs. 216-1 at 11, 39, 216-2, 216-2 at 25, and 216-14 at 99:19–101:16.

The Court must first determine whether Connecticut or New York law applies to Wiener's claim for equitable reinstatement.  The parties cite New York law in their arguments concerning this claim.  Where, as here, the parties agree that New York law controls, that is sufficient to establish choice of law.  *See Fed Ins. Co. v. Am. Home. Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011).  Accordingly, New York law governs this claim.  *See Smith v. Mikki More, LLC*, 21 F. Supp. 3d 276, 283 n.2 (S.D.N.Y. 2014).

In New York, insurance companies have the right to say whether or not evidence of insurability is satisfactory when considering reinstatement applications.  *See Kallman v. Equitable Life Assurance Soc'y of U.S.*, 248 A.D. 146, 149 (N.Y. App. Div. 1936), *aff'd*, 5 N.E.2d 375 (N.Y. 1936).  Still, "insurance companies making reinstatement decisions are required to act reasonably, and not arbitrarily and capriciously, in determining whether an applicant has submitted satisfactory evidence of insurability." *Wiener v. AXA Equitable Life Ins. Co.*, No. 16 Civ. 4019 (ER), 2019 WL 1228074, at *6 (S.D.N.Y. Mar. 15, 2019) (citing *Thompson v. Postal Life Ins. Co.*, 123 N.E. 750, 751 (N.Y. 1919)); *see also Miller v. Cont'l Cas. Co.*, 261 A.D. 395, 397–98 (N.Y. App. Div. 1941), *aff'd*, 39 N.E.2d 275 (N.Y. 1941).  As such, an agreement to reinstate an insurance policy upon satisfactory evidence of insurability does not bestow on the insurer absolute discretion to disapprove an application for reinstatement; so long as an applicant's insurability would be satisfactory to a reasonable insurer, and all back premiums have

---

[10] In his operative complaint, Wiener also alleges that AXA Equitable acted arbitrarily by assigning Hungerford to Wiener's accounts and by failing, through him, to advise Wiener on financially managing his policies.  Doc. 79 ¶¶ 80–81.  In their briefing, the parties do not address this allegation as to this claim.  For the same reasons stated in the Court's analysis of this allegation in the context of Wiener's claim for breach of the covenant of good faith and fair dealing, the Court concludes that this allegation fails as a matter of law to support a claim for equitable reinstatement.  *See infra* Section II.K.

been paid, reinstatement cannot be denied.[11]  *See Wiener*, 2019 WL 1228074, at *6 (citing *Ryman v. Am. Nat'l Ins. Co.*, 488 P.2d 32, 43 (Cal. 1971)); *see also Thompson*, 123 N.E. at 750–51 (holding that insurer acted arbitrarily by denying reinstatement where applicant's supporting documents gave "no hint of a defect in health or habits"). Accordingly, "[t]here must be some sound and valid reason for finding the applicant no longer insurable." *Kallman*, 248 A.D. at 149; *see also Thompson*, 123 N.E. at 750–51.

Wiener alleges that AXA Equitable arbitrarily refused to grant Wiener a technical reinstatement despite two of its own errors:  (1) AXA Equitable's failure to send premium reminder notices on November 1, 2013 and (2) its mishandling of an address change so the October 1, 2013 policy lapse notices for the polices at issue were sent incorrectly to his Connecticut address.  However, neither of these constitutes a basis for a technical reinstatement.  As to the first underlying allegation, the policies did not require AXA Equitable to send premium reminder notices on November 1, 2013.  *See supra* Section II.C.  And as to the second allegation, Wiener continued to make payments for several years after the address change, thereby waiving the ability to challenge that change.  *See supra* Section II.E.  Accordingly, the Court concludes that, as a matter of law, Wiener was not entitled to a technical reinstatement, and AXA Equitable therefore did not act arbitrarily or capriciously in denying that reinstatement.

Regarding regular reinstatement, AXA Equitable argues that the record conclusively establishes that it reasonably relied on Wiener's serum albumin levels to determine whether he was insurable at the time of his reinstatement application.  AXA Equitable notes that its applicant medical checklist for seniors recommends underwriters "usually [d]ecline" reinstatement when they see serum albumin levels that are "3.8 or less," and Wiener's medical records state that his serum albumin levels were, at various

---

[11] In New York, a life insurance policy must contain a provision stating "that the policy shall be reinstated at any time within three years from the date of default, unless the cash surrender value has been exhausted or the period of extended insurance has expired, if the policyholder," among other things, "provides evidence of insurability, including good health, satisfactory to the insurer."  N.Y. Ins. Law § 3203(a)(10).

times, below 3.8.  *See* Docs. 192-16, and 192-17; *see also Wiener*, 2019 WL 1228074, at *6 n.6 ("There appears to be no dispute that Wiener's serum albumin levels were in a range that the Senior Medical Checklist would counsel an underwriter to 'usually decline.'"); Doc. 192-10 at 71:9–11, 117:6–23, 123:10–12.  AXA Equitable also asserts that Hawkins, the underwriter who reviewed Wiener's application, relied upon those serum albumin levels and applied the guidelines.  *See* Doc. 216-24 at 231:23–232:10.  Further, AXA Equitable proffers expert testimony in support of not only its guidelines but Hawkins's application of those guidelines.  *See* Doc. 192-13.  AXA Equitable argues that, based on this evidence and Wiener's lack of expert testimony regarding the reasonableness of its guidelines, it is entitled to summary judgment.

Wiener disagrees.  Wiener argues that, because AXA Equitable denied reinstatement based solely on health considerations, he may challenge the underlying assessment of his health conditions.   To that end, Wiener asserts that AXA Equitable misinterpreted his medical records, and points to portions of his medical records and testimony by Dr. Boyd, his physician, to refute the health assessments by Hawkins.[12]  Further, Wiener calls into question whether Hawkins relied on Wiener's serum albumin levels in making her decision to decline reinstatement, arguing that there was inconsistency in her testimony that implicates her credibility.  Specifically, Wiener contends that the underwriter changed her testimony, stating at one point that she relied on Wiener's serum albumin levels and another point that she relied on other factors.  *See* Docs. 216-24 at 231:23–24 and 216-25 at 210:4–211:13.  Additionally, Wiener asserts that Hawkins declined to gather additional medical information when she reviewed Wiener's application.  Wiener also argues that AXA Equitable's serum-albumin threshold for individuals who are over seventy years old constitutes age discrimination, and points

---

[12] More specifically, Wiener challenges the assessments regarding the following conditions:  anemia, monoclonal gammopathy of undetermined significance, memory loss, gait instability, stroke, serum albumin, sleep apnea, and atrial fibrillation.

to a few articles from scientific journals to support his argument.  *See* Docs. 216-39, 216-40, and 216-41.

The Court agrees with AXA Equitable.  As the Court noted in its March 15, 2019 Order, the question regarding reinstatement is not whether Wiener was in good health; rather, the question at issue is whether AXA Equitable "acted arbitrarily and capriciously by applying certain underwriting guidelines in determining that he was not insurable." *Wiener*, 2019 WL 1228074, at *6.  Since AXA Equitable declined Wiener's request for reinstatement because of his serum albumin levels, "liability will ultimately be determined by a finding, *from an underwriting or insurance risk perspective*, that [AXA Equitable] reasonably relied on Wiener's albumin level to determine whether he was insurable." *Id.*  (emphasis added).  To that end, the proffered evidence addressing his health and any information potentially missing in health records are immaterial.  *See id.* Further, Wiener provides no admissible evidence to challenge the reasonableness of AXA Equitable's reliance on his serum albumin levels in its decision to deny reinstatement, and AXA Equitable has put forth expert testimony in support of the reasonableness of its guidelines.[13]  *See* Doc. 192-13 at 52:14–19, 71:5–18.  Finally, as to Wiener's argument regarding Hawkins's credibility, the record reflects that there is no inconsistency in her testimony regarding whether she relied upon Wiener's serum albumin levels to deny his claim:  she simply testified that there were "other factors" that counseled declining reinstatement, but his serum albumin levels alone justified the decision.  *See* Doc. 216-24 at 231:23–232:10.  Accordingly, because there is no evidence in the record challenging the reasonableness of AXA Equitable's underwriting decision, the Court grants summary judgment to AXA Equitable on this issue.

---

[13] Although Wiener points to a few scientific studies to challenge AXA Equitable's guidelines, it provides no witness to lay a foundation for those studies.

**K. Breach of Covenant of Good Faith and Fair Dealing (Count VIII)**

AXA Equitable also moves for summary judgment on Wiener's claim for the breach of the covenant of good faith and fair dealing.  Wiener notes that this claim is based, broadly, on four allegations—namely, that AXA Equitable:  (1) failed to send the October 2013 policy lapse notices, (2) failed to send premium reminder notices on November 1, 2013, (3) assigned Hungerford to Wiener's accounts, resulting in Hungerford's failure to advise Wiener on how to financially manage his policies, and (4) denied Wiener's reinstatement application not because of his unsatisfactory evidence of medical insurability but instead because it sought to avoid paying significant death benefits.  According to Wiener, these actions led to the termination of his policies, as he alleges that he was placed in a position where missing a single payment could lead to termination and where Wiener's application for reinstatement of his policies would not be properly reviewed.

AXA Equitable argues that Wiener's claim fails as a matter of law.  Specifically, AXA Equitable notes that New York law applies here, and it does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim is also pleaded based on the same facts.  *See Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013).  According to AXA Equitable, Wiener's claim here is based on the same facts underlying his breach of contract claims and, therefore, should be barred.  Wiener disagrees, arguing that Connecticut law governs this claim, and that, under Connecticut law, a party may bring a separate claim for breach of the covenant of good faith and fair dealing in addition to a claim for breach of contract. *See Phillips v. State Farm Fire & Cas. Co.*, No. 19 Civ. 623 (AWT), 2020 WL 3105485, at *2 (D. Conn. Feb. 28, 2020) (citing *Buckman v. People Express, Inc.*, 530 A.2d 596, 599 (Conn. 1987)).  Wiener also argues that, in the event that New York law applies, his claim may proceed because his breach of contract claims are not based on his third and fourth allegations and because he seeks punitive damages for this claim.

46

As with Wiener's other claims, the Court must first determine whether Connecticut or New York law governs.  In Connecticut, courts recognize an independent cause of action in tort arising from an insurer's common law duty of good faith and fair dealing that is separate from a breach of contract claim.  *See Phillips*, 2020 WL 3105485, at *2 (citing *Buckman*, 530 A.2d at 599); *see also Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 67 A.3d 961, 988 (Conn. 2013); *Arch Ins. Co. v. Centerplan Constr. Co., LLC*, No. 16 Civ. 1891 (VLB), 2018 WL 6519063, at *13 (D. Conn. Dec. 11, 2018); *Nationwide Mut. Ins. Co. v. Pasiak*, No. 08 Civ. 84015401, 2011 WL 6413817, at *3 (Conn. Super. Ct. Nov. 30, 2011).  However, although it is a separate claim, asserting a claim for breach of the covenant of good faith and fair dealing must be tied to an alleged breach of a specific contract term.  *Geysen v. Securitas Sec. Servs. USA, Inc.*, 142 A.3d 227, 237 (Conn. 2016); *Karas v. Liberty Ins. Corp.*, 33 F. Supp. 3d 110, 116 (D. Conn. 2014).  By contrast, in New York, breach of the implied covenant of good faith and fair dealing is considered a breach of the underlying contract and therefore is not an independent cause of action.  *See Cruz*, 720 F.3d at 125; *see also Keystone Food Holdings Ltd. v. Tyson Foods, Inc.*, No. 19 Civ. 3888 (ALC), --- F. Supp. 3d ----, 2020 WL 5849223, at *15 (S.D.N.Y. Sept. 30, 2020).  Accordingly, to bring a claim for breach of the covenant of good faith and fair dealing, a plaintiff must base her claim on allegations distinct from those underlying the accompanying claim for breach of contract. *Keystone Food*, --- F. Supp. 3d ----, 2020 WL 5849223, at *15.  "Therefore, when a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant."  *Cruz*, 720 F.3d at 125; *see also JN Contemp. Art LLC v. Phillips Auctioneers LLC*, No. 20 Civ. 4370 (DLC), --- F. Supp. 3d ----, 2020 WL 7405262, at *11 (S.D.N.Y. Dec. 16, 2020).  Wiener acknowledges that two of the allegations underlying his breach of contract claims—that AXA Equitable allegedly (1) failed to send the October 1, 2013 policy lapse notices and (2) failed to send the premium reminder notices on November 1,

2013—form part of the basis of his claim for breach of the covenant of good faith and fair dealing. *See* Doc. 216 at 45–46. Thus, while Wiener could bring his claim in Connecticut based on all of the underlying allegations, he is barred from bringing part of his claim in New York because of the overlap in facts relating to the claims. Because there is an actual conflict of law, the Court must conduct a choice of law analysis. *See W. Dermatology*, 153 A.3d at 586–87; *Cohen*, 27 A.3d at 16.

The Court now turns to the factors under §§ 145 and 6 of the Restatement to determine which law governs this tort claim.[14] *See W. Dermatology*, 153 A.3d at 584. Given the overlap in allegations underlying this claim and Wiener's claims for negligence, breach of fiduciary duty, and CUTPA, the Court relies on the choice of law analyses it conducted for those claims. *See* Sections II.G, II.H, and II.I. Again, those analyses favored New York law, and the only pertinent difference regarding this claim does not affect the Court's analysis. Specifically, that difference relates to the fifth factor under § 6—the basic policies underlying the particular field of law—and that factor is neutral, as claims for breach of the covenant of good faith and fair dealing are intended to effectuate the same policy of deterring tortious conduct and providing compensation for victims who suffer from that conduct. *See* Restatement § 6(2)(e); *see also W. Dermatology*, 153 A.3d at 586. Accordingly, the Court concludes that New York law governs this claim.

Under New York law, "[t]he implied covenant of good faith and fair dealing is incorporated into every contract." *Mariah Re Ltd. v. Am. Fam. Mut. Ins. Co.*, 52 F. Supp. 3d 601, 611 (S.D.N.Y. 2014). "The implied covenant of good faith and fair dealing is breached when a party acts in a manner that would deprive the other party of the right to

---

[14] There is some debate among Connecticut courts whether a claim for breach of the covenant of good faith and fair dealing sounds in tort or contract. *See DelMonaco v. Albert Kemperle, Inc.*, No. 14 Civ. 6045251S, 2014 WL 7525518, at *8–9 (Conn Super. Ct. Nov. 26, 2014). However, generally, Connecticut courts construe the claim as sounding in tort, so the Court does so here. *See Buckman*, 530 A.2d at 599; *see also Arch Ins.*, 2018 WL 6519063, at *16; *Sessa v. Amica Mut. Ins. Co.*, No. 15 Civ. 6030881, 2016 WL 2955830, at *3 (Conn. Super. Ct. May 2, 2016).

receive the benefits of their agreement." *1357 Tarrytown Rd. Auto, LLC v. Granite Props., LLC*, 142 A.D.3d 976, 977 (N.Y. App. Div. 2016).  "Encompassed within the implied obligation . . . are any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Singh v. City of New York*, 189 A.D.3d 1697, 1700 (N.Y. App. Div. 2020) (quoting *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995)).  "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Dalton*, 663 N.E.2d at 291.  Still, "New York law is clear that the covenant does not create obligations that go beyond those intended and stated in the language of the contract." *Mariah*, 52 F. Supp. 3d at 611 (quotation omitted).

The Court concludes that, as a matter of law, the first three underlying allegations fail as a basis for Wiener's good faith claim.  Regarding the first two broad allegations—that AXA failed to send the October 1, 2013 policy lapse notices and failed to send the premium reminder notices on November 1, 2013—Wiener concedes that these are the same as allegations underlying his breach of contract claims.  *See* Doc. 216 at 45–46.  Thus, as a matter of law, Wiener's claim for breach of the covenant of good faith and fair dealing fails as to those allegations.  *See Cruz*, 720 F.3d at 125.

As to the third allegation—that AXA Equitable assigned Hungerford to Wiener's accounts, resulting in Hungerford's failure to advise Wiener on how to financially manage his policies—the Court largely relies on its reasoning regarding Wiener's claims for negligence and breach of fiduciary duty.  *See supra* Sections II.G and II.H.  At bottom, Wiener asserts that AXA Equitable breached the covenant of good faith and fair dealing because Hungerford's alleged failure to advise Wiener on how to financially manage his policies purposefully and intentionally put Wiener in a position where a single missed payment could—and did—bring about the termination of his policies.  Of course, on a motion for summary judgment, the Court must construe all facts in the light most favorable to the non-moving party and resolve all ambiguities and draw all

reasonable inferences against the movant.  *See Brod*, 653 F.3d at 164.  However, in opposing the instant motion, Wiener cannot simply rely on unsupported assertions or conjecture, but must instead set forth significant, probative evidence on which a reasonable factfinder could decide in his favor.  *See Goenaga*, 51 F.3d at 18; *Senno*, 812 F. Supp. 2d at 467–68.  That Wiener, who started a financial firm and consistently relied on that firm to manage his policies, did not realize that his failure to pay his premiums could lead to termination of the policies—despite the plain language of the policies and notices stating that his policies could terminate under those circumstances, and his history of payments following lapses—strains all credulity.  *See Goenaga*, 51 F.3d at 18; *Senno*, 812 F. Supp. 2d at 467–68.  Because no reasonable factfinder could conclude that Wiener breached the covenant of good faith and fair dealing based on the third allegation, such a claim fails as a matter of law.

Finally, regarding the fourth allegation—that AXA Equitable denied Wiener's reinstatement application not because of his unsatisfactory evidence of medical insurability but instead because it sought to avoid paying significant death benefits—the Court concludes that there is no evidence in the record to support the claim.  As noted in the Court's analysis regarding Wiener's claim for equitable reinstatement, the record contains evidence that Wiener was not insurable—namely, his serum albumin levels— and no reasonable factfinder could conclude that AXA Equitable arbitrarily and capriciously denied reinstatement.  *See supra* Section II.J; *see also Wiener*, 2019 WL 1228074, at *6.  Accordingly, no reasonable factfinder could conclude that Wiener breached the covenant of good faith and fair dealing based on this allegation.  *See Dalton*, 663 N.E.2d at 291–92.

The Court therefore grants summary judgment to AXA Equitable on this issue.

### L. Declaratory Judgment and Injunctive Relief (Count I)

Wiener separately brings a claim for declaratory relief that his policies remain in force and injunctive relief in the form of reinstating those policies.  In support of this

claim, Wiener relies on the same allegations underlying his other claims. Because there is no evidence to support those other claims, the Court likewise grants summary judgment to AXA Equitable as to this claim.

## III.    CONCLUSION

For the foregoing reasons, AXA Defendants' and Hungerford's motions for summary judgment are GRANTED, and Wiener's cross-motion for partial summary judgment is DENIED. The Clerk of Court is respectfully directed to terminate the motions, Docs. 186, 194, and 202, and close the case.

It is SO ORDERED.

Dated:    March 31, 2021
          New York, New York

_____

EDGARDO RAMOS, U.S.D.J.